UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ENHANCED US LLC, | Case No. 25 Civ. 7096 |
| *Plaintiff*, | |
| v. | **COMPLAINT JURY** |
| | **DEMAND** |
| WORLD AQUATICS f/k/a FÉDÉRATION INTERNATIONALE DE NATATION; USA SWIMMING INC.; and WORLD ANTI-DOPING AGENCY, | |
| *Defendants*. | |

Plaintiff Enhanced US LLC ("Plaintiff" or "Enhanced"), by and through its attorneys, Reed Smith LLP, hereby submits the following Complaint against defendants World Aquatics f/k/a Fédération Internationale de Natation ("World Aquatics"), USA Swimming Inc. ("USA Swimming"), and World Anti-Doping Agency ("WADA") (collectively, the "Defendants") and alleges as follows:

## NATURE OF CASE

1.      Enhanced brings this action to challenge and enjoin the predatory and illegal conduct undertaken by Defendants to (1) conspire to foreclose recent entrant Enhanced from the markets for international elite aquatics competitions and the engagement of athletes for such events by banning anyone who in any way supports, endorses or participates in events and competitions organized by Enhanced, including its planned May 2026 Enhanced Games, from any aquatics competition organized by World Aquatics or its members federations in violation of Sherman Act Section 1; and (2) as to World Aquatics, exercising its monopoly and monopsony power to kill off its only potential competitor, Enhanced, by blocking Enhanced's access to those athletes and other professionals it needs to compete.  If allowed to proceed unchecked, Defendants' conduct will harm not only new competitors such as Enhanced from gaining entry

into this market, but also the athletes who are critically underpaid for the risks and sacrifices they undergo daily in competing under Defendants' regime. Defendants' conspiracy constitutes a clear, *per se* violation of Sherman Act Section 1, and a violation of Section 2 by undisputed monopolist World Aquatics.

2.      Since its founding in 1908 under its former title, the Fédération Internationale de Natation, World Aquatics has held an indisputable monopoly over all aspects of aquatic sports competitions at a global level, including but not limited to exercising monopsony power over the market for the services of elite-level swimmers, their coaches, as well as affiliated medical professionals, physical therapists and other integral support individuals for international elite-swimming events. In doing so, World Aquatics has unreasonably restrained competition in the market for such services and the market for international elite swimming events.

3.      World Aquatics makes no attempt to hide its power over aquatic sports. It boasts that it "is the sole and exclusive world governing body for all Aquatics."

4.      World Aquatics' dominance in the field is also reflected in its financial reports, which reveal financial assets as of December 31, 2023 (its last audited financial statements) of US$191.51 million and projected revenue for the period of 2024-2026 to exceed US$200 million.

5.      World Aquatics claims that its financial resources are derived primarily from the Olympic Games and the World Aquatics-run Championship competitions. To maximize its profits and shield its monopoly and monopsony power from competition, World Aquatics has engaged in various predatory schemes (described below) to suppress competition from actual or potential rivals in the market for international elite swimming events.

6.     World Aquatics' efforts to foreclose competition have been well documented over the years.  Any potential competitors seeking to host aquatic sports competitions at an international level have been forcefully deprived of that opportunity by World Aquatics' use of threats, pressure and prohibitive rulemaking to prevent members of World Aquatics—including not only athletes, but also coaches, sports medical professionals, physical therapists, other critical members of the athletes' teams and even administrative support staff—from participating in, or even voicing support for, competing leagues or events.  World Aquatics further conspires with WADA, USA Swimming, and its other federation member organization to boycott its rivals and reinforce its complete dominance over aquatics competitions.

7.     World Aquatics' prior efforts to snuff out a competitor are well-documented in litigation pending in the United States District Court for the Northern District of California.  In 2018, International Swimming League Ltd. ("ISL") and a class of aquatic athletes brought claims challenging World Aquatics' antitrust violations after World Aquatics coerced its member federations, including USA Swimming, to pull out of and refuse to participate in an international swimming competition planned by newcomer ISL.  World Aquatics threatened athletes with a ban from World Aquatics events, including qualifying meets for the 2020 Olympic Games, if they participated in ISL's competition.  The United States Court of Appeals for the Ninth Circuit held in September 2024 that ISL and the athlete class members had, at a minimum, raised triable issues regarding ISL's *per se* and quick look Sherman Act Section 1 claims (the rule of reason claims were not before the court), including that "a rational trier of fact could conclude that [World Aquatics' restrictive rule-making] had no purpose other than to disadvantage [World

Aquatics'] competitors," and "cut off ISL's access to top-tier professional swimmers, an input necessary for ISL to compete."[1]

8.     Undeterred, World Aquatics has borrowed from the same playbook in targeting Enhanced as the newest threat to its monopoly and monopsony power in the international aquatic competition markets.  That World Aquatics launched *another* transparent, conspiratorial effort to foreclose a competitor from the market *through the same means of a patently illegal boycott* while it is heading towards trial on the resulting antitrust claims in January 2026 resulting from its *other ban* is a testament to World Aquatics' hubris and the degree to which it has largely remained insulated not just from competition but from accountability throughout its long history.

9.     Enhanced seeks to disrupt the athletics industry by embracing scientific and medical technology in sports competitions.  Participating athletes can choose to compete as "non-enhanced" athletes—meaning they do not take enhancements that are on WADA's List of Prohibited Substances and Methods—or as "enhanced" athletes, who choose to use performance enhancing substances ("PESs") and undergo rigorous medical testing.  Enhanced offers enhanced athletes the option to participate in Enhanced's own enhancement program, which is guided by highly-qualified teams with extensive medical and scientific research experience.  All athletes' health and safety, whether non-enhanced or enhanced, are protected at every stage of the process. Enhanced's program includes an extraordinary level of in-depth medical monitoring and follow-up that both protects and promotes athletes' health and safety to a degree that *far* exceeds what almost every athlete receives in the World Aquatics ecosystem.

---

[1] *International Swimming League Ltd. v. World Aquatics*, No. 23-1516 (9th Cir. Sept. 17, 2024), on appeal from N.D.Cal. Case No. 3:18-cv-07394-JSC.  As of the date of this filing, it has recently been reported that World Aquatics has settled the claims filed by a class of swimmers harmed by World Aquatics' illegal boycott (*see* https://www.law360.com/articles/2368885/), and that it is scheduled to go to trial in the case filed by ISL in January 2026.

10.    Enhanced also seeks to fairly compensate athletes for their services and offers generous bonuses, in stark contrast to the treatment of athletes by the leaders of World Aquatics and other International Olympic Committee ("IOC") affiliated sports bodies, who demonstrate utter indifference to the grave financial challenges and perils faced by all but the most elite athletes under their strict control (all while the organizations and executives continue to reap the profits from the athletes' hard work and sacrifices).  Indeed, one Enhanced swimmer observed that he makes more in one month with Enhanced than he sometimes made in an entire year when swimming for World Aquatics.

11.    Enhanced is actively planning and developing its first major competition, scheduled to take place in May 2026 in Las Vegas, Nevada, which will include, in relevant part, several international elite swimming events.

12.    Fearful of the threat that Enhanced poses to World Aquatics' market control, on June 3, 2025, World Aquatics conspired with USA Swimming, its other member federations, and WADA to adopt a patently predatory by-law specifically aimed at preventing the entry of Enhanced into the market for international elite swimming competitions by choking off the necessary supply of swimmers and other professionals it needs to compete.

13.    Under the transparent and hypocritical pretense of "protect[ing] the integrity and the image of Aquatic sports, and the health, safety and well-being of Aquatics Athletes," World Aquatics adopted new By-Law 10, prohibiting both athletes and non-athletes from (1) "actively support[ing] or endors[ing] a sporting event or competition that embraces scientific enhancements . . . ;" (2) "participat[ing] (in any capacity) in any such event or competition; and/or;" (3) "support[ing] (e.g., as a coach, trainer, manager, training partner, doctor or

physiotherapist) any other person in their preparation for and/or participation in any such event or competition" ("By-Law 10").  *See* Exhibit A (By-Law 10.2-.3).

14.    Individuals found to be in violation of By-Law 10 will be subject to a potential lifetime ban on participating in any World Aquatics events or competitions and from being employed or engaged by World Aquatics in any capacity.  Ex. A (By-Law 10.4).  Because of World Aquatics' complete control over international elite swimming competitions, such a lifetime ban would block any banned athlete's pathway to the World Championships and Olympics, effectively ending their careers.

15.    In furtherance of their conspiracy to block competition, WADA and USA Swimming encouraged World Aquatics to take action against Enhanced and, after By-Law 10 was adopted, issued supporting statements to magnify the intended exclusionary effect of the By-Law on Enhanced.

16.    WADA "applauded" World Aquatics' adoption of By-Law 10 and "condemned the Enhanced Games as 'a dangerous and irresponsible concept," while threatening that participating in the Games would constitute a violation of WADA's Anti-Doping Code.

17.    Likewise, USA Swimming issued a statement to its members evidencing its intent to further the mission of World Aquatics' new By-Law 10 and threatening the "livelihood, future career, and reputation within the sport and the Olympic Movement" of any person—whether athlete, coach, official or other support personnel—participating or even supporting, in any way, the Enhanced Games.

18.    USA Swimming further cites to co-conspirator WADA's rules and regulations, as well as WADA's own public statement, in support of its message.

19.    This extortionate language reflects a transparent effort to force World Aquatics' and USA Swimming's constituent members to boycott Enhanced and the Enhanced Games by holding hostage elite swimmers and support personnel under the threat of disqualification from future Olympic events and competitions controlled by World Aquatics.

20.    Defendants' purported "concerns" that Enhanced poses a "threat" to "clean sport," "[f]air competition and athlete safety," are belied by Defendants' notorious reputations for permitting athletes to compete while under the influence of non-medically supervised PESs, and for their sweeping under the rug even widespread and blatant "doping" by athletes.  So egregious is their conduct that World Aquatics and WADA are reportedly the targets of DOJ criminal fraud investigations, and legislation is pending in Congress to force WADA to stop turning a blind eye toward doping, while the U.S. government has suspended payments to WADA because of its gross abrogation of its duties.

21.    In any event, Defendants *could* control doping in their games if they were serious about consistently doing so.  They already have protocols in place to test for—and validly exclude—athletes using PESs while training for or competing in World Aquatics' events. Furthermore, any athletes who participate in the Enhanced Games are required to first retire from the WADA testing pool prior to taking any enhancements—meaning they already are removing themselves from eligibility for competition in World Aquatics' events for the duration of their enhancement program, and therefore not subject to the WADA Code.  Preemptively banning those athletes from ever returning to future events sponsored or sanctioned by World Aquatics, even when no longer using PESs and complying with the WADA Code for return to non-enhanced sport, is purely exclusionary and anticompetitive.

22.     Further revealing the anticompetitive intent of its putative justification, By-Law 10's threat of a lifetime ban applies not only athletes who use enhancements, but also non-enhanced athletes, coaches, medical professionals, and all other support staff who merely participate in or even voice support for Enhanced confirms the real purpose: stifling competition and depriving Enhanced of the opportunity to enter the market.

23.     World Aquatics clearly seeks to kill off Enhanced before it can establish itself in the markets in part because Enhanced is compensating athletes at levels well above what they make in the World Aquatics ecosystem.  In 2024, World Aquatics events provided just $7.1 million in prize money to 319 swimmers *for an entire year of competitions*.  Outside the 20 highest-earning swimmers of 2024, the vast majority of those swimmers received less than annual federal minimum wage earnings from World Aquatics.  In contrast, the 2026 Enhanced Games will have a potential prize purse of $7.5 million *for just a single day of competition*.

24.     Enhanced's competitive success would mean that World Aquatics would need to find ways to innovate, to be held more accountable for its conduct, and to find ways for athletes to earn living wages.  The latter would undermine World Aquatics' current practice of keeping for itself and its leadership the vast revenues it enjoys from its role as the world's elite aquatics monopolist, and forcing most athletes (save those from athletes from China, Russia and other countries who fully subsidize their athletes and a handful of others), to scrape by while lining the coffers of World Aquatics and the pockets of its leadership.

25.     Accordingly, Enhanced seeks to enjoin Defendants from enforcing their illegal boycott and hold them accountable for their unchecked antitrust violations and tortious interference with Enhanced's prospective business relations.

## THE PARTIES

### *Plaintiff Enhanced US LLC*

26.     Enhanced is a Delaware limited liability company with a principal place of business in New York, New York.

27.     Enhanced and its affiliates were founded with the goal of innovating and expanding the horizons of sports through the integration of science and technology to maximize athletic performance.

28.     Specifically, Enhanced strongly believes that science, technology and medicine should not be shunned by athletics.  Rather, when properly administered under medical supervision, PESs can be safely integrated into alternative sports competitions and hold the potential to lead to groundbreaking scientific and medical discoveries that will benefit the general public.

29.     Under the guidance and supervision of an independent commission of the world's leading medical and scientific experts, Enhanced's program operates under strict medical safety protocols and applies rigorous scientific standards to protect the well-being and safety of all participating athletes.

30.     Critically, athletes competing in Enhanced's competitions will be well compensated—far above the pay offered by the current sports-governing entities—through competitive appearance fees, prize money, and additional bonuses based on performance.

31.     Currently, Enhanced offers competitions and programs in swimming, as well as track and weightlifting events.

32.     Enhanced's competitions are open not only to athletes taking PESs, mostly through Enhanced's enhancement program, but also to "non-enhanced" athletes at the top of their sports fields.

33.     Enhanced requires any athletes taking PESs as part of the program to withdraw from WADA's registered testing pool and thus be rendered temporarily ineligible to compete in World Aquatics' and USA Swimming's events, among others.  Enhanced athletes who use PESs and who seek to return to non-enhanced sport after ceasing use of PESs become part of the WADA registered testing pool for six months, as required by the WADA Code, before they participate in WADA sanctioned competition.

34.     Non-enhanced athletes, who will play a critical role in the Enhanced Games, do not take PESs as part of the program and usually choose to remain part of WADA's registered testing pool and remain eligible to compete at any time in other competitions, including those organized by World Aquatics and its members that are subject to the WADA Code.

35.     No participant in Enhanced's competitions is required to take PESs; it is entirely voluntary and at all times subject to medical eligibility.

36.     Non-athletes, including coaches, medical professionals, physical therapists, timekeepers, and other supporting individuals, also play a critical role in Enhanced's program and competitions.

37.     Enhanced's first multi-sport event—the Enhanced Games—is scheduled to take place in May 2026 in Las Vegas, Nevada, with swimming planned as the capstone event. Planning for that event is actively underway and at a critical juncture, as detailed herein.

### *Defendant World Aquatics*

38.     Upon information and belief, World Aquatics is an international, non-governmental, not-for-profit organization headquartered in Lausanne, Switzerland.

39.     World Aquatics controls global development and competitions involving six aquatic sports: (1) swimming; (2) artistic swimming; (3) open water swimming; (4) diving; (5) high diving; and (6) water polo.

40.     World Aquatics is recognized by and works closely with the IOC as its aquatics arm and effectively serves as a gatekeeper to aquatic athletes seeking to compete in the Olympic Games.

41.     Specifically, the IOC—which has exclusive control over the Olympic Games—operates through two branches: (1) approximately 200 National Olympic Committees, representing participating nations; and (2) more than 40 International Sports Federations, which represent each of the sporting events held during the Olympic Games.  World Aquatics falls in the latter category.

42.     As one of the IOC's recognized International Sports Federations, World Aquatics purports to (1) supervise the development of its member aquatic athletes at all levels; (2) govern aquatic sports at the world-level; and (3) be responsible for the sports' promotion and development.

43.     World Aquatics, in turn, operates throughout the world via its Continental and National Member Federations.  Upon information and belief, World Aquatics has five Continental entities and 209 National Member Federations.

44.    In the United States, World Aquatics is represented through its continental entity, PanAm Aquatics, Inc., and five National Member Federations, including Defendant USA Swimming.

45.    World Aquatics is actively involved in planning the 2028 Los Angeles Summer Olympics and hosts multiple World Championship events throughout the United States.

### Defendant USA Swimming

46.    Upon information and belief, USA Swimming Inc. is a not-for-profit corporation organized under the laws of the State of Colorado, with a principal place of business in Colorado.

47.    USA Swimming is a National Federation Member of World Aquatics and acts as World Aquatics' affiliate and/or agent in the United States.

48.    USA Swimming holds itself out as the national governing body for amateur swimming in the United States and claims it is responsible for the conduct and administration of amateur swimming in the United States.

49.    USA Swimming selects and trains teams for international competitions, including the Olympic Games.

50.    In addition to governing the U.S. National Swim Team and U.S. National Jr. Swim Team, USA Swimming also governs approximately 2,700 club teams, and collectively has more than 380,000 individual members—including, upon information and belief, a significant number of individuals in New York.

### Defendant World Anti-Doping Agency

51.    WADA is a private, not-for-profit foundation headquartered in Montreal, Canada.

52.    Established in 1999, WADA purports to "lead a collaborative worldwide movement for doping-free sport" through developing international rules and policies and monitoring compliance with the World Anti-Doping Program, among other activities.

53.    Although claiming that it "observe[s] the highest ethical standards and avoid[s] improper influences or conflicts of interest that would undermine [its] independent and unbiased judgement," WADA's corruption, selective enforcement of its own rules, and preferential treatment to certain member nations are widely known.

54.    Currently, WADA and World Aquatics are reportedly the subject of criminal fraud investigations by the United States Department of Justice ("DOJ"), and were recently the subject of investigations by both the U.S. House of Representatives and Senate arising from WADA's failure to investigate or recommend punishment for 23 Chinese swimmers who tested positive for banned substances in the 2021 Olympic Games—three of whom were awarded gold medals—among other recent examples of WADA's failures.  Congress also focused on WADA's tolerance for the repeated, widespread state-sponsored doping throughout Russian Olympic teams.  Following a hearing on June 17, 2025 into WADA's cover-up of the notorious Chinese swim team Olympics doping scandal in 2021, on June 24, 2025, the Senate Commerce Committee reported out a bill entitled *Restoring Confidence in the World Anti-Doping Agency.*

55.    In announcing a Senate hearing on WADA, U.S. Senator Marsha Blackburn accurately characterized WADA as a blatantly corrupt bully that acts like it is above the law and beyond the reach of the U.S. government, noting that "when the federal government investigated WADA's inaction, they tried to strongarm the United States and threaten our hosting of the Salt Lake City Games."

## JURISDICTION

56.     This Court has subject matter jurisdiction over this case under Section 4 of the

Sherman Act (15 U.S.C. § 4), as well as pursuant to 28 U.S.C. §§ 1331, 1337 and 1367.

57.     This Court has personal jurisdiction over World Aquatics, USA Swimming and

WADA pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22).

58.     World Aquatics has substantial contacts with and regularly transacts business

throughout the United States, including through USA Swimming as its agent and on its own

behalf.  World Aquatics' regular activities directed to the United States include, but are not

limited to, (1) organizing and holding championship aquatic competitions in multiple U.S. states;

and (2) regulating U.S. citizens who are subject to World Aquatics' rules and procedures,

including, upon information and belief, a significant number of New York State residents.

59.     For example, in 2025, World Aquatics has hosted and/or will host three major—

and very lucrative—events in the United States: (1) the 2025 American Cup diving competition

on June 12-15, 2025 in Morgantown, West Virginia; and (2) two stages of the World Aquatics

Swimming World Cup 2025 in Carmel, Indiana and Westmont, Illinois on October 10-12 and

17-19, 2025, respectively.  Likewise, in 2024, World Aquatics held the 2024 American Cup

diving competition in Indianapolis, Indiana.

60.     World Aquatics also is actively involved in planning the 2028 Summer Olympic

Games in Los Angeles, California.

61.     Upon information and belief, World Aquatics' treasurer, Dale Neuburger, is a

U.S. resident and lives in Indianapolis, Indiana.

62.     World Aquatics further demonstrated its extensive contacts in the United States

and New York through the implementation and enforcement of rules and regulations directed to

its U.S.-based National Federation Members—including USA Swimming—and U.S.- and New York-based individuals, such as athletes, coaches, medical professionals and other support personnel for World Aquatics events.

63.     Most recently, this includes the promulgation of By-Law 10, which seeks to control the conduct of U.S.-based individuals, among others, and threatens to ban them from future competitions—such as those taking place in the United States—for associating, in any way, with Enhanced and/or participating in Enhanced's 2026 Games, which will take place exclusively in the United States in Las Vegas, Nevada.

64.     World Aquatics further directed its actions to the United States by seeking to stifle competition and prevent Enhanced—a U.S. entity with its principal place of business in New York, New York—from entering the market for international aquatics competitions and encouraging a boycott against participating in the Enhanced Games.

65.     USA Swimming is a U.S.-based entity that likewise has extensive and pervasive contacts throughout the United States, including New York.  Upon information and belief, USA Swimming's membership includes a significant number of individuals—athletes, coaches and support personnel—who reside in New York, and USA Swimming transacts business in New York through sponsorships, vendor agreements, and other commercial means.  Accordingly, USA Swimming's conduct, including its issuance of written threats to members and enforcing a boycott of Enhanced, is directed to New York.

66.     WADA likewise directs significant activities toward the United States in general, and New York in particular, through its issuance of rules and regulations that govern U.S. athletes and affiliated individuals.  WADA has issued several public statements directed to U.S. athletes, coaches, medical professionals and support staff, as well as Enhanced's prospective

business partners—including venues, sponsors, potential funders—seeking to harm Enhanced's business and enforce the boycott against Enhanced and the Enhanced Games in the United States.  WADA further threatened to weaponize its U.S. affiliate, United States Anti-Doping Agency ("USADA") to carry out WADA's anticompetitive scheme in the United States, and publicly urged U.S. authorities to take civil and/or criminal action against Enhanced to prevent the Enhanced Games from taking place.

67.    WADA's pervasive conduct directed to the United States likewise is demonstrated by the ongoing criminal investigation by the DOJ and Congress concerning WADA's misconduct that has harmed U.S. athletes.

68.    All Defendants further directed conduct towards the United States by issuing a series of public statements and correspondence targeting Enhanced and the athletes and non-athletes participating and/or considering participating in the U.S.-based Enhanced Games, and threatening retaliation—including criminal charges—as well as professional and reputational harm against individuals in the United States in furtherance of their anticompetitive scheme.

69.    Venue is proper under 28 U.S.C. §§ 1391(b)(2) and (3) because Plaintiff Enhanced has its principal place of business in New York, New York, and the substantial part of Defendants' conduct will cause harm to Enhanced in New York.  Venue also is proper pursuant to 28 U.S.C. § 1391(c)(3) because World Aquatics and WADA are foreign entities, and may be sued in any district court in the United States.

## FACTS RELEVANT TO ENHANCED'S CLAIMS

I.     **THE ENHANCED GAMES POSE A THREAT TO DEFENDANTS' DOMINANCE OVER ELITE SWIMMING COMPETITIONS AND THE LABOR NEEDED FOR SAME**

     A.     **Enhanced Seeks to Enter the Market for International Elite Swimming Competitions**

70.     One of Enhanced's founding goals is to disrupt the international athletics competition industry, which for too long has been held captive by a small number of notoriously corrupt, sclerotic, self-serving organizations and their leaders who for decades have faced virtually no competition and almost no meaningful accountability.

71.     Enhanced seeks to destigmatize the use of medical and scientific enhancements in sports, and instead to embrace these breakthroughs and explore the potential for athletic achievements.  To be clear, Enhanced is not seeking to promote the use of enhancements in any other sports leagues or properties in which the use of such innovation is banned, such as WADA-sanctioned competitions and events.

72.     Enhanced already has supported aquatic athletes in their goals of breaking world records.  On Feb 25, 2025, Kristian Gvolomeev, an elite swimmer and former Olympic athlete, beat the world record in a 50-meter freestyle time trial by 0.02 seconds.  Enhanced awarded Gvolomeev a prize of $1 million for his record-breaking performance—a preview of the substantial bonus money available to Enhanced athletes who break world records as part of the program.

73.     Enhanced's keystone event will be the Enhanced Games, the first iteration of which is scheduled to take place in Las Vegas, Nevada in May 2026.

74.     The Enhanced Games will include three core events: swimming (50m and 100m freestyle, 50m and 100m butterfly); track (100m Sprint, 100m/110m hurdles); and weightlifting

(snatch, clean & jerk).  Future games will seek to expand beyond these events to include other aquatic and non-aquatic sports.

75.     For the inaugural Enhanced Games, Enhanced aims to involve 20-30 elite swimmers, consisting of an equal number of male and female swimmers.  Enhanced will need at least this number of athletes to hold successful games.  This will include both enhanced and non-enhanced swimmers.

76.     The planned competition between and among the two groups of swimmers—enhanced and non-enhanced—is intended and expected to generate substantial media and fan interest, and is a critical element of the planned May 2026 Games.  This can only take place, of course, if Enhanced is able to recruit both enhanced and non-enhanced swimmers.

77.     By-Law 10 would prevent elite athletes who are at peak performance and may have ambitions to compete in future Olympics from participating in the Enhanced Games.  Non-enhanced athletes in the Enhanced Games will remain in the WADA registered testing pool and therefore remain eligible—but for By-Law 10—to compete in championship events.  Likewise, although enhanced athletes are required to withdraw from WADA's registered testing pool in order to participate in the Enhanced Games and in any enhancement program, they can choose to return to WADA-governed events in the future in compliance with the WADA Code following completion of the program, and, if they wish, to compete for a place on an Olympic team.

78.     Enhanced's inability to recruit some of the most elite members of the swimming world as a result of the threatened ban by World Aquatics will mean less interest in the games, less publicity, less revenue, less good-will generated from the event, and less of the momentum it needs to succeed.

79.    By-Law 10 has also a chilling effect on recruiting for the non-aquatic events at the Enhanced Games.  Participants in the planned weightlifting and track events—who are similarly elite athletes at the top of their respective fields—have raised concerns that By-Law 10, if allowed to stand, will be adopted in form and substance by other international sports bodies.

80.    In addition to athletes, Enhanced anticipates involving at least 20 officials to administer the aquatics competition and 50-75 volunteers.  These individuals—in addition to support personnel, such as coaches, trainers, and medical professionals—are likewise critical to the Enhanced Games and also risk being banned as a result of World Aquatics' By-Law 10.

81.    The Enhanced Games are intended to rival the elite international swimming competitions held by World Aquatics and its various federations (and for other sports, as well). They will compete with World Aquatics and its federations for swimmers, coaches and other professionals, and for fans and viewers and the revenue that comes with them.

82.    Enhanced seeks to hold the Enhanced Games on an annual basis, in addition to Enhanced's standalone, single-sport events that may be held throughout the year in the future, following the inaugural Enhanced Games.

83.    Defendants' accusations that Enhanced seeks to encourage, permit, or facilitate athletes who are actively seeking qualification for the Olympic Games to use PESs is utterly false.  In fact, the opposite is true: anyone who agrees to participate in the Enhanced Games as an enhanced athlete must withdraw from WADA's registered testing pool—meaning they will not be eligible to compete in World Aquatics' and USA Swimming's competitions—and are subject to all applicable testing requirements under the WADA Code if they elect to return to regular competitions in the future.

84.     Moreover, the enhanced athletes participating in the Enhanced Games are far outnumbered by the individuals and entities involved in the Games who are not taking, or in any way involved in the administration of, any enhancements, and who are swept within the scope of the boycott.  These include non-enhanced athletes—those who do not take PESs—as well as support personnel, such as coaches, doctors, physical therapists, timekeepers, referees, etc., and commercial partners and sponsors.

85.     All athletes who participate in the 2026 Enhanced Games will be compensated on an individual basis.  For example, each swimming event will each carry a total prize purse of $500,000, with $250,000 awarded to first place.  Additionally, Enhanced may pay appearance fees to participating athletes and will offer significant bonuses for record-setting performances, including life-changing prize purses of up to $1 million for breaking world records in the 100-meter sprint and 50-meter freestyle.

**B.    Defendants' Coordinated Control Over Athletes and Support Personnel**

86.     By gatekeeping access to the Olympic Games and other elite competitions, World Aquatics—individually and through its agent USA Swimming, other member federations, and in conspiracy with WADA—has been able to control not only aspiring Olympic athletes, but also every individual and entity that provides support services to those athletes, including coaches, medical professionals, physical therapists, and even timekeepers and referees, among others.

87.     Defendants' interrelated rules, regulations and codes are draconian in nature and are closely coordinated among the entities to protect the existing monopoly they hold.  WADA relies on World Aquatics and its federation members to enforce its rules, and World Aquatics and its federation members rely on WADA and the national anti-doping bodies for testing and other services.

88.     This dense matrix of rules governs not only athletes' physical and medical requirements, but also auxiliary matters such as equipment specifications, training venues, coaching credentials, travel schedules, media appearances, and marketing rights.

89.     Failure to strictly abide by these often arbitrary and capricious rules can doom an athletes' career and/or preclude support personnel from working in competitive athletics.

90.     World Aquatics is governed primarily by the World Aquatics Constitution and a series of ten (10) by-laws—including By-Law 10 at issue herein—that apply to its members.

91.     World Aquatics also has promulgated a set of Doping Control Rules, which mirror the WADA Code.

92.     Although USA Swimming has issued an independent set of rules for member athletes—known as the USA Swimming Corporate By-Laws—as a National Federation Member of World Aquatics, it remains bound by the World Aquatics Constitution and its by-laws—meaning, in turn, each of USA Swimming's individual athletes and members are equally bound by World Aquatics' policies.

93.     Specifically, World Aquatics' rules require National Federation Members, including USA Swimming, to acknowledge in its national rules that World Aquatics is the only recognized body in the world that may govern international aquatics.  World Aquatics' Constitution further prohibits National Federation Members from promulgating rules that conflict with World Aquatics' own rules.  Going a step further, World Aquatics' rules grant it the power to dictate the contents of National Federation Members' own rules.

94.     World Aquatics' constitution also requires all of its members follow all of WADAs rules and regulations, including its By-Laws.

95.    WADA's rules are memorialized in the World Anti-Doping Code ("WADA Code"), which is intended to apply across all sports and at the international and national levels.

96.    WADA is empowered to determine if violations of the WADA Code have occurred, and to entertain appeals of such findings, but enforcement is delegated to the individual Nation and Sport Federations who must opt in to abide by WADA's rules.  WADA itself has no enforcement mechanism and cannot take any action against individual athletes.

97.    The WADA Code sets a universal set of rules regarding, among other issues, (1) the definition of what qualifies as "doping," including an extensive list of banned substances; (2) testing and investigation procedures, including how samples should be collected and analyzed; (3) penalties and sanctions in the event of a doping violation; and (4) procedures for appealing decisions.

98.    Elite swimmers who are subject to the WADA Code—meaning those who are actively participating or seeking to participate in World Aquatics and USA Swimming events and/or competitions—usually become part of WADA's registered testing pool.  In some countries, including the United States, those swimmers can be subject to random and surprise blood and urine testing at any time and any place, requiring those athletes to sacrifice their privacy and constantly provide their whereabouts to WADA.  Notably, however, WADA has no legal control over those who have "retired" from the WADA registered testing pool or are otherwise uninvolved in WADA-governed competitions.

99.    As relevant here, the WADA Code extends its reach to non-athletes, by seeking to regulate the conduct of those who "assist[], encourage[], aid[], abet[], conspir[e], [or] cover[] up" for any athlete who is found to be complicit in an anti-doping rule violation.  The Code further

prohibits association with individuals serving periods of ineligibility for having been found guilty of conduct equivalent to an anti-doping rule violation.

### C.     Defendants Regularly Ignore Their Own Rules, to the Detriment of Athletes and Competitors

100.     Despite purporting to act in the best interests of athletes worldwide and promote "clean sport," Defendants' selective enforcement of their own rules, as well as their regular flouting of commonly-accepted ethical norms (such as not engaging in fraud and corruption) are open secrets in the international sports community.

101.     Contrary to WADA's self-proclaimed statistics, which suggest that an average of only 1-2% of athletic blood and urine samples test positive for PESs, an anonymized random survey of elite athletes competing in two events overseen by WADA revealed that PES use rates were actually as high as 57.1%. That number rose to 70.1% when factoring in the use of supplements with performance-enhancing effects in the prior year.[2]

102.     The gross disparity in numbers is due, in part, to WADA's unreliable testing protocols, which rely on biological testing methods that are susceptible to false negative results. To avoid detection, competitive athletes who are self-administering PESs, often without medical supervision and with great risk to health, often take masking substances that can skew test results and allow them to avoid detection.

103.     These issues are further compounded by unreliable enforcement of WADA's Code by individual sport and national federations due to socio-geographical factors (e.g., language barriers, cultural differences in drug regulation), political factors (e.g., conflicts with

---

[2] Rolf Ulrich, et al., "Doping in Two Elite Athletics Competitions Assess by Randomized-Response Surveys," Sports Medicine (Aug. 28, 2017) (https://link.springer.com/article/10.1007/s40279-017-0765-4).

other political objectives), organizational issues (e.g., national anti-doping organizations' lack of independence), and human resource constraints (e.g., staff turnover, lack of expertise).[3]

104.    In addition to flawed testing protocols, Defendants' hypocrisy is demonstrated in part through their permissive grant of exemptions from its rules and frequent decisions to ignore blatant doping incidents.

105.    Athletes also commonly cheat by taking advantage of the "therapeutic use exemption" ("TUE") which allows athletes who are competing to use otherwise banned substances based on purported "medical need."  This form of cheating is subject to little scrutiny, resulting in frequent abuse—and overuse—of the exemption.

106.    WADA also has been widely criticized—including by the U.S. Anti-Doping Agency, the U.S. Department of Justice and Congress—for its preferential treatment of certain National Federal members and decisions to ignore clear doping violations.  This includes widely reported efforts of WADA to cover-up blatant and rampant state-sponsored doping through Russian Olympic teams competing in multiple games over the last twenty years.

107.    Most recently, in 2021, 23 Chinese swimmers who were competing in the Tokyo Olympics tested positive for a banned substance, trimetazidine ("TMZ").  The Chinese Anti-Doping Agency—which was responsible for administering the tests—delayed reporting those results, later claimed that the swimmers' results were due to inadvertent exposure through food contamination, and elected not to impose penalties against its swimmers.  When WADA sought to conduct site visits to investigate, it was precluded from doing so.  Despite this, WADA "ultimately concluded that it was not in a position to disprove the possibility that contamination

---

[3] Daniel Read, et al., "The challenges of harmonising anti-doping policy implementation," Sports Management Review, Vol. 27, Issue 3 (Dec. 11, 2023) (https://www.tandfonline.com/doi/full/10.1080/14413523.2023.2288713)

was the source of TMZ" and allowed the swimmers to compete. Several of the athletes who tested positive went on to win medals at the Tokyo Olympics, including three gold medals.

108.    Significant backlash against WADA and World Aquatics followed, and the flames of harsh criticism were fanned upon discovery that WADA had received $2 million in excess funds from the Chinese government in 2021.[4]

109.    Following pressure from the U.S. House Select Committee on the CCP, the U.S. Department of Justice launched a criminal investigation into the scandal-ridden WADA's conduct and failure to act. The DOJ is also reportedly also investigating World Aquatics' role in the suspected fraudulent cover-up and other conduct.

110.    The U.S. subsequently withheld funding from WADA in 2024 and 2025, and the U.S. Senate introduced a bill called the "Restoring Confidence in the World Anti-Doping Agency Act of 2025," which, if passed, will permit the United States to continue withhold funds from WADA until it remedies its pervasive issues. That bill was voted out of the Senate Commerce Committee on June 25, 2025.

111.    WADA's public response to the bill's announcement was classic WADA: a claim that they have everything under control and that the problems, if any, are being handled, coupled with a malicious claim that the *real problem* is Enhanced.[5]

112.    In a recent announcement regarding the Senate Commerce Committee's investigation, Chair Blackburn accurately characterized WADA's duplicity and arrogance, as well as its reliance on World Aquatics and USA Swimming for enforcing – or not enforcing – its

---

[4] The Select Committee on the CCP "Moolenaar: 'World Anti-Doping Agency Has Lost the Trust of the US'" Jan. 9, 2025 (https://selectcommitteeontheccp.house.gov/media/press-releases/moolenaar-world-anti-doping-agency-has-lost-trust-us).
[5] WADA, "WADA statement on U.S. Senate Commerce Committee bill," (June 26, 2025) (https://www.wada-ama.org/en/news/wada-statement-us-senate-commerce-committee-bill).

own rules and policies: *"[WADA] has allowed Communist China and Russia to lie, cheat, and steal, putting American athletes at risk. When Congress used its oversight authority to investigate WADA's blatant corruption, they acted like they were above the law."*[6]

## II.     WORLD AQUATICS' CONSPIRACY WITH WADA AND USA SWIMMING

113.    On May 21, 2025, Enhanced announced its intention to launch the first Enhanced Games, to take place in May, 2026 in Las Vegas. In response, Defendants conspired to block those Games from taking place and to prevent Enhanced from gaining a foothold in the relevant markets.

### A.     WADA's May 22, 2025 Statement

114.    On May 22, 2025, the day after Enhanced's announcement, WADA issued a scathing press release against the Enhanced Games: "WADA condemns the Enhanced Games as a dangerous and irresponsible concept," and "invite[s] all our clean sport partners, including athletes, to join us in condemning this event regardless of its wealthy and influential supporters."[7]

115.    The statement goes on to "warn[] athletes and support personnel" that they risk violating the WADA Code, as well as permanent harm to their reputations, by participating in or supporting the Enhanced Games—a claim that ignores the facts that (1) enhanced athletes will be retired from the WADA testing pool or registered testing pool, and therefore not under its control; (2) non-enhanced athletes who do not take PESs also will be participating; and (3) no participating athletes or support personnel are currently under an active ban, among many other factors that render the statement false and misleading.

---

[6] U.S. Senate Committee on Commerce, Science, & Transportation "WADA Shame: Swimming in Denial Over Chinese Doping," (June 17, 2025) (https://www.commerce.senate.gov/2025/5/wada-shame-swimming-in-denial-over-chinese-doping_2_2_2).
[7] WADA, *WADA Condemns Enhanced Games as Dangerous and Irresponsible*, (May 22, 2025), (https://www.wada-ama.org/en/news/wada-condemns-enhanced-games-dangerous-and-irresponsible).

116.    WADA, itself already the subject of a DOJ criminal fraud investigation and plainly trying to shift public focus to Enhanced, also called "on all governments and law enforcement agencies to assess whether athletes who admit to taking performance-enhancing drugs—or the physicians who supply or administer those substances—may be in breach of criminal laws or professional rules, whether in their own countries or wherever the event takes place."

117.    Recognizing the illegal and anticompetitive nature of WADA's threats to shut down the Enhanced Games and encourage criminal charges against those involved, USADA sought to distance itself from its global counterpart and issued a response noting that "[WADA CEO] Banka's indignation equals his misinformation or ignorance about how free democratic societies and markets work."

**B.    The USA Swimming Statement**

118.    On May 23, 2025, USA Swimming issued its own statement to its National Team athletes, coaches, and support staff echoing WADA's threats of harm not only to the reputations and livelihoods of athletes who compete in the Enhanced Games, but also to any individual—be they support personnel, family members or friends of athletes—expressing interest or support for the Enhanced Games.

119.    USA Swimming claimed to be "reaching out to express [its] serious concerns" regarding the Enhanced Games, while acknowledging that "participating in the Enhanced Games is not currently a rule violation."

120.    USA Swimming cites to WADA's May 22, 2025 statement and warns its members that even athletes and non-athletes who "are not personally engaged in doping" may still violate the WADA Code through "association with certain individuals serving period of ineligibility for anti-doping violations."  USA Swimming also issued a direct threat to anyone

involved in the Enhanced Games: "If you are considering participating in the Enhanced Games in any capacity, whether as a coach, athlete, official, or other support personnel, or even in a governance or business capacity, we urge you to carefully consider the serious impact an anti-doping violation from USADA or WADA could have on your livelihood, future career, and reputation within the sport and the Olympic Movement."

121.    Beyond these threats, USA Swimming also asked its National Team athletes, coaches, and support staff to report on any recruiting activity or other contacts with Enhanced representatives: "We also want to inform you that the Enhanced Games is actively recruiting athletes.  If you are contacted by a representative of the Enhanced Games, please feel free to notify Michelle Steinfeld at USA Swimming."  Upon information and belief, Michelle Steinfeld is the General Counsel of USA Swimming.

122.    Finally, USA Swimming sought to control its National Team members' public reactions to the Enhanced Games by offering "to assist with redirecting media requests to USA Swimming and/or providing accurate information if you choose to provide a comment . . . if you are contacted by a member of the media regarding the Enhanced Games."

**C.    USA Swimming's Sham Investigation into Enhanced Games' Head Swim Coach Brett Hawke**

123.    On May 27, 2025, USA Swimming's Associate General Counsel, Derek Paul, sent a letter to Mr. Brett Hawke, a retired world champion swimmer, stating that USA Swimming was opening an investigation into Mr. Hawke's purported potential rule violations based on his role as Enhanced's Head Swim Coach.

124.    Mr. Hawke voluntarily sat for an interview with USA Swimming's counsel and was interrogated about his role with Enhanced, Enhanced's operations, and the identities of any

swimmers who were in the "active recruitment pipeline" for the Enhanced Games at the time.  A representative of USADA was also present and participated in the interview.

125.    USA Swimming's true purpose in sending the warning letter and opening a purported investigation into Mr. Hawke was clear: to intimidate those who sought to work with Enhanced and to identify additional targets for harassment.

### D.    World Aquatics Adopts By-Law 10

126.    On June 3, 2025, World Aquatics promulgated a new by-law specifically targeting any athletes or other individuals contemplating participating in or supporting the Enhanced Games and threatening them with a potential lifetime ban.  The ban reflects an agreement among the Defendants and the other World Aquatics member federations to boycott Enhanced by shutting off the supply of athletes and others who it needs to hold successful Games next year and, thereby, kill off their only competitor.

127.    By-Law 10 threatens anyone who has any relationship with Enhanced or who even supports Enhanced in any way with a lifetime ban from all World Aquatics organized or sponsored competitions and events including, but not limited to, the Olympics.

128.    In particular, By-Law 10 targets anyone who has (1) *actively supported or endorsed* a sporting event or competition that embraces scientific enhancements that include the use of Prohibited Substances or Prohibited Methods (as those terms are defined in the Doping Control Rules) and/or the use of any illegal drug; and/or (2) *participated (in any capacity)* in any such event or competition; and/or (3) *supported (e.g., as a coach, trainer, manager, training partner, doctor, or physiotherapist)* any other person.  *See* Ex. A.

129.    Notably, the By-Law *only applies to individuals who are not at the time subject to World Aquatics* "Rules and Regulations"—meaning it is intended to police the conduct of athletes and others over whom it and WADA have no legal control, and with whom they have no

relationship. In other words, By-Law 10 is intended to extend the long-arm of World Aquatics autocratic control beyond its monopolistic walls and legal limits to block those who have every right to join Enhanced from doing so through the draconian threat of being banned for life from any other aquatics events, including the Olympics.

130.    Those found in violation of By-Law 10 shall be deemed ineligible "to be accredited for and/or to participate (in any capacity) in a World Aquatics event or competition; to be employed or engaged by World Aquatics; to be elected or appointed to any World Aquatics committee or other body; or to participate in any other activity organised by World Aquatics."

131.    Unlike actual violations under the Doping Control Rules—which typically carry a penalty of an ineligibility period ranging from one month to four years and reserve lifetime bans only for the most egregious, intentional and aggravated conduct—By-Law 10 does not place any time restrictions on the period of ineligibility. As was World Aquatics' intent, By-Law 10 has been widely understood as providing for a lifetime ban of anyone who in any way supports Enhanced: a threat that would deter anyone with a desire to return to the World Aquatics/WADA ecosystem after involvement with the Enhanced Games to cease working with Enhanced out of fear of retribution.

132.    Seemingly recognizing that it was opening itself up to a legal challenge, World Aquatics narrowly restricts an impacted individual's ability to challenge any findings of ineligibility thereunder, and purports to preclude others from challenging the legitimacy of By-Law 10 itself: "[N]o one else shall have standing to challenge in any forum, or to appeal against, either this By-law or any decision made by the Bureau pursuant to this By-law." Ex. A. That World Aquatics attempts, by fiat, to deprive anyone, including an injured party, government or

court from challenging By-Law 10 speaks not just to its hubris but its decades-long insulation from accountability.

133.    Although By-Law 10 does not refer to Enhanced by name, World Aquatics has made abundantly clear that it is targeting Enhanced and seeks to exclude it from the market.

134.    World Aquatics chief executive, Brent Nowicki, has been vocal in his hatred for Enhanced and the Enhanced Games, describing the Enhanced Games as "a farce" and "a joke." He further threatened athletes and support personnel with lifetime bans even before By-Law 10 was promulgated:  "[I]f you are going to partake in that activity, you shouldn't be involved in any sport ever again. You cross that bridge, you don't come back."

135.    Notably, however, World Aquatics almost *never* issues lifetime bans to its own athletes who are found to have violated its anti-doping rules or the WADA Code.  Moreover, the fact that Nowicki was subpoenaed by a grand jury to testify about World Aquatics' fraudulent conduct in covering up gross doping abuses in its games is further testament to World Aquatics' hubris and hypocrisy.

**E.    WADA Praises World Aquatics' Adoption of By-Law 10**

136.    Immediately following World Aquatics' adoption of By-Law 10, the anticompetitive conspiracy among Defendants was bolstered through a series of coordinated public statements.

137.    On June 4, 2025, WADA issued a public statement lauding World Aquatics' adoption of By-Law 10: "WADA applauds the initiative shown by World Aquatics to take a firm stand against those who are actively jeopardizing the health of athletes and the integrity of clean sport.  It sends a firm message that World Aquatics will not be deterred, and that those who choose to partake in experimental and dangerous sideshows will no longer be welcome to participate in credible competition."

138.    Moreover, WADA joins in World Aquatics' call to boycott the Enhanced Games: "WADA calls on all its clean sport partners, including athletes, to join us in condemning those who put greed and ego before the well-being of athletes and the values of fair competition."

139.    The WADA statement goes a step further and, in a clear attempt to instill fear in athletes and non-athletes alike, actively threatens all individuals in any way associated with the Enhanced Games by stating: "WADA warns athletes and support personnel who wish to participate in sport regulated by the World Anti-Doping Code that if they were to take part in events which actively promote doping, they would risk committing anti-doping rule violations under the Code."  WADA does not—and cannot—reconcile its broad threat with the fact that enhanced athletes will be withdrawn from the WADA registered testing pool during their participation, and therefore not subject to the WADA Code, or that non-enhanced athletes and support personnel will not be taking any actions in violation of the WADA Code.

140.    Apparently feeling the sting of being criminally investigated by the DOJ and Congress, and not content with joining the conspiracy to block Enhanced from being able to recruit the athletes and others it needs for the 2026 games, WADA went even further by again attempting to induce the U.S. government to turn its sights on Enhanced.  A week after joining the boycott conspiracy, on June 11, 2025, WADA president, Witold Banka, told reporters that WADA "will urge the U.S. authorities to find legal ways to block" the Enhanced Games, and that "it must be stopped."  WADA, unsurprisingly, failed to identify what Enhanced is doing that would warrant the government even investigating it, let alone taking steps to "block" it.

## III.    DEFENDANTS' ANTICOMPETITIVE AND TORTIOUS CONDUCT HAS HARMED ENHANCED, ATHLETES AND COMPETITION

141.    An international elite swimming competition will be the capstone event of the May 2026 Enhanced Games, and is expected to draw the most interest and demand of the three

categories of sports that will be showcased.  It is what Enhanced has been promoting, and is expected to be the driving force behind broadcast deals, advertising, sponsorships and partnerships, and Enhanced expects to raise significant revenues attributable to the swimming events alone.

142.    To maximize public interest in the Enhanced Games, Enhanced is soliciting participation from a targeted group of talented and well-known swimmers. as well as support personnel, of whom there is a small pool of individuals who are qualified and have the requisite experience.

143.    However, Defendants' conduct—including World Aquatics' issuance of By-Law 10 and Defendants' threats against prospective participants in and/or supporters of the Enhanced Games—has crippled Enhanced's recruitment of elite swimmers, coaches, medical professionals, and other support personnel, all of whom are critical to Enhanced carrying out the Enhanced Games.

144.    Following the announcement of By-Law 10 by World Aquatics, and the endorsement of By-Law 10 by WADA and USA Swimming, numerous elite swimmers with whom Enhanced had been in discussions to sign on to the Enhanced Games have now refused to participate, expressly citing World Aquatics' By-Law, Defendants' public statements, and their concerns about the impact on their future Olympic and championship aspirations due to Defendants' threats of ineligibility.

145.    Some athletes expressed fear of even responding to basic inquiries posed by Enhanced's recruitment team.

146.    At least one elite swimmer who had previously expressed interest and excitement about participating in the Enhanced Games went so far as to publicly shame and condemn

Enhanced following issuance of By-Law 10 in order to repair any perceived damage to her relationship with World Aquatics.

147.    Several coaches and trainers with whom Enhanced was in discussions to join the Enhanced Games have privately expressed support for Enhanced and its vision, but declined to participate in the Games or be publicly associated with Enhanced in any capacity.  Once again, Defendants' conspiracy and By-Law 10 were cited as the reasons for their refusal.

148.    Other support personnel, such as timekeepers, consultants and operational staff—whose roles are critical to delivering a safe and effective event—have declined to participate out of fear that it would harm their standing and ability to work with World Aquatics and USA Swimming in the future.

149.    Other prospective participants—athletes and support personnel with whom Enhanced staff had prior professional connections and long histories of working collaboratively together—have ceased all communication with Enhanced since the issuance of Defendants' public statements and By-Law 10.

150.    By-Law 10 also has interfered with Enhanced's ability to recruit athletes and non-athletes for the weightlifting and track events.  Several of the world's top track and weightlifting athletes (or their agents) have told Enhanced that they are not willing to participate in the Enhanced Games out of fear that their respective international governing federations—the equivalents of World Aquatics—will follow suit and adopt language similar to By-Law 10.  Since By-Law 10 was adopted, Enhanced has not been able to successfully recruit *any* track athletes.

151.    Most recently, following highly critical statements about Enhanced by the President of the International Weightlifting Federation ("IWF")—the IOC-affiliated body

overseeing international elite weightlifting and access to the Olympics—two suppliers of weightlifting equipment who had expressed interest in supplying the equipment for Enhanced's May 2026 Games backed out of negotiations, citing direct threats by the IWF as the reason.

152.    One of the core features of the Enhanced Games is the revolutionary nature of offering open and transparent competition between both enhanced and non-enhanced athletes. Unlike the Olympic Games, where use of enhancements by certain athletes is swept under the rug and drug test results—no matter how suspicious—are seldom questioned, Enhanced aims to provide spectators and participants with a clear demonstration of whether (and how) PESs can expand athletic achievements and to what degree. A competition among enhanced athletes alone would not garner nearly as much interest, nor would it engage commercial partners or sponsors at the same level.

153.    The participation of non-enhanced swimmers is expected to drive much of the media and fan interest in the Games, and is therefore extremely important to their success. Enhanced expects that the narrative surrounding the competition between enhanced and non-enhanced athletes will be compelling, and Enhanced intends to feature that element of the Games in its marketing. Defendants' success in blocking Enhanced's ability to recruit non-enhanced swimmers for the Games would significantly impair the success of those Games and damage Enhanced's ability to leverage those games to grow and thrive as a competitor to World Aquatics.

154.    Nor can Enhanced have the kind of success with its Games that it would otherwise have if it is unable to recruit enhanced athletes who want to preserve the option of returning to World Aquatics' competitions.

155.    It is therefore critical to Enhanced's viability to be able to recruit both non-enhanced and enhanced athletes, all of whom are among the best in the world.

156.    Enhanced also requires dozens of behind-the-scenes support personnel to successfully carry out the Enhanced Games, none of whom are participating in the enhancements program.

157.    On the athlete side, enhanced athletes must undergo preliminary medical testing, screening and qualification exams to participate in the formal enhancement program, which begins in November 2025.  Enhanced must enter into contracts with willing athlete participants soon in order to have them ready to participate in the enhancement program in a timely manner.

158.    Likewise, even non-enhanced athletes will need to undergo medical screening and testing in advance to confirm their eligibility to compete.

159.    Moreover, among both non-enhanced and enhanced athletes, Enhanced requires substantial lead time to start advertising and marketing the Games, including compiling and featuring profiles of the participating athletes, designing promotional materials and entering into marketing agreements.

160.    As a start-up, Enhanced's future success will be determined largely by the success of the inaugural 2026 Enhanced Games.  If Enhanced is unable to deliver the full and complete Games—inclusive of non-enhanced athletes competing against enhanced athletes—it will severely damage if not destroy Enhanced's credibility and goodwill with athletes, investors, fans, and the athletics medical and scientific community.

161.    Enhanced has already expended significant monetary resources in connection with constructing dedicated venues, retaining services of support personnel, and launching the comprehensive enhancement medical studies.  Additional down-payments are due soon to ensure

that preparation work continues.  Likewise, funding is required to ensure adequate reserves for the athletes' compensation for participating in the Games.  Enhanced risks being unable to make the substantial deposits with contractors because the pipeline of swimmers and other professionals needed for the swimming events is turned back on in full, it cannot move forward with putting down the very substantial deposits with the contractors so that they can begin work.

162.    Enhanced is also seeking brand partners, sponsors, vendors, and volunteers to help make the Enhanced Games successful.  These efforts are severely compromised by the boycott.

163.    Defendants' continued enforcement of their boycott diminishes Enhanced's short and long-term enterprise value.  It also, therefore, damages Enhanced's ability to raise the additional capital that it needs to fund its ongoing operations, the planned May 2026 Games, and its continued growth, and to do so under terms that it could obtain in the absence of the boycott. This constrains Enhanced's ability to grow and thrive as a viable competitor of World Aquatics.

164.    Indeed, given the inherent challenges of establishing an entirely new sports property, the boycott and Defendants' campaign to crush Enhanced as a potential rival inevitably threatens Enhanced's long-term viability.

165.    It is also inevitable that the boycott will dramatically impact the mix, caliber, and reputation of the athletes Enhanced needs for the Games to succeed at the level needed to establish Enhanced as a viable competitor to World Aquatics.

IV.    **WORLD AQUATICS HOLDS AN UNLAWFUL MONOPOLY AND MONOPSONY**

   A.    **World Aquatics' Unlawful Monopoly Power**

      1.    **The Organization, Promotion and Hosting of International Elite Swimming Competitions Constitutes a Relevant Product Market**

166.    The relevant product market for Enhanced's monopoly claim is the market for the organization, promotion and hosting of international elite swimming competitions.  These events feature world-class, top-tier swimmers, typically from different countries, competing in various events.  At the sub-Olympic level, swimmers competing in these events are typically vying to qualify for another event and/or to "place" at a swimming championship.  Many have set national or world records in one or more events, or are competitive with those who have.  The swimmers typically enjoy reputations within the swimming community and can and do attract fans.  Most enjoy relatively brief careers.

167.    International elite swimming competitions typically include swimmers competing in different events, which vary among swim styles and distances.  The competitions include, but are not limited to, the Olympic Games, the World Aquatics World Cup, the World Aquatics Swimming Championships, and the World Aquatics World Championships.

168.    The competitions are typically broadcast and/or streamed, and tickets are sold to fans who wish to view the competitions in person.  Ticket sales and distribution of the events through broadcast or streaming typically generate revenues for the organizer/promoters, who can also earn revenue from other means of promoting the competitions, such as corporate sponsorships and merchandise sales.

169.    No other sporting or other events (such as baseball, football, cricket, track and field, or ice skating) are reasonably interchangeable with the promotion and hosting of international, elite swimming competitions.  Consumers (fans) who attend or watch such events

do so because of their interest in watching competitions among the best swimmers in the world. They cannot have that experience by attending or viewing any other sporting event.

170.    Nor would swimming fans view swimming competitions among less accomplished swimmers to be reasonable substitutes for international elite swimming competitions because the swimmers would not be nearly as well-known, would not swim nearly as fast, and would not have built reputations comparable to those of the swimmers at international elite competitions.  This would include regional or national-level competitions.  For the same reasons, consumers would not consider NCAA Division 1 competitions or competitions among students outside the U.S. to be reasonable substitutes for international elite swimming competitions.

171.    A hypothetical monopolist for such events could profitably raise ticket prices or other costs to consumers for attending or watching their competitions by 5% because there are no substitutes for such events.

172.    The relevant geographic market for international elite swimming events is global in scope.  These events are those that feature international competition among world-class, top-tier swimmers.  Such athletes come from nations across the globe.  For example, at the 2024 World Aquatics Championship held in Qatar, the men's 100m freestyle event included 108 swimmers from 104 countries, with the top 8 finishers coming from China, Italy, Hungary, Great Britain, the United States, Korea, Serbia, and Aruba.

173.    Given the dispersion of elite swimmers, elite swimming events can be, and in fact are, held in cities throughout the world.  For example, the top 200 times for the men's 100m freestyle, as maintained by World Aquatics, were set at events hosted in 20 different countries.  Swimming competitions of a more limited geographic scope, such as competitions

limited to swimmers of a given country or region, are not a substitute for international elite swimming events because, by definition, they cannot feature international competition among world-class, top-tier swimmers and, therefore, do not command the same degree of athleticism, fan appeal, media attention, and commercial value. In the global market for international elite swimming events, World Aquatics has monopoly power.

**2.    World Aquatics Holds Monopoly Power in the Relevant Product Market**

174.    World Aquatics, individually and in coordination with its national member federations, holds a monopoly over the relevant product market for the organization, promotion and hosting of international elite swimming competitions.

175.    World Aquatics holds itself out as the sole entity authorized to approve, arrange, organize, promote, and host international swimming competitions involving elite swimmers across the globe.  World Aquatics derives significant revenues from these events, including but not limited to ticket sales, sponsorships, advertising rights, broadcast rights, merchandising and/or from exploiting event-related intellectual property rights.

176.    Given World Aquatics' world-wide control over every aspect of elite swimmers' lives and careers, the risk of even minor infractions coerces elite swimmers to capitulate to World Aquatics' rules without question.

177.    In addition to the elite swimmers themselves, the key support personnel at elite swimming competitions consists of a small pool of highly qualified and experienced support personnel, such as coaches—including former elite swimmers—timekeepers, medical professionals who specialize in swimmers' injuries, and others.  These support personnel have specialized knowledge that cannot be replaced or interchanged.

178.    Based on the unique and non-interchangeable nature of elite swimmers and international competitions that feature such swimmers, and by exerting complete control over the participants in these events—from the athletes to the support personnel—and preventing them from providing their services to other entities, World Aquatics has unlawfully acquired and maintained monopoly power over international elite swimming competitions and monopsony power over the elite swimmers.

179.    World Aquatics' anticompetitive conduct—in collusion with USA Swimming and WADA—has resulted in harm to Enhanced in New York, including by issuing threats to U.S.- and N.Y.-based members causing them to withdraw or preventing them from participating in the Enhanced Games.  World Aquatics anticompetitive acts are actual and obvious: by threatening lifetime bans against swimmers and support personnel who participate in, or even show support for, the Enhanced Games, they seek to deprive Enhanced of its ability to enter the market as a new competitor in the field for elite swimming competitions.

180.    It is indisputable that World Aquatics' control over the market for international elite swimming competitions constitutes a monopoly.

181.    As evidenced herein, World Aquatics regularly exercises its control over the relevant market for anticompetitive purposes.  Specifically, it is actively using its dominance and powers to coerce elite swimmers, coaches, medical professionals, timekeepers and other support personnel to refuse to participate in the Enhanced Games—including through the issuance of By-Law 10 and numerous public statements intended to threaten their members.

**B.      World Aquatics Holds an Unlawful Monopsony in the Relevant Labor Market**

**1.      The Services of Elite Swimmers for International, Elite Swimming Competitions Constitute a Relevant Labor Market**

182.    As described above, World Aquatics, individually and in coordination with its national member federations, also holds a monopsony over the relevant labor market for the services of elite swimmers for international, elite swimming competitions.

183.    Elite swimmers are world-class, top-tier swimmers who have achieved international recognition in the sport of swimming, including but not limited to those who have competed on national teams, participated in Olympic Games or World Aquatics-sanctioned events, set national or world records, or competed at the highest collegiate level (such as NCAA Division I), and whose specialized skills, training, and accomplishments distinguish them from non-elite, amateur, or recreational swimmers and make them a critical draw for competitive swimming events, sponsors, and fans.  Most enjoy relatively brief careers.

184.    Elite swimmers must compete against other world-class swimmers at international swimming events to achieve and maintain international recognition in the sport of swimming, and swimmers who fail to do so will not command the same degree of fan appeal, media attention, and commercial value.  Elite swimmers typically enjoy reputations within the swimming community and can (and do) attract fans.

185.    Organizers, promoters, and hosts of international elite swimming competitions, as well as swimming fans, would not view the services of less accomplished swimmers to be reasonable substitutes for the services of elite swimmers because less accomplished swimmers would not be nearly as well-known, would not swim nearly as fast, and would not have built reputations comparable to those of elite swimmers.  They also are less likely to be able to qualify for international elite swimming competitions.

186.    A hypothetical monopsonist in the labor market for the services of elite swimmers for international, elite swimming competitions would have the power to suppress compensation, prize money, or other benefits for elite swimmers substantially below competitive levels for a sustained period of time, because elite swimmers who offer their services for international, elite swimming competitions have no reasonable substitute to which they could plausibly turn in the event of a suppression of compensation, prize money, or other benefits below competitive levels. For example, non-elite or non-international swimming competitions do not offer the level of prize money, athletic competition, public platforms, sponsorship opportunities, ranking opportunities, world record breaking opportunities, or the other attributes of international, elite swimming competitions that would make them viable options for elite swimmers in the event that a hypothetical monopsonist controlled the labor market for the services of elite swimmers for international, elite swimming competitions.  This is demonstrated by the conduct of World Aquatics, which has been able to impose sub-competitive compensation for international, elite swimming competitions without losing a meaningful number of elite swimmers to another type of sport or event.

187.    The relevant geographic market for the services of elite swimmers for international, elite swimming competitions is global in scope.  Such athletes come from nations across the globe.  For example, at the 2024 World Aquatics Championship held in Qatar, the men's 100m freestyle event included 108 swimmers from 104 countries, with the top 8 finishers coming from China, Italy, Hungary, Great Britain, the United States, Korea, Serbia, and Aruba.

### 2.    World Aquatics Holds Monopsony Power in the Relevant Labor Market

188.    By functioning as gatekeepers for the Olympic Games and all other international elite swimming competitions, World Aquatics has a monopoly over the organization, hosting,

and promotion of such events and, thereby, exerts exclusive control over elite swimmers seeking

to qualify and to compete at the highest levels of the sport.  World Aquatics' threats to penalize

swimmers with potential lifetime bans for participating in or voicing support for a

competitor's—namely, Enhanced—event has a chilling effect on the market and prevents

Enhanced from entering and competing.

189.    World Aquatics' rules are complex and reach nearly every aspect of elite

swimmers' lives.  By exerting virtually complete control over them—as well as their coaches,

doctors, and other support personnel—and threatening exclusion from competitions and

qualification from the Olympic Games for something as simple as expressing their personal

opinions in support of a competitor's events, World Aquatics has demonstrated absolute control

over and restricts access to this relevant labor market.

190.    This exclusive control over the labor market constitutes a monopsony.

191.    Upon information and belief, World Aquatics holds a 100-percent share of the

labor market for the services of elite swimmers for international, elite swimming competitions.

World Aquatics uses this complete dominance to the exclusion of competitors, such as

Enhanced.

192.    World Aquatics' monopsony over the relevant labor market has led to depressed

compensation for elite swimmers.  International, elite swimming competitions that are sponsored

or sanctioned by World Aquatics provide bare minimum compensation to elite swimmers,

despite the grueling nature of training and inherent risks of physical injury that they are subjected

to in the course of competing at the elite level, and that is below the level of compensation that a

competitive market would offer for their services.  This compensation generally comes in the

form of stipends and/or prize money.  In the absence of any rival international elite swimming

competitions, elite swimmers have no alternative to turn to, other than, potentially, Enhanced, and World Aquatics has no incentive to sacrifice its own profits to pay swimmers fair compensation or prize money.

193.     World Aquatics' power in this labor market allows it to profitably suppress the compensation and prize money made available to swimmers for their events below the level of compensation that a competitive market would offer for their services.

**COUNT I**
**(Against All Defendants)**

**VIOLATION OF SHERMAN ACT SECTION 1 (15 U.S.C. § 1)**

194.     Enhanced repeats and realleges each of the allegations of paragraphs 1 – 193 above as if fully set forth herein.

195.     Each Defendant—World Aquatics, USA Swimming, and WADA—is a separate economic actor from one another.  World Aquatics is a separate economic actor from its member federations (including but not limited to USA Swimming), who also are separate economic actors from one another.  In addition, World Aquatics' Congress, Bureau, and Executive bodies, and its membership each consist of many separate economic actors, including approximately 209 national member federations competing horizontally and seeking to compete horizontally in the same market, as well as their respective officers and representatives.  Each federation is separately incorporated and does not share profits or losses with one another.  The actions of World Aquatics, its members (including USA Swimming), and its directors, officers, employees, and representatives undertaking the conduct alleged herein constitute action by separate economic actors engaged in concerted action and agreements.

196.     Defendants and others have entered into a continuing contract, combination, or conspiracy in unreasonable restraint of trade with the purpose, intent and effect of restraining

horizontal competition for the organization, promotion, and hosting of international elite swimming events and for the services of elite swimmers for such events, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, in the relevant markets identified in this Complaint.

197.    This contract, combination or conspiracy has resulted in an agreement, understanding, or concerted action between and among Defendants and others under which World Aquatics has adopted a discriminatory and anticompetitive By-Law 10 that blacklists anyone who in any way plays a role in or supports a sporting event or competition that embraces scientific enhancements that include the use of PESs.  The purpose and effect of these agreements is to deprive Enhanced of the supply of athletes and others it needs to compete, and, thereby foreclose it from the relevant markets.  Defendants and their co-conspirators have also engaged in additional anticompetitive conduct in furtherance of their conspiracy as set forth in this Complaint.

198.    This contract, combination or conspiracy has resulted in an agreement, understanding or concerted action between and among Defendants and others that accords competitive and economic advantages to World Aquatics and its national member federations (including USA Swimming) over all other event organizers, promoters and hosts of international elite swimming competitions, such as Enhanced, by virtue of World Aquatics' power to declare ineligible anyone who competes at, supports, or is affiliated with a rival swimming competition that World Aquatics deems to bring aquatics into disrepute.

199.    The actions of Defendants make clear that they had a conscious commitment to a common scheme to foreclose the entry of a new competitor for international elite swimming events and for the services of elite swimmers for such events.  The unlawful contract,

combination or conspiracy is evidenced by the actions and statements of Defendants, as set forth in this Complaint, including:

- WADA's May 22, 2025 press release, issued the day after Enhanced's announcement of its inaugural Enhanced Games, which invited World Aquatics and its national member federations (including USA Swimming) to shut down the Enhanced Games: "WADA condemns the Enhanced Games as a dangerous and irresponsible concept," and "invite[s] all our clean sport partners, including athletes, to join us in condemning this event regardless of its wealthy and influential supporters."

- USA Swimming's May 23, 2025 statement, which mirrored WADA's statements and expanded its threats of harm not only to the reputations and livelihoods of athletes who compete in the Enhanced Games, but also to any individual—be they support personnel, family members or friends of athletes—expressing interest or support for the Enhanced Games.

- Following these coordinated threats and their call to action, World Aquatics promulgated By-Law 10, which specifically targets any athletes or other individuals contemplating participating in or supporting rival swimming competitions, such as Enhanced, by declaring them ineligible to participate in any World Aquatics events or associated activities.

- Pursuant to their illegal alliance, USA Swimming opened an investigation into Mr. Hawke for his work as Head Swim Coach of the Enhanced Games.  In the course of this investigation, USA Swimming and USADA interrogated Mr.

Hawke regarding the identities of any swimmers who were in the "active recruitment pipeline" for the Enhanced Games at the time.

- Defendants also took additional steps in furtherance of their common scheme, including WADA's June 4, 2025 endorsement of World Aquatics' ban on the Enhanced Games and the June 11, 2025 statement by WADA's president that urged the U.S. authorities to find ways to block the Enhanced Games.

200.    Defendants' contract, combination or conspiracy has conferred and maintained World Aquatics' monopoly power by excluding or driving out a potential competitor from the relevant markets, and continues to do so, to the benefit of WADA, World Aquatics, and its national member federations (including USA Swimming).

201.    This is a facially anticompetitive and inherently suspect contract, combination, or conspiracy that is *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  Defendants have conspired to deny other event organizers, promoters and hosts of international elite competitions, including Enhanced, access to athletes, coaches, medical professionals and other critical support staff who are essential for international elite swimming competitions, thereby directly excluding Enhanced and any other rival that World Aquatics deems to embrace scientific enhancements that include the use of PESs from effectively competing with World Aquatics and its national member federations.  The anticompetitive nature of Defendants' contract, combination, or conspiracy is obvious without elaborate industry analysis.  Accordingly, it should be found to be a *per se* violation of Section 1 of the Sherman Act.

202.    Alternatively, Defendants' contract, combination, or conspiracy directly forecloses competition from rivals and is a naked restraint on output of international elite swimming events and competition for the services of elite swimmers, which requires no more

than a cursory examination to establish that its principal or only effect is anticompetitive under the abbreviated Rule of Reason, i.e., the "quick look" test.

203.    This contract, combination, or conspiracy has led to significant anticompetitive effects in the relevant markets, as alleged above, and has caused antitrust injury to consumers and competitors in the relevant markets.  It also has conferred and maintained monopoly status upon World Aquatics in the relevant markets for international elite swimming events and the services of elite swimmers, and has created barriers to effective competition against World Aquatics and its national member federations in these markets.  This contract, combination, or conspiracy has not served any procompetitive purpose, as alleged above, and has instead served to create and preserve the monopoly status of World Aquatics and to economically benefit Defendants, including through the substantial revenues generated by their control over international elite swimming events.

204.    Further, even if this contract, combination, or conspiracy had some plausible procompetitive purpose, reasonably less restrictive means existed to achieve any such purpose, rendering it unlawful.  Other international and national sports organizations have not found it necessary to ban individuals that participate, support, or affiliate with Enhanced.  Nor have other sports organizations found it necessary to impose such bans on athletes and non-athletes as a means to ensure clean sport for their competitions.  Nothing prevents Defendants from achieving those objectives by means of actually enforcing their existing rules, policies, and processes, and no conduct by Enhanced will present an obstacle to that enforcement.  Moreover, Defendants' long-held practice of only imposing limited-duration bans on athletes caught doping, while claiming to provide fair competitions free of PESs, confirms that there are numerous reasonably less restrictive alternatives to their threats of lifetime bans for anyone that affiliates with

Enhanced.  Defendants' coordinated response to Enhanced has been deliberately made more exclusionary and more restrictive to preserve the monopoly position of World Aquatics.  There is simply no justification for Defendants to unreasonably restrict competition by banning all athletes and support personnel merely because they participate in, endorse, or support Enhanced events.

205.    Accordingly, in the alternative, this contract, combination, or conspiracy should be found to be a violation of Section 1 of the Sherman Act under a full rule of reason analysis.

206.    Defendants' agreement, combination, or conspiracy occurred in and unreasonably restrained interstate commerce.  As a result of By-Law 10 and Defendants' other coordinated anticompetitive conduct, Enhanced has been and will continue to be harmed in its business or property; competition in the relevant markets will be harmed; World Aquatics will unlawfully maintain its monopoly position; and Enhanced, consumers, and other stakeholders will be harmed.  Each of the injuries suffered by Enhanced is of the type the antitrust laws were intended to prevent, and each flows from Defendants' unlawful conduct. Such conduct is inherently and manifestly anticompetitive and has an injurious effect on competition.

207.    Enhanced has been and will continue to be irreparably harmed by Defendants' unlawful conduct such that Enhanced needs injunctive relief in order to stop Defendants' unlawful conduct.  It has already foreclosed Enhanced from recruiting essential athletes and support personnel required for the Enhanced Games due to fear of retribution by Defendants.  It will likewise deprive these elite-level swimmers from realizing the appearance fees, prize money, and other monetary and non-monetary benefits that come with participating in Enhanced swimming events.  The ongoing nature of By-Law 10 and Defendants' other anticompetitive conduct means that elite swimmers will continue to be deprived of the ability to maximize their

commercial value and athletic potential through Enhanced's new approach to sport. Further, Defendants' agreement, combination, or conspiracy denies millions of fans, located in the United States and worldwide, the ability to watch never-before-seen contests between elite athletes, both non-enhanced and enhanced, who have the science and sports medical expertise that Enhanced brings to bear behind them. All of these injuries to competition will continue until Defendants are enjoined from further engaging in their unlawful conduct.

208.    Defendants' contract, combination or conspiracy violates Section 1 of the Sherman Act.

209.    Enhanced seeks injunctive relief, monetary damages, treble damages, costs of this suit, reasonable attorneys' fees, and interest pursuant to 15 U.S.C. §§ 15(a) and 26, and any other relief this Court deems just and proper under Count I.

## COUNT II
### (Against World Aquatics and USA Swimming)

### VIOLATION OF SHERMAN ACT SECTION 1 (15 U.S.C. § 1)

210.    Enhanced repeats and realleges each of the allegations of paragraphs 1 – 209 above as if fully set forth herein.

211.    World Aquatics and USA Swimming are separate economic actors, as further alleged above.

212.    World Aquatics and its national member federations, including USA Swimming, have entered into a continuing agreement in unreasonable restraint of trade with the purpose of eliminating competition and preventing the entry and competitive viability of Enhanced and others into the relevant markets. Specifically, World Aquatics and its national member federations, including USA Swimming, have agreed to a group boycott, embodied in By-Law 10, of Enhanced, other potential event organizers, promoters and hosts of international elite

swimming competitions that embraces scientific enhancements that include the use of PESs, elite swimmers who participate in, endorse, or support Enhanced events, including the 2026 Enhanced Games, and any other person or entity who seeks to be affiliated with Enhanced.

213.    World Aquatics and its national member federations, including USA Swimming, have agreed to engage in this group boycott, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, with the purpose, intent, and effect of harming competition for the organization, promotion, and hosting of international elite swimming events and for the services of elite swimmers for international elite swimming events.

214.    World Aquatics is a separate economic actor from its member federations (including but not limited to USA Swimming), who also are separate economic actors from one another.  Because the national member federations and World Aquatics are competitors in the relevant market for organization, promotion, and hosting of international elite swimming events and in the relevant market for the services of elite swimmers for international elite swimming events, the agreements embodied in By-Law 10 constitute a horizontal agreement.

215.    In the alternative, and as the result of its structure described above, World Aquatics is the instrumentality of its national member federations and its conduct, including but not limited to the adoption of By-Law 10, which is necessarily the result of a horizontal agreement among separate economic actors, including the approximately 209 national member federations competing horizontally and seeking to compete horizontally in the same relevant markets.

216.    Moreover, even if the national member federations and World Aquatics were not viewed as horizontal competitors, World Aquatics' power and authority over the national member federations establishes that World Aquatics has organized a horizontal boycott by

operation of World Aquatics' superseding rules and as reflected in By-Law 10's express authorization that "Member Federations may choose to apply a similar policy for national competitions and events under their jurisdiction."  Ex. A.

217.    This group boycott, embodied in By-Law 10, is inherently anticompetitive because it blacklists *anyone* who in *any way* plays a role in or supports Enhanced or any other sporting event or competition that embraces scientific enhancements that include the use of PESs.  The purpose, intent, and effect of this group boycott is to foreclose Enhanced's efforts to enter the market and to create new athletic and financial opportunities for elite swimmers.  World Aquatics, individually and in coordination with its national member federations, controls the market for international elite swimming events.  The exclusion and foreclosure of Enhanced is a naked attempt to maintain that control, thereby unreasonably restraining competition for elite swimmers who participate in international elite swimming events.

218.    This group boycott, embodied in By-Law 10, accords competitive and economic advantages to World Aquatics and its national member federations (including USA Swimming) over all other event organizers, promoters and hosts of international elite swimming competitions, such as Enhanced, by virtue of World Aquatics' power to declare ineligible for World Aquatics' related activities anyone who competes at, supports, or is affiliated with a rival swimming competition that World Aquatics deems to bring aquatics into disrepute.

219.    The actions of World Aquatics and USA Swimming make clear that they had a conscious commitment to a common scheme: to foreclose Enhanced from entering the markets for the organization, promotion, and hosting of international elite swimming events and for the services of elite swimmers for such events.  The unlawful agreement is further evidenced by

other actions and statements of World Aquatics and USA Swimming, as set forth in this

Complaint, including:

- USA Swimming's May 23, 2025 statement, which threatened harm not only to the reputations and livelihoods of athletes who compete in the Enhanced Games, but also to any individual—be they support personnel, family members or friends of athletes—expressing interest or support for the Enhanced Games.

- World Aquatics' public webpage announcing By-Law 10, which stated that "[t]his new By-Law clearly affirms World Aquatics' position: people, organisations and competitions that promote or enable doping have no place in aquatics."

- USA Swimming's investigation into Mr. Hawke for his work as Head Swim Coach of the Enhanced Games.  In the course of this investigation, USA Swimming interrogated Mr. Hawke regarding the identities of any swimmers who were in the "active recruitment pipeline" for the Enhanced Games at the time.

- Public statements by World Aquatics' chief executive, Brent Nowicki, describing the Enhanced Games as "a farce" and "a joke" and threatening that "[i]f you are going to partake in that activity, you shouldn't be involved in any sport ever again.  You cross that bridge, you don't come back."

220.    This group boycott, embodied in By-Law 10, has conferred and maintained World Aquatics' monopoly power by excluding or driving out Enhanced and other potential competitors from the relevant markets, and continues to do so, to the benefit of World Aquatics, and its national member federations (including USA Swimming).

221.    This group boycott, embodied in By-Law 10, is a facially anticompetitive and inherently suspect agreement that is *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1, because it directly excludes Enhanced and any other rival that World Aquatics deems to embrace scientific enhancements that include the use of PESs from the relevant markets.  By foreclosing Enhanced and other potential rivals from access to athletes, coaches, medical professionals and other critical support staff who are essential for international elite swimming competitions, the group boycott denies Enhanced the necessary inputs for effectively competing with World Aquatics and its national member federations.  The anticompetitive nature of this horizontal agreement is obvious without elaborate industry analysis.  Accordingly, it should be found to be a *per se* violation of Section 1 of the Sherman Act.

222.    Alternatively, the agreement embodied by By-Law 10 directly excludes rivals from competing against World Aquatics and its national member federations and is a naked restraint on the output of international elite swimming events and competition for the services of elite swimmers, which requires no more than a cursory examination to establish that its principal or only effect is anticompetitive under the abbreviated Rule of Reason, i.e., the "quick look" test.

223.    The agreement embodied by By-Law 10 has led to significant anticompetitive effects in the relevant markets, as alleged above, and has caused antitrust injury to consumers and competitors in the relevant markets.  It also has conferred and maintained monopoly status upon World Aquatics in the relevant markets for international elite swimming events and the services of elite swimmers, and has created barriers to effective competition against World Aquatics and its national member federations in these markets.

224.    The agreement embodied by By-Law 10 has not served any procompetitive purpose, as alleged above, and has instead served to create and preserve the monopoly status of

World Aquatics and to economically benefit Defendants, including through the substantial revenues generated by their control over international elite swimming events. Further, even if By-Law 10 had some plausible procompetitive purpose, reasonably less restrictive means existed to achieve any such purpose, as alleged above, rendering it unlawful. There is simply no justification for World Aquatics and its national member federations to unreasonably restrict competition by banning all athletes and support personnel merely because they participate in, endorse, or support Enhanced events.

225.    Accordingly, in the alternative, this agreement should be found to be a violation of Section 1 of the Sherman Act under a full rule of reason analysis.

226.    Defendants' agreement, embodied by By-Law 10, occurred in and unreasonably restrained interstate commerce. As a result of the group boycott imposed by By-Law 10, Enhanced has been and will continue to be harmed in its business or property; competition in the relevant markets will be harmed; World Aquatics will unlawfully maintain its monopoly position; and Enhanced, consumers, and other stakeholders will be harmed. Each of the injuries suffered by Enhanced is of the type the antitrust laws were intended to prevent, and each flows from the unlawful conduct of World Aquatics, USA Swimming, and other national member federations. Such conduct is inherently and manifestly anticompetitive and has an injurious effect on competition.

227.    Enhanced has been and will continue to be irreparably harmed by the group boycott imposed by By-Law 10 such that Enhanced needs injunctive relief in order to stop this unlawful conduct. It has already foreclosed Enhanced from recruiting essential athletes and support personnel required for the Enhanced Games due to fear of retribution by Defendants. It will likewise deprive these elite swimmers from realizing the appearance fees, prize money, and

other monetary and non-monetary benefits that come with participating in Enhanced swimming events.  The ongoing nature of the group boycott imposed by By-Law 10 means that elite swimmers will continue to be deprived of the ability to maximize their commercial value and athletic potential through Enhanced's new approach to sport.  Further, the group boycott imposed by By-Law 10 denies millions of fans, located in the United States and worldwide, the ability to watch and participate in never-before-seen contests between elite athletes, both non-enhanced and enhanced.  All of these injuries to competition will continue until World Aquatics and its national member federations are enjoined from further engaging in their unlawful conduct.

228.    The agreement embodied by By-Law 10 violates Section 1 of the Sherman Act.

229.    Enhanced seeks injunctive relief, monetary damages, treble damages, costs of this suit, reasonable attorneys' fees, and interest pursuant to 15 U.S.C. §§ 15(a) and 26, and any other relief this Court deems just and proper under Count II.

**COUNT III**
**(Against All Defendants)**

**VIOLATION OF SHERMAN ACT SECTION 2 (15 U.S.C. § 2)**
**(CONSPIRACY TO MONOPOLIZE)**

230.    Enhanced repeats and realleges each of the allegations of paragraphs 1 – 229 above as if fully set forth herein.

231.    Defendants are separate economic actors, as further described above.

232.    Defendants and others have entered into a continuing agreement, combination, or conspiracy with the specific intent of acquiring and maintaining a monopoly for World Aquatics in the relevant market for the organization, promotion, and hosting of international elite swimming events by excluding Enhanced as a potential competitor to World Aquatics, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

233.    Elite swimmers are world-class, top-tier swimmers who have achieved international recognition in the sport of swimming, including but not limited to those who have competed on national teams, participated in Olympic Games or World Aquatics-sanctioned events, set national or world records, or competed at the highest collegiate level (such as NCAA Division I), and whose specialized skills, training, and accomplishments distinguish them from non-elite, amateur, or recreational swimmers and make them a critical draw for competitive swimming events, sponsors, and fans.

234.    International elite swimming events are those that feature international competition among elite swimmers, such as international championship meets, Olympic qualifying events, and other competitions that attract the participation of elite swimmers.

235.    Defendants and others have entered into a continuing agreement, combination, or conspiracy with the specific intent of acquiring and maintaining a monopoly for World Aquatics in the relevant markets for the organization, promotion, and hosting of international elite swimming events and for the services of elite swimmers for international elite swimming events by excluding Enhanced as a potential competitor to World Aquatics, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

236.    Defendants and others have engaged in concerted action, including numerous overt acts described above, with the specific intent of acquiring and maintaining such monopoly power for World Aquatics in the relevant markets for the purposes of unreasonably excluding or limiting competition, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  The concerted actions of Defendants and others, as alleged further throughout this Complaint, are exclusionary in nature, do not constitute legitimate business activities, and are an abuse of their market position.

237.     Defendants' conspiracy to monopolize the relevant markets occurred in and unreasonably restrained interstate commerce.  As a result of Defendants' conspiracy to monopolize the relevant markets, Enhanced has been and will continue to be harmed in its business or property; competition in the relevant markets will be harmed; World Aquatics will unlawfully maintain its monopoly position; and Enhanced, consumers, and other stakeholders will be harmed.  Each of the injuries suffered by Enhanced is of the type the antitrust laws were intended to prevent, and each flows from Defendants' unlawful conduct.  Such conduct is inherently and manifestly anticompetitive and has an injurious effect on competition.

238.     Enhanced has been and will continue to be irreparably harmed by Defendants' conspiracy to monopolize the relevant markets such that Enhanced needs injunctive relief in order to stop Defendants' unlawful conduct.  It has already foreclosed Enhanced from recruiting the essential athletes and support personnel required for the Enhanced Games due to fear of retribution by Defendants.  It will likewise deprive these elite swimmers from realizing the appearance fees, prize money, and other monetary and non-monetary benefits that come with participating in Enhanced swimming events.  The ongoing nature of Defendants' conspiracy to monopolize the relevant markets means that elite swimmers will continue to be deprived of the ability to maximize their commercial value and athletic potential through Enhanced's new approach to sport.  Further, Defendants' conspiracy to monopolize the relevant markets denies millions of fans, located in the United States and worldwide, the ability to watch and participate in never-before-seen contests between elite athletes, both non-enhanced and enhanced.  All of these injuries to competition will continue until Defendants are enjoined from further engaging in their unlawful conduct.

239.     Defendants' conspiracy to monopolize the relevant markets violates Section 2 of the Sherman Act.

240.     Enhanced seeks injunctive relief, monetary damages, treble damages, costs of this suit, reasonable attorneys' fees, and interest pursuant to 15 U.S.C. §§ 15(a) and 26, and any other relief this Court deems just and proper under Count III.

## COUNT IV
### (Against World Aquatics)

### VIOLATION OF SHERMAN ACT SECTION 2 (15 U.S.C. § 2)
### (MONOPOLIZATION – PRODUCT MARKET)

241.     Enhanced repeats and realleges each of the allegations of paragraphs 1 – 240 above as if fully set forth herein.

242.     World Aquatics, either acting alone or with its co-conspirators as set forth above, has monopolized the market for the organization, promotion, and hosting of international elite swimming events, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

243.     International elite swimming events are those that feature international competition among elite swimmers, such as international championship meets, Olympic qualifying events, and other competitions that attract the participation of elite swimmers.

244.     World Aquatics possesses monopoly power in the market for the organization, promotion, and hosting of international elite swimming events by holding itself out as the sole and exclusive governing body for all international aquatic competitions, controlling access to premier events such as the Olympic Games and World Championships, and dictating the terms under which these events are conducted, thereby foreclosing meaningful competition from rival organizers.

245.     World Aquatics, either acting alone or with its co-conspirators as set forth above, has willfully maintained and abused its monopoly power through the anticompetitive conduct set

forth above, not least by foreclosing Enhanced and other potential rivals from access to athletes, coaches, medical professionals and other critical support staff who are essential for international elite swimming competitions and thereby excluding Enhanced from the necessary inputs for effectively competing against swimming events that are sponsored or sanctioned by World Aquatics.

246.    World Aquatics has engaged in the willful acquisition and maintenance of its monopoly power over the relevant market by conspiring with and exerting influence over its national member federations and others in order to adopt, disseminate, and discriminatorily apply the anticompetitive By-Law 10 to create and maintain World Aquatics' monopoly power over the relevant market.  World Aquatics' national member federations and others have agreed to and willfully engaged in the act of conferring such power upon World Aquatics and maintaining that power through the acceptance, approval, and endorsement of its anticompetitive By-Law 10.

247.    The purpose and effect of World Aquatics acts of monopolization, either acting alone or with its co-conspirators as set forth above, has been to ensure that World Aquatics can use its rules, sanctioning power, coercive authority, and disciplinary mechanisms to maintain World Aquatics' monopoly status in the relevant market, by adopting its anticompetitive By-Law and leveraging By-Law 10 in a discriminatory manner to prevent World Aquatics' competitors and potential competitors such as Enhanced from competing with World Aquatics.

248.    World Aquatics' conduct in monopolizing the relevant market, whether alone or with its co-conspirators as set forth above, is exclusionary in nature, does not consist of legitimate business activities, and is an abuse of its market position.  The anticompetitive actions of World Aquatics do not further any procompetitive goals and are not reasonably necessary to achieve any procompetitive benefits.  World Aquatics' monopoly power in the relevant market

does not result from growth or development as a consequence of a superior product, business acumen, or historic accident.

249.    World Aquatics' conduct in monopolizing the relevant market, whether alone or with its co-conspirators as set forth above, occurred in and unreasonably restrained interstate commerce.  As a result, Enhanced has been and will continue to be harmed in its business or property; competition in the relevant markets will be harmed; World Aquatics will unlawfully maintain its monopoly position; and Enhanced, aquatic and other athletes, consumers, and other stakeholders will be harmed.  Each of the injuries suffered by Enhanced is of the type the antitrust laws were intended to prevent, and each flows from Defendants' unlawful conduct. Such conduct is inherently and manifestly anticompetitive and has an injurious effect on competition.

250.    World Aquatics' unlawful conduct, whether alone or with its co-conspirators as set forth above, to acquire and maintain its monopoly power has harmed Enhanced and competition in the relevant markets, as set forth above, and will continue to do so until World Aquatics is enjoined from further engaging in conduct to maintain and protect its monopoly power.

251.    World Aquatics' anticompetitive acts, whether alone or with its co-conspirators as set forth above, violate Section 2 of the Sherman Act.

252.    Enhanced seeks injunctive relief, monetary damages, treble damages, costs of this suit, reasonable attorneys' fees, and interest pursuant to 15 U.S.C. §§ 15(a) and 26, and any other relief this Court deems just and proper under Count IV.

## COUNT V
### (Against World Aquatics)

### VIOLATION OF SHERMAN ACT SECTION 2 (15 U.S.C. § 2)
### (MONOPSONIZATION – LABOR MARKET)

253. Enhanced repeats and realleges each of the allegations of paragraphs 1 – 252 above as if fully set forth herein.

254. World Aquatics, either acting alone or with its co-conspirators as set forth above, has monopsonized the market for the services of elite swimmers for international elite swimming events, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

255. Elite swimmers are world-class, top-tier swimmers who have achieved international recognition in the sport of swimming, including but not limited to those who have competed on national teams, participated in Olympic Games or World Aquatics-sanctioned events, set national or world records, or competed at the highest collegiate level (such as NCAA Division I), and whose specialized skills, training, and accomplishments distinguish them from non-elite, amateur, or recreational swimmers and make them a critical draw for competitive swimming events, sponsors, and fans.

256. Elite swimmers must compete against other world-class swimmers at international swimming events to achieve and maintain international recognition in the sport of swimming, and swimmers that fail to do so will not command the same degree of fan appeal, media attention, and commercial value.

257. World Aquatics exercises monopsony power over the market for the services of elite swimmers by functioning as the exclusive gatekeeper for athletes seeking to compete at the highest levels, including the Olympics, and by leveraging its authority to restrict athletes' ability to offer their services to alternative competitions, thus depriving them of competitive opportunities and suppressing compensation.

258.    World Aquatics, either acting alone or with its co-conspirators as set forth above, has willfully maintained and abused its monopsony power through the anticompetitive conduct set forth above, not least by foreclosing Enhanced and other potential rivals from access to elite swimmers and thereby excluding Enhanced from the necessary inputs for effectively competing with swimming events that are sponsored or sanctioned by World Aquatics.

259.    World Aquatics has engaged in the willful acquisition and maintenance of its monopsony power over the relevant market by conspiring with and exerting influence over its national member federations and others in order to adopt, disseminate, and discriminatorily apply the anticompetitive By-Law 10 to create and maintain World Aquatics' monopsony power over the relevant market.  World Aquatics' national member federations and others have agreed to and willfully engaged in the act of conferring such power upon World Aquatics and maintaining that power through the acceptance, approval, and endorsement of its anticompetitive By-Law 10.

260.    The purpose and effect of World Aquatics acts of monopsonization, either acting alone or with its co-conspirators as set forth above, have been to ensure that World Aquatics can use its rules, sanctioning power, coercive authority, and disciplinary mechanisms to maintain World Aquatics' monopsony status in the relevant market, by adopting its anticompetitive By-Law and leveraging By-Law 10 in a discriminatory manner to prevent World Aquatics' competitors and potential competitors such as Enhanced from competing with World Aquatics.

261.    World Aquatics' conduct in monopsonizing the relevant market, whether alone or with its co-conspirators as set forth above, is exclusionary in nature, does not consist of legitimate business activities, and is an abuse of its market position.  The anticompetitive actions of World Aquatics do not further any procompetitive goals and are not reasonably necessary to achieve any procompetitive benefits.  World Aquatics' monopsony power in the relevant market

does not result from growth or development as a consequence of a superior product, business acumen, or historic accident.

262.    World Aquatics' conduct in monopsonizing the relevant market, whether alone or with its co-conspirators as set forth above, occurred in and unreasonably restrained interstate commerce.  As a result, Enhanced has been and will continue to be harmed in its business or property; competition in the relevant market will be harmed; World Aquatics will unlawfully maintain its monopsony position; and Enhanced, aquatic and other athletes, consumers, and other stakeholders will be harmed.  Each of the injuries suffered by Enhanced is of the type the antitrust laws were intended to prevent, and each flows from Defendants' unlawful conduct. Such conduct is inherently and manifestly anticompetitive and has an injurious effect on competition.

263.    World Aquatics' unlawful conduct, whether alone or with its co-conspirators as set forth above, to acquire and maintain its monopsony power has harmed Enhanced and competition in the relevant market, as set forth above, and will continue to do so until World Aquatics is enjoined from further engaging in conduct to maintain and protect its monopsony and monopoly power.

264.    World Aquatics' anticompetitive acts, whether alone or with its co-conspirators as set forth above, violate Section 2 of the Sherman Act.

265.    Enhanced seeks injunctive relief, monetary damages, treble damages, costs of this suit, reasonable attorneys' fees, and interest pursuant to 15 U.S.C. §§ 15(a) and 26, and any other relief this Court deems just and proper under Count V.

## COUNT VI
### (Against World Aquatics)

### VIOLATION OF SHERMAN ACT SECTION 2 (15 U.S.C. § 2)
### (ATTEMPTED MONOPSONIZATION/MONOPOLIZATION)

266.    Enhanced repeats and realleges each of the allegations of paragraphs 1 – 265 above as if fully set forth herein.

267.    World Aquatics, either acting alone or with its co-conspirators as set forth above, has attempted to monopsonize the market for the services of elite swimmers for international elite swimming events, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

268.    World Aquatics, either acting alone or with its co-conspirators as set forth above, has attempted to monopolize the market for the organization, promotion, and hosting of international elite swimming events, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

269.    World Aquatics, either acting alone or with its co-conspirators as set forth above, has specifically engaged in anticompetitive and exclusionary conduct in furtherance of its attempted monopsonization and monopolization of the relevant markets, as alleged further throughout this Complaint.  Such conduct includes, but is not limited to, foreclosing Enhanced and other potential rivals from access to athletes, coaches, medical professionals and other critical support staff who are essential for international elite swimming competitions and thereby excluding Enhanced from the necessary inputs for effectively competing with swimming events that are sponsored or sanctioned by World Aquatics.

270.    World Aquatics has acted with the specific intent of acquiring and maintaining a monopsony in the market for the services of elite swimmers for international elite swimming events and a monopoly in the market for the organization, promotion, and hosting of international elite swimming events, as alleged further throughout this Complaint.  World Aquatics' actions are irrational but for their anticompetitive effect, including by suppressing the

athletic potential and livelihood of the elite swimmers who participate in swimming events that are sponsored or sanctioned by World Aquatics.  World Aquatics' specific intent to monopolize and monopsonize the relevant markets is shown through its statements and actions alleged above, including by conspiring with and exerting influence over its national member federations and others in order to adopt, disseminate, and discriminatorily apply the anticompetitive By-Law 10 to acquire for World Aquatics monopsony and monopoly power over the relevant markets.   World Aquatics' national member federations and others have agreed to and willfully engaged in specific acts to acquire such power for World Aquatics through the acceptance, approval, and endorsement of its anticompetitive By-Law 10.

271.    World Aquatics' unlawful exclusionary conduct presents a dangerous probability that World Aquatics will succeed, to the extent it has not already, in its attempt to monopsonize and monopolize the relevant markets, as shown by its willful and intentional efforts and success in using its rules, sanctioning power, coercive authority, and disciplinary mechanisms to adopt its anticompetitive By-Law 10 and leveraging By-Law 10 in a discriminatory manner to prevent World Aquatics' competitors and potential competitors such as Enhanced from competing with World Aquatics.

272.    In particular, and as set forth in detail above, World Aquatics' conduct, either acting alone or with its co-conspirators as set forth above, carries a dangerous probability of destroying the competitive viability of Enhanced.  It has denied and will continue to deny Enhanced access to the elite swimmers and support personnel who are essential to international elite swimming events, such as the 2026 Enhanced Games.  By-Law 10 and Defendants' coordinated threats of punishment have scared off the large majority of elite swimmers (particularly, non-enhanced swimmers) as well as necessary support personnel.  And even for

those individuals who have agreed to participate in Enhanced events, they are now under active investigations and/or facing lifetime bans from Defendants. This has forced Enhanced into an unsustainable business model.

273.    World Aquatics' conduct to acquire monopoly and monopsony power in the relevant markets, whether alone or with its co-conspirators as set forth above, is exclusionary in nature, does not consist of legitimate business activities, and is an abuse of its market position. The anticompetitive actions of World Aquatics do not further any procompetitive goals and are not reasonably necessary to achieve any procompetitive benefits.

274.    World Aquatics' attempt to monopsonize and monopolize the relevant markets, whether alone or with its co-conspirators as set forth above, occurred in and unreasonably restrained interstate commerce. As a result, Enhanced has been and will continue to be harmed in its business or property; competition in the relevant markets will be harmed; World Aquatics will unlawfully monopsonize and monopolize the relevant markets; and Enhanced, consumers, and other stakeholders will be harmed. Each of the injuries suffered by Enhanced is of the type the antitrust laws were intended to prevent, and each flows from Defendants' unlawful conduct. Such conduct is inherently and manifestly anticompetitive and has an injurious effect on competition.

275.    Enhanced has been and will continue to be irreparably harmed by World Aquatics' unlawful conduct, whether alone or with its co-conspirators as set forth above, such that it needs injunctive relief stopping immediately World Aquatics' threats of lifetime bans on elite swimmers and support personnel designed to thwart Enhanced's entry and enjoining enforcement of World Aquatics' anticompetitive By-Law 10. Absent injunctive relief halting the Defendants' anticompetitive conduct, Enhanced will be unable to sustain a competitively viable

business, and it will be unable to meaningfully constrain World Aquatics' monopsony and monopoly power.

276.    To the extent that World Aquatics is not presently a monopolist in the relevant markets, World Aquatics' anticompetitive conduct, whether alone or with its co-conspirators as set forth above, carries a dangerous probability of acquiring and maintaining World Aquatics' monopoly and monopsony power in the relevant markets, in violation of Section 2 of the Sherman Act.

277.    Enhanced seeks injunctive relief, monetary damages, treble damages, costs of this suit, reasonable attorneys' fees, and interest pursuant to 15 U.S.C. §§ 15(a) and 26, and any other relief this Court deems just and proper under Count VI.

## COUNT VII
## (Against All Defendants)

## TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

278.    Enhanced repeats and realleges each of the allegations of paragraphs 1 – 277 above as if fully set forth herein.

279.    Defendants' issuance of malicious threats and promulgation of illegal rules, among other intentional and unlawful conduct, has resulted in Enhanced's loss of potential business opportunities.

280.    As an emerging new entity poised to disrupt the athletics competition industry, Enhanced has undertaken extensive efforts to solicit and negotiate commercial relationships with brand partners, sponsors, venues, and vendors in connection with its upcoming Enhanced Games.

281.    Enhanced likewise has been actively soliciting participation of athletes—both non-enhanced and enhanced—as well as coaches, medical professionals, and other support personnel in the Enhanced Games and the broader Enhanced program.

282.    Defendants have knowingly and maliciously taken steps to interfere with Enhanced's ability to enter into deals with such participants and commercial business partners. Their intention is transparent: to deter prospective business partners, athletes and support personnel from entering into agreements with Enhanced out of fear of retribution by Defendants, thus preventing Enhanced from entering the market for international aquatics competitions and solidifying Defendants' control over the benefits to be derived therefrom.

283.    This conduct includes, but is not limited to, World Aquatics' promulgation of its By-Law 10, the issuance of multiple public statements, press releases, and targeted messages by each of the Defendants threatening draconian punishment to any individuals or entities participating in, voicing support for, or in any way playing a role in the Enhanced Games or Enhanced, and, the publicized investigations into individuals who already have expressed interest in supporting Enhanced's business.  Upon information and belief, Defendants also have directly pressured individual athletes and coaches to shun Enhanced.

284.    Following Defendants' misconduct, Enhanced has received multiple rejection notices from athletes, coaches, medical professionals, and prospective commercial partners who previously had expressed interest in participating in and/or entering into agreements with Enhanced, citing Defendants' threats and By-Law 10 as grounds for their decisions.

285.    Enhanced has suffered—and will continue to suffer—significant monetary damages in an amount to be proven at trial as a result of Defendants' tortious conduct.

## COUNT VIII

## INJUNCTIVE RELIEF

286.    Enhanced repeats and realleges each of the allegations of paragraphs 1 – 285 above as if fully set forth herein.

287.    Defendants' anticompetitive and tortious conduct already has harmed Enhanced's ability to plan and carry out the Enhanced Games in May 2026.

288.    In the absence of permanent injunctive relief, Enhanced will be irreparably harmed, including but not limited to its inability to enter into the marketplace for international athletic competitions, loss of goodwill and reputation, and inability to continue business operations.

289.    Monetary damages are inadequate to compensate Enhanced for the foregoing irreparable losses.

290.    The balance of equities weighs strongly in favor of Enhanced, which is being foreclosed from entering the marketplace and carrying out its legitimate business purpose, and against Defendants, who are conspiring to hoard their existing control and dominance over the limited market for athletics competitions, elite aquatic athletes, and qualified support personnel.

291.    The public interest weighs in favor of enjoining Defendants from their anticompetitive and tortious conduct.

292.    Plaintiff is entitled to permanent injunctive relief barring Defendants from threatening or carrying out any penalties against any individuals in the aquatic competition community solely based on their support for, interest in, and/or participation in the Enhanced Games or any other events hosted by Enhanced.

**PRAYER FOR RELIEF**

WHEREFORE, Enhanced respectfully requests that the Court enter judgment in favor of Enhanced and against Defendants as follows:

1.  Declaring that Defendants' conduct as described herein constitutes violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2;

2. Permanently enjoining World Aquatics, its agents, employees, successors, assigns, business entities and affiliates, and all others acting in concert, participation or privity with World Aquatics from enforcing World Aquatics By-Law 10;

3. Permanently enjoining Defendants, their agents, employees, successors, assigns, business entities and affiliates, and all others acting in concert, participation or privity with Defendants, from:

   a. Banning, excluding, barring, or deeming ineligible for participation in any athletic competitions, events or programs, or otherwise penalizing or taking retaliatory action against, any athlete, coach, physician, physiotherapist, or anyone else as a result of the their actual or suspected support for and/or participation in events or competitions organized by Enhanced;

   b. Issuing or making threats of banning, excluding, barring, or deeming ineligible for participation in athletic competitions, events or programs anyone based on their actual or suspected association, support and/or participation in events or competitions organized by Enhanced;

   c. Making any false, misleading, or unsubstantiated claims about Enhanced, the Enhanced Games and/or the athletes and other personnel who participate in events or competitions organized by Enhanced;

4. Awarding damages in an amount to be determined at trial, but in any event no less than $200,000,000 for Defendants' violation of Section 1 of the Sherman Act;

5. Awarding damages in an amount to be determined at trial, but in any event no less than $200,000,000 for Defendants' violation of Section 2 of the Sherman Act;

6. Awarding punitive damages in an amount to be determined at trial, but in any event no less than $200,000,000 for Defendants' tortious interference with prospective business relations;

7. Awarding treble damages as allowed by law;

8. Awarding costs and attorneys' fees to Enhanced as allowed by law; and

9. Such other and further relief as the Court deems just, fair and equitable.

Dated: August 27, 2025
New York, New York

REED SMITH LLP

_Edw. B. Schwart_

Edward B. Schwartz, Esq.
1301 K Street, N.W.
Suite 1000, East Tower
Washington, DC 20005-3317
Tel. +1 (202) 414-9200
Fax: +1 (202) 414-9299
eschwartz@reedsmith.com

Ian Turetsky, Esq.
Pamela Schoenberg, Esq.
599 Lexington Ave., 22nd Floor
New York, NY 10022
Tel. +1 (212) 521-5400
Fax: +1 (212) 521-5450
ituretsky@reedsmith.com
pschoenberg@reedsmith.com

Christopher R. Brennan, Esq.
(*pro hac vice forthcoming*)
Nicole Kaplan, Esq.
(*pro hac vice forthcoming*)
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA, 15222
Tel. +1 (412) 288-3131
Fax: +1 (412) 288-3063
cbrennan@reedsmith.com
nkaplan@reedsmith.com

*Attorneys for Enhanced US LLC*