UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ENHANCED US LLC,

        *Plaintiff,*

    v.

WORLD AQUATICS f/k/a FÉDÉRATION
INTERNATIONALE DE NATATION; USA SWIMMING
INC.; and WORLD ANTI-DOPING AGENCY,

        *Defendants.*

Case No. 25-cv-07096 (JMF)


**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF ENHANCED US LLC's MOTION FOR PRELIMINARY INJUNCTION**


**REED SMITH LLP**
1301 K Street, N.W.
Suite 1000, East Tower
Washington, DC 20005-3317
Tel. +1 (202) 414-9200
Fax: +1 (202) 414-9299

599 Lexington Ave., 22nd Floor
New York, New York 10022
Tel.: +1 (212) 521-5400
Fax: +1 (212) 521-5450

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................................. 1

RELEVANT FACTS ............................................................................................................... 6

I.    Enhanced Aims to Revolutionize Athletics and Sports Medicine and Was Poised for
      Success .................................................................................................................... 6

II.   Defendants Exercise Complete Control Over Elite International Swimming
      Competitions ........................................................................................................... 8

III.  Defendants' Flawed and Fraudulent Control of Doping in their Own Games ................... 9

IV.   Defendants' Conspiracy to Foreclose Enhanced From the Market and to Protect
      their Monopoly ...................................................................................................... 11

      A.    The Enhanced Games Are Announced ................................................................ 11

      B.    Defendants Launch Their Coordinated Campaign to Destroy Enhanced ............. 12

            1.    WADA and USA Swimming Attack Enhanced ...................................... 12

            2.    The Full Boycott Is Launched: World Aquatics Adopts the By-
                  Law .................................................................................................... 12

            3.    USA Swimming and WADA Ratify and Amplify the Effects of the
                  By-Law ............................................................................................... 13

V.    The Severe Harm to Enhanced Resulting from the Conspiracy ................................... 13

ARGUMENT ...................................................................................................................... 19

I.    The Court Should expeditiously Issue a Preliminary Injunction to Preserve the
      Status Quo ............................................................................................................. 19

      A.    Enhanced Will Suffer Irreparable Harm If Defendants Are Not
            Expeditiously Enjoined ...................................................................................... 19

            1.    Defendants' Boycott Threatens Enhanced's Viability ............................. 20

            2.    Defendants' Boycott Causes Substantial Harm to Enhanced's
                  Good Will and Reputation ................................................................... 20

      B.    Enhanced is Likely to Succeed on the Merits of Its Claims ................................ 22

1. The Adoption and Enforcement of By-Law 10 Is An Illegal Boycott in Violation of Sherman Act Section 1 ...................................... 23

   a. World Aquatics Engaged in Concerted Actions with Separate Economic Actors ............................................................ 23

   b. By-Law 10 Constitutes a Naked Conspiracy to Restrain Competition and a *Per Se* Section 1 Violation ............................ 25

   c. World Aquatics' Group Boycott Violates Section 1 Under Quick Look or Rule of Reason Analysis ...................................... 27

2. World Aquatics' Section 2 Violations ....................................... 28

   a. World Aquatics Possesses Monopoly and Monopsony Power in the Relevant Markets ...................................................... 28

   b. World Aquatics Is Unlawfully Maintaining Its Monopoly and Monopsony by Willfully Excluding Competition.................. 29

3. Defendants' Purported Justifications for Their Conduct Are Patently Pretextual and Irrelevant ............................................. 31

4. Enhanced Has Suffered Antitrust Injury.................................... 32

C. The Balance of Hardships Weighs Decidedly in Favor of Enhanced.................. 33

D. The Public Interest Favors Immediate Injunctive Relief Against Defendants ........................................................................... 34

II. No Bond Is Necessary Under Rule 65 ................................................. 35

CONCLUSION............................................................................... 36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Needle, Inc. v. NFL*,
    560 U.S. 183 (2010)........................................................................................23

*American Tobacco Co. v. United States*,
    328 U. S. 781, 328 U. S. 810 (1946)................................................................23

*Arizona v. Maricopa Cty. Med. Soc'y*,
    457 U.S. 332 (1982)........................................................................................25

*Aspen Highland Skiing Corp. v. Aspen Skiing Corp.*,
    472 U.S. 585 (1985)........................................................................................35

*Blue Shield of Virginia v. Mcready*,
    457 U.S. 465 (1982)........................................................................................32

*Broker Genius, Inc. v. Zalta*,
    280 F. Supp. 3d 495 (S.D.N.Y. 2017)............................................................23

*Brunswick Corp. v. Pueblo Bowl-O-Mat*,
    429 U.S. 477 (1977)..................................................................................19, 32

*Cal. Dental Ass'n v. FTC*,
    526 U.S. 756 (1999)........................................................................................25

*California v. Am. Stores Co.*,
    495 U.S. 271 (1990)........................................................................................19

*Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*,
    598 F.3d 30 (2d Cir. 2010).............................................................................23

*Clarett v. NFL*,
    306 F. Supp. 2d 379 (S.D.N.Y.), *rev'd on other grounds*, 369 F.3d 124 (2d
    Cir. 2004) .......................................................................................................28

*In re Dental Supplies Antitrust Litig.*,
    2016 U.S. Dist. LEXIS 133410 (E.D.N.Y. Sep. 26, 2016)............................30

*Doctor's Assocs. v. Distajo*,
    107 F.3d 126 (2d Cir. 1997)...........................................................................35

*Doctor's Assocs. v. Stuart*,
    85 F.3d 975 (2d Cir. 1996).............................................................................36

*Eastman Kodak Vo. v. Image Technical Services, Inc.*,
  504 U.S. 451 (1992)...................................................................................35

*Forest City Daly Hous., Inc. v. Town of N. Hempstead*,
  175 F.3d 144 (2d Cir. 1999)........................................................................19

*FTC v. Ind. Fed'n of Dentists*,
  476 U.S. 447 (1986)...................................................................................25

*FTC v. Superior Court Trial Lawyers Ass'n*,
  493 U.S. 411 (1990)...................................................................................31

*FuboTV Inc. v. Walt Disney Co.*,
  745 F. Supp. 3d 109 (S.D.N.Y. 2024).........................................................34

*International Swimming League v. Fédération Internationale de Natation*,
  No. 23-15156 (9th Cir. filed Sept. 17, 2024) .................................................3

*John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.*,
  588 F.2d 24 (2d Cir. 1978)..........................................................................20

*John E. Andrus Mem'l, Inc. v. Daines*,
  600 F. Supp. 2d 563 (S.D.N.Y. 2009).........................................................21

*Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*,
  323 F. Supp. 2d 525 (S.D.N.Y. 2004).........................................................21

*Laumann v. NHL*,
  56 F. Supp. 3d 280 (S.D.N.Y. 2014)...........................................................24

*LePage's Inc. v. 3M*,
  324 F.3d 141 (3d Cir. 2003)........................................................................32

*LLC v. Nat'l Ass'n of Realtors*,
  32 F.4th 824 (9th Cir. 2022) .......................................................................30

*Lorain Journal Co. v. United States*,
  342 U.S. 143 (1951)...................................................................................30

*N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*,
  883 F.3d 32 (2d Cir. 2018)..........................................................................19

*N.C. State Bd. of Dental Exam'rs v. FTC*,
  717 F.3d 359 (4th Cir. 2013), *aff'd*, 135 S. Ct. 1101 (2015) ........................25

*NCAA v. Alston*, 594 U.S. 69 (2021)...................................................31, 32

*NCAA v. Board of Regents*,
  468 U.S. 85 (1984).................................................................................24, 27

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*,
   472 U.S. 284 (1985)........................................................................................26

*Oneida Nation of New York v. Cuomo*,
   645 F.3d 154 (2d Cir. 2011)............................................................................19

*Regeneron Pharm., Inc. v. United States HHS*,
   510 F. Supp. 3d 29 (S.D.N.Y. 2020)................................................................21

*Reuters Ltd. v. United Press Int'l, Inc.*,
   903 F.2d 904 (2d Cir. 1990)............................................................................21

*Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co.*,
   749 F.2d 124 (2d Cir. 1984)............................................................................20

*Ross v. Bank of America*,
   524 F.3d 217 (2d Cir. 2008)............................................................................33

*Shields v. Fed'n Internationale de Natation*,
   649 F. Supp. 3d 904 (N.D. Cal. 2023) ............................................................24

*Shields v. World Aquatics*,
   2024 U.S. App. LEXIS 23559 (9th Cir. Cal., Sept. 17, 2024)............24, 27, 29, 31

*Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*,
   60 F.3d 27 (2d Cir. 1995) ...........................................................................20, 22

*trueEX, LLC v. MarkitSERV Ltd.*,
   266 F. Supp. 3d 705 (S.D.N.Y. 2017)..............................................................34

*U.S. v. Dentsply Int'l, Inc.*,
   399 F.3d 181 (3d Cir. 2005)............................................................................32

*U.S. v. E.I. duPont de Nemours & Co.*,
   351 U.S. 377 (1956)........................................................................................28

*U.S. v. Grinnell Corp.*,
   384 U.S. 563 (1966)........................................................................................28

*U.S. v. Visa U.S.A., Inc.*,
   344 F.3d 229 (2d Cir. 2003)............................................................................32

*United States Football League v. National Football League*,
   842 F.2d 1335 (2d Cir. 1988)..........................................................................29

*United States v. Apple, Inc.*,
   791 F.3d 290 (2d Cir. 2015)............................................................................23

*United States v. Columbia Pictures Indus., Inc.,*
 507 F. Supp. 412 (S.D.N.Y. 1980)............................................................35

*US Airways Inc. v. Sabre Holdings Corp.,*
 2017 U.S. Dist. LEXIS 40932 (S.D.N.Y. Mar. 21, 2017), *rev'd on other
 grounds*, 938 F.3d 43 (2d Cir. 2019) ......................................................27

*Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council,*
 857 F.2d 55 (2d Cir. 1988)......................................................................24

*Wash. State Bowling Proprietors Ass'n v. Pac. Lanes, Inc.,*
 356 F.2d 371 (9th Cir. 1966) ..................................................................30

*Weyerhaeuser Co. v. Ross–Simmons Hardwood Lumber Co.,*
 549 U.S. 312 (2007)................................................................................28

*Willis v. Herriott,*
 550 F. Supp. 3d 68 (S.D.N.Y. 2021)........................................................34

*Zenith Radio Corp. v. Hazeltine Research, Inc.,*
 395 U.S. 100 (1969)................................................................................34

## Statutes

15 U.S.C. § 1..............................................................................................23

15 U.S.C. § 26........................................................................................1, 19

## Rules

Fed. R. Civ. P. 65....................................................................................1, 35

## Other Authorities

S. ROSNER & K. SHROPSHIRE, THE BUSINESS OF SPORTS (2nd Ed. , 2012) ......................................8

Plaintiff Enhanced US LLC ("Plaintiff" or "Enhanced"), by its attorneys Reed Smith LLP, respectfully submits this Memorandum of Law, along with the accompanying Declarations of Dr. Aron D'Souza dated July 27, 2025 ("D'Souza Decl."), Rick Adams dated July 27, 2025 ("Adams Decl."), Brett Hawke dated July 27, 2025 ("Hawke Decl."), Ivan Rojas dated July 9, 2025 ("Rojas Decl."), Andrii Govorov dated July 9, 2025 ("Govorov Decl."), Kristian Gkolomeev dated July 8, 2025 ("Gkolomeev Decl."), Nicole Kaplan dated July 29, 2025 ("Kaplan Decl."), and the expert declaration of Scott Rosner dated July 29, 2025 ("Rosner Decl."), in support of its motion for a preliminary injunction, pursuant to Fed. R. Civ. P. Rule 65 and 15 U.S.C. § 26.

The requested relief is urgently needed to enjoin Defendants World Aquatics f/k/a Fédération Internationale de Natation ("World Aquatics"), USA Swimming Inc. ("USA Swimming"), and the World Anti-Doping Agency ("WADA") (collectively, the "Defendants") from enforcing a patently predatory and illegal boycott directed at Enhanced, which threatens to ban *for life* any person (including swimmers, coaches, timekeepers, and others) affiliated in any way with Enhanced from all aquatic events controlled by World Aquatics (including the Olympics). The boycott constitutes a blatant, *per se* violation of the antitrust laws, and is the tip of the spear of Defendants' efforts to destroy Enhanced, a new market entrant and competitor. Absent the timely award of the requested relief, Enhanced's viability is threatened, and it will at a minimum continue to suffer substantial harm to its goodwill and reputation, and be substantially impaired in its ability to gain a foothold and grow in the relevant markets.

## PRELIMINARY STATEMENT

Enhanced set out two years ago to redefine the future of sports by merging elite athletic performance with scientific advances and sports medicine. Enhanced is committed to building a more fair and financially equitable platform than is available to elite athletes today, one that

empowers athletes to transcend conventional boundaries and reclaim excellence through a combination of innovation, best-in-class coaching, and a scientifically developed and medically supervised approach to enhancements and training.  Enhanced intends to achieve these goals in part by working with the best in sports science and medicine to develop, administer, and carefully monitor the safe, effective use of FDA-approved performance enhancing substances ("PESs") as part of its training regimen for "enhanced" athletes.  Non-enhanced athletes (i.e., athletes who remain in the WADA testing pool and therefore only take WADA-permitted substances) will also compete in Enhanced's events.

In contrast to the scandal-ridden competitions organized by Defendants where "doping" is widespread, intentionally overlooked and covered-up, Enhanced is completely transparent about its efforts to advance and study the potential benefits of PESs for athletes and others.  Thus, one of the top swimming coaches in the world, who has coached Olympians and other elite swimmers for decades, has described Enhanced as "the purest, most honest, and transparent sports organization with which I have ever been affiliated."  Hawke Decl. ¶ 29.

Since its launch was first announced, Enhanced has generated enormous interest among athletes, coaches, sports fans, the media, and the public.  Unsurprisingly, it has also generated some controversy.  But one of the virtues of our market economy is that in competitive markets, both buyers and sellers have *choices* and *they* get to decide what products, services, and terms are right for them.  And an enormous virtue of our antitrust laws is that they prohibit entrenched monopolists from deciding what products, services and terms should be made available by their competitors.

Yet, that is precisely what Defendants are attempting to do.  For over 100 years, World Aquatics, the International Olympics Committee's ("IOC's") only-recognized aquatics

federation, has dominated every aspect of non-collegiate elite aquatics. Wholly insulated from competition, World Aquatics has devolved into a sclerotic, corrupt, self-serving global body that exploits its power for the benefit of its own bureaucracy and financial gain. It reaps tens of millions in annual surpluses that fund the sovereign-like lifestyles of its leadership, while the vast majority of athletes who devote their lives and bodies to their sport barely survive financially. The brazen nature of Defendants' illegal boycott – which applies by its terms to those over whom *they have no contractual or other control* – reflects the hubris they acquired through decades of insulation from competition and accountability.

Enhanced's efforts to enter the market with its "disruptive" approach to elite athletics threatens World Aquatics' monopoly. It offers athletes, coaches, trainers, sponsors and others the opportunity to be part of that experience. And it offers fans the chance to witness never-before-seen battles between enhanced and non-enhanced athletes, and "unbreakable" world records being broken.

But Defendants are intent on killing any potential competitor who could threaten their dominance and force *them* to compete. In 2018, when faced with a new rival – the International Swimming League ("ILS") – World Aquatics responded, as it did here, by adopting a boycott of athletes who joined the new league. While litigation continues, ISL was forced out of business and foreclosed from organizing rival aquatics events. *See International Swimming League v. Fédération Internationale de Natation*, No. 23-15156 (9th Cir. filed Sept. 17, 2024) (reversing summary judgment for World Aquatics on plaintiffs' *per se* and quick look Section 1 claims, and reversing denial of class certification motion of athletes' class).

Prompted by Enhanced's announcement on May 21, 2025 of the inaugural Enhanced Games to be held next May, Defendants immediately pivoted their sights to Enhanced and

conspired to choke off the supply of swimmers and other professionals Enhanced needs to organize elite-level aquatics events. The following day, WADA issued a press release condemning Enhanced and calling for potential participants *to be prosecuted criminally* for participating in the Enhanced Games (albeit without specifying what law had been violated). One day later, USA Swimming adopted similar language in a letter sent to national team athletes, coaches and support personnel, threatening them (as well as friends and family members) with reputational and professional harm should they participate in, or even publicly voice support for, the Enhanced Games.

Then, just 11 days later, World Aquatics launched its boycott targeting Enhanced by adopting a By-Law ("By-Law 10") that blacklists *anyone*, including athletes who *do not* use PESs, coaches, trainers, doctors, physiotherapists and anyone else who is any way associated with Enhanced, from all World Aquatics' events, ranging from regional-level competitions to the Olympics. The aquatics community, the press and others understand that the ban is *for life*.

World Aquatics' attempt to portray its predatory scheme as a noble endeavor to protect the "integrity" of sports is transparently pretextual. The By-Law does *nothing* to improve or maintain existing anti-doping controls. Moreover, the irony of World Aquatics' proffered justification for the boycott of Enhanced – protecting the "integrity" of elite aquatics from the influence of PESs – is that World Aquatics and WADA are notoriously tolerant of PES use after the fact, particularly by athletes from Russia, China and other countries whose governments help evade the rules and on whose coffers the IOC, World Aquatics and WADA depend for funding (and, reportedly, bribes). Their efforts to sweep flagrant transgressions under the rug have left fans angry and deprived deserving athletes of medals. As a result, WADA and World Aquatics

are now reportedly the focus of a DOJ criminal fraud investigation, Congressional hearings, and legislation targeting WADA.

Defendants' conspiracy constitutes a naked and blatant restraint on competition with no legitimate business objective or procompetitive benefits and, thus, a *per se* violation of Section 1 of the Sherman Act. Moreover, the ban is so grossly overbroad in scope that its anticompetitive effects would *far* outweigh any possible procompetitive benefits (if there were any), and it should be struck down under the "quick look" or rule of reason tests.

Defendants adopted the By-Law *now* to destroy Enhanced before it establishes a foothold in the market by hosting successful inaugural games next May. Defendants know that Enhanced is actively recruiting, planning and fundraising for those games, and they launched their conspiracy to block it from recruiting the athletes and other personnel it needs for the Games to succeed.

In the weeks since the By-Law was announced, Enhanced's recruitment of swimmers and support personnel has largely stalled, and the boycott has shut down its recruitment of non-enhanced swimmers, who cannot forgo World Aquatics competitions including the Olympics. Yet, they are vital to the success of the Enhanced Games. The boycott has even negatively impacted Enhanced's recruitment of weightlifters and track & field athletes, especially non-enhanced athletes or athletes who would want to return to non-enhanced sports, and who fear that their governing bodies will follow World Aquatics' lead if its ban is allowed to stand. Absent an injunction, Defendants could succeed in crushing their only competitor, and, at a minimum, they will leave Enhanced damaged and weakened as a competitor, while foreclosing athletes and others who wish to join Enhanced from doing so. Enhanced therefore requests that

the Court expeditiously enjoin Defendants' from enforcing their conspiracy so as to avoid the irreparable harm it will otherwise suffer.

**RELEVANT FACTS**

For a full and complete statement of facts supporting Enhanced's Motion, Enhanced respectfully refers the Court to the accompanying D'Souza Decl., Adams Decl., Hawke Decl., Turner Decl., Rojas Decl., Gkolomeev Decl., Govorov Decl., Kaplan Decl., and Rosner Decl., as well as the Complaint (Dkt. No. 2). Below is a summary of the key facts in support of the Motion.

## I. ENHANCED AIMS TO REVOLUTIONIZE ATHLETICS AND SPORTS MEDICINE AND WAS POISED FOR SUCCESS

Enhanced was founded in 2023 with two key goals: (1) disrupting elite athletics, including by fairly compensating athletes and offering generous performance-based bonuses; and (2) establishing the first-ever safe, medically-supervised, transparent and scientifically-based PES program to enable athletes to perform at levels not previously thought possible, while leading a global effort to study the broader benefits, applications and safety of such substances. D'Souza Decl. ¶¶ 4-10, 14-16; Adams Decl. ¶¶ 12-17; Hawke Decl. ¶¶ 19-20; Turner Decl. ¶¶ 13, 17-28; Gkolomeev Decl. ¶¶ 18-20; Govorov ¶¶ 32-34. Enhanced invites participation from both enhanced and non-enhanced athletes. Adams Decl. ¶ 15; D'Souza Decl. ¶ 27.

Enhanced offers elite athletes a level of financial support that is severely lacking under existing international sports regimes. In particular, most elite swimmers, even Olympians and world record holders, struggle financially under the World Aquatics system. Gkolomeev Decl. ¶ 8; Govorov ¶¶ 11-18. Government funding, when available, often provides modest compensation, which is typically insufficient to cover an athlete's training, travel, and living expenses. Govorov ¶¶ 12-13. Sponsorship opportunities have also become increasingly scarce

and not meaningfully tied to athletic achievement. *Id.* at ¶ 14. This forces most elite swimmers to pursue alternative income sources in addition to the demands of swimming full time. *Id.* at ¶ 17. In stark contrast, Enhanced has made a commitment to ensuring athletes earn compensation that reflects their achievements and sacrifices to the sport while also providing athletes greater autonomy and respect. D'Souza Dec. ¶15; Gkolomeev Decl. ¶ 18; Govorov ¶ 33.

The Enhanced PES program operates under the guidance and supervision of an independent commission of leading medical and scientific experts and adheres to strict medical safety protocols and rigorous scientific standards to protect the well-being and safety of all participants. Turner Decl. ¶ 22; D'Souza Decl. ¶ 21. Enhanced's program involves a multi-phase and months-long-process that requires comprehensive initial medical screening and gradual administration of PESs under close medical supervision. Turner Decl. ¶ 26; D'Souza Decl. ¶ 21. Enhanced's approach features comprehensive, individualized medical assessments and monitoring that far exceed the typical standard of care athletes receive from existing sport competitions. Turner Decl. ¶ 28; Gkolomeev Decl. ¶ 19. Enhanced's in-depth health assessments and constant medical supervision do not exist in the World Aquatics system, and enable faster identification of the toll of rigorous training on athletes' bodies. Hawke Decl. ¶ 33.

Enhanced's program includes an Institutional Review Board ("IRB")-approved clinical research program to be established in coordination with a leading hospital to study the impact of certain PESs, all of which are legal and approved by the U.S. Food and Drug Administration ("FDA"). Turner Decl. ¶ 17. Ultimately, Enhanced strives to allow athletes to achieve athlete peak performance, improve recovery times and test the bounds of human achievement. This already has been demonstrated by one Enhanced swimmer breaking the 50-meter freestyle world record in a standalone time trial event this year. Gkolomeev Decl. ¶ 13; Hawke Decl. ¶ 18.

Enhanced also seeks to translate these developments into new breakthroughs for public health and human longevity studies. D'Souza Decl. ¶ 21; Turner Decl. ¶ 27.

Enhanced wasn't relying solely on innovation to position itself for future success and to establish itself as a formidable competitor to World Aquatics. As reflected in the expert declaration of Scott Rosner, Program Director of the Master of Science in Sports Management program at Columbia University, and one of the nation's leading experts in sports management and marketing,[1] Enhanced possesses each of the characteristics required of an emerging sports league or property to succeed. Rosner Decl. ¶¶ 40-75. However, Defendants' illegal and predatory boycott has dramatically affected its ability to recruit the athletes and support personnel it needs to hold successful Games next May and, unless enjoined by this Court, will present a substantial obstacle to Enhanced's ability to establish itself as a viable competitor to World Aquatics.

## II. DEFENDANTS EXERCISE COMPLETE CONTROL OVER ELITE INTERNATIONAL SWIMMING COMPETITIONS

World Aquatics and its member federations, together with WADA, exercise exclusive control over the market for elite international swimming competitions and the market for athletes competing therein, as well as the critical support personnel for those events. D'Souza Decl. ¶ 57; Hawke Decl. ¶ 9.

World Aquatics is recognized by the International Olympic Committee ("IOC"), and serves as a gatekeeper to aquatic athletes seeking to compete in international competitions, including the Olympics. D'Souza Decl. ¶ 57; Hawke Decl. ¶ 9. It holds itself out as the sole

---

[1] Professor Rosner is also a co-author of S. ROSNER & K. SHROPSHIRE, THE BUSINESS OF SPORTS (2nd Ed. , 2012), a leading textbook in the field, previously co-developed and launched the Wharton Sports Business Initiative, an academic center for knowledge creation and dissemination in the sports industry, and has consulted for numerous sports properties and others, including the Philadelphia Phillies, the United States Tennis Association, Maple Leaf Sports & Entertainment, Northwestern University, the NFL, and others. Rosner Decl. ¶ 22, Ex. A.

global governing body for aquatic sports, and exerts near-total control over the international competitive landscape. Hawke Decl. ¶ 6. World Aquatics operates globally and derives a significant portion of its revenues and profits from its World Championship competitions and other sanctioned events hosted by its member national federations, including USA Swimming. Kaplan Decl. ¶ 17.

Every swimmer who aspires to compete at the Olympic and/or World Championship level must strictly follow World Aquatics' draconian rules, dictating many aspects of their careers and even personal lives, or risk potentially severe sanctions. D'Souza Decl. ¶ 6; Gkolomeev Decl. ¶ 9; Govorov Decl. ¶ 20. World Aquatics' rules are adopted and implemented by national federation members, such as USA Swimming, and World Aquatics can force member federations to adopt specific rules, including its by-laws. Hawke Decl. ¶ 7; Kaplan Decl. ¶ 24 & Ex. AC.

WADA, in turn, promulgates its own set of rules that have been adopted by World Aquatics and USA Swimming concerning the use of PESs and establishing testing protocols and penalties for violations. Hawke Decl. ¶ 8. WADA lacks an enforcement arm, and therefore relies on World Aquatics and its federation members to implement its rules and recommendations. Hawke Decl. ¶ 8. With extremely limited exception, those members strictly follow WADA's rules and dictates out of fear of punishment by WADA. Hawke Decl. ¶ 8.

## III. DEFENDANTS' FLAWED AND FRAUDULENT CONTROL OF DOPING IN THEIR OWN GAMES

As is widely known within and beyond the world of elite aquatics, WADA's and World Aquatics' control of doping in their own games – from regional competitions to the Olympics – is deeply flawed and inconsistent. Among other things they have (1) turned a blind eye to egregious violations, sometimes under extremely suspicious circumstances; (2) attempted to hide

instances of blatant and rampant cheating; and (3) relied on inconsistent and often biased self-reporting of national federations regarding their own athletes.  Hawke Decl. ¶¶ 14-17; Gkolomeev Decl. ¶¶ 6-7; Govorov ¶¶ 21-25.  In fact, WADA has been under investigation by the U.S. House and Senate, and the U.S. recently cut off funding WADA due to its corrupt and fraudulent practices.  Both WADA and World Aquatics are also now reportedly under criminal investigation by the U.S. Department of Justice (Fraud Section) for covering up doping scandals, including at the Olympics.  Kaplan Dec. ¶¶ 11-12.

The Senate's investigation of WADA has led to legislation entitled *Restoring Confidence in the World Anti-Doping Agency* being recently voted out of the Commerce Committee.  Kaplan Decl. ¶ 14.  In announcing a hearing to investigate WADA, Senator Blackburn accurately characterized its hypocrisy, duplicity, and arrogance:

> [WADA] has allowed Communist China and Russia to lie, cheat, and steal, putting American athletes at risk. When Congress used its oversight authority to investigate WADA's blatant corruption, they acted like they were above the law. When the federal government investigated WADA's inaction, they tried to strongarm the United States and threaten our hosting of the Salt Lake City Games. As one of the largest financial contributors to WADA, the United States deserves answers. My colleagues and I refuse to be silenced in our mission to make certain WADA does not turn a blind eye to corruption. There must be real oversight and accountability at WADA, and this hearing will move us one step closer to ensuring fair competition for all athletes.

Kaplan Decl. ¶ 13.  Defendants' coordination and control of existing aquatic competition has deprived swimmers of Olympic medals and has left other athletes and fans demoralized, frustrated and angry.  Hawke Decl. ¶ 14.

Yet, Defendants hold themselves out as the defenders of the integrity of elite aquatics, imbued with the authority to police how *others* manage their games, and to engage in flagrant violations of U.S. law in doing so.  Their illegal conspiracy and arrogance cannot go unchecked.

# IV. DEFENDANTS' CONSPIRACY TO FORECLOSE ENHANCED FROM THE MARKET AND TO PROTECT THEIR MONOPOLY

## A. The Enhanced Games Are Announced

On May 21, 2025, following two years of development and planning, Enhanced announced its inaugural, multi-sport event, the Enhanced Games, scheduled to take place on May 24-26, 2026 in Las Vegas, Nevada. Adams Decl. ¶ 24; D'Souza Decl. ¶ 24. The swimming competitions will be the capstone event. Adams Decl. ¶ 20; D'Souza Decl. ¶ 51. Enhanced seeks to recruit a minimum of twenty elite swimmers (with equal numbers of male and female athletes) to participate in the swimming competitions. Adams Decl. ¶ 21; Hawke Decl. ¶ 36.

The inclusion of non-enhanced swimmers in the swimming competitions is a critical element of the Games, giving spectators a control against which to compare the enhanced athletes, and giving them not just individual swimmers but a group of swimmers to root for. Pitting enhanced against non-enhanced swimmers is the exact kind of sports narrative Enhanced needs (in addition fielding world-class athletes positioned to potentially break world records) to draw fan and media attention; more so than any other aspect of the Games. Rosner Decl. ¶ 57; D'Souza Decl. ¶ 27; Adams Decl. ¶ 25; Hawke Decl. ¶¶ 31-32. As Enhanced founder Aron D'Souza told an AP reporter in 2023, "I hope that the bold, natural athlete shows up to the games and says, 'Hey guys I'm natural, I'm still WADA compliant and I'm going to beat all you guys' - that is going to be great television." D'Souza Decl. ¶ 28.

Enhanced will also require the participation of a wide range of support personnel, including coaches, trainers, medical staff, physiotherapists, timekeepers, event administrative staff, and others. Adams Decl. ¶ 23. These will include both volunteers and paid staff totaling 100-200 individuals. *Id*.

### B. Defendants Launch Their Coordinated Campaign to Destroy Enhanced

#### 1. WADA and USA Swimming Attack Enhanced

On May 22, 2025, the day after the Enhanced Games announcement, WADA issued a press release condemning the Games. D'Souza Decl. ¶ 41. WADA's statement expressly encouraged other sports organizations to take actions against Enhanced. It also called on authorities to *prosecute* potential Enhanced Games participants (both athletes and their support staff) for unidentified and unidentifiable crimes. *Id*. Notably, the President of the *US Anti-Doping Agency* ("USADA") blasted WADA's statement, accurately characterizing it as an effort to "distract from fixing WADA and to stoke anti-American rhetoric." Kaplan Decl. ¶ 21.

The following day, USA Swimming adopted similar language in a letter to national team athletes, coaches and support personnel, threatening them – as well as friends and family members – with reputational and professional harm if they participate in the Enhanced Games, or even publicly voiced support for Enhanced. D'Souza Decl. ¶ 43.

#### 2. The Full Boycott Is Launched: World Aquatics Adopts the By-Law

On June 3, 2025, World Aquatics closed ranks with WADA and USA Swimming by promulgating By-Law 10, which renders "ineligible" from World Aquatics' competitions (*i.e.,* the Olympics pipeline) anyone who "actively support[s]" or in any way or participates in any Enhanced activities or competitions. D'Souza Decl. ¶ 56; Kaplan Decl. ¶ 22, Ex. AB.

Notably, the By-Law is expressly directed at athletes, coaches and others *who are not subject at that time to World Aquatics' or WADA's rules or regulations.* Kaplan Decl. ¶ 22 Ex. AB (By-Law 10.2.1). The By-Law does not set a maximum time limit on the period of ineligibility, exposing its targets to the risk of lifetime bans; a penalty few, if any, ever receive from World Aquatics, even for egregious doping violations. Kaplan Decl. ¶¶ 27-28 and Ex. AH.

### 3. USA Swimming and WADA Ratify and Amplify the Effects of the By-Law

Although the By-Law does not expressly refer to Enhanced, the reference to "scientific enhancements," together with Defendants' public statements, makes clear that Enhanced is the intended target. D'Souza Decl. ¶ 48; Kaplan Decl. ¶ 26. USA Swimming and WADA subsequently issued press releases applauding World Aquatics' new rule and doubling down on their vitriol and threats against Enhanced. D'Souza Decl. ¶ 49. Their statements echoed prior threats made against those who expressed interest in playing any role in the Enhanced Games, either as non-enhanced or enhanced athletes or even in support positions. *Id*.

USA Swimming also retaliated against Enhanced by launching a sham investigation into Enhanced's Head Swim Coach, Brett Hawke, on the utterly false pretense that he had violated USA Swimming's anti-doping rules. USA Swimming used the interview primarily to obtain information about others potentially participating in the Enhanced Games, as well as Enhanced's business plans. Hawke Decl. ¶ 50; D'Souza Decl. ¶ 49.

## V. THE SEVERE HARM TO ENHANCED RESULTING FROM THE CONSPIRACY

The success of the May 2026 Games is critical to Enhanced's future. Rosner Decl. ¶¶ 16-17; D'Souza Decl. ¶ 51; Adams Decl. ¶¶ 36-37. This inaugural event will serve as a proof-of-concept, generate global media attention, and establish Enhanced as a legitimate and sustainable sporting organization. *Id*. Launching with a weak event will be very damaging to the enterprise and could doom it. Rosner Decl. ¶ 87.

Enhanced is currently in a critical planning phase for the Enhanced Games. Rosner Decl. ¶¶ 95-106; Adams Decl. ¶¶ 26-33; Hawke Decl. ¶ 36. Yet, the boycott has had its intended effect of kneecapping Enhanced in that planning, as well as in Enhanced's efforts to continue to build goodwill and reputation in the sports community and beyond. In particular, the By-Law

has *dramatically* impacted Enhanced's ability to recruit elite swimmers, coaches, medical professionals, and other support personnel, all of whom are critical to success.  Adams Decl. ¶ 35; Hawke Decl. ¶¶ 38-41.

Following the By-Law announcement, numerous athletes have communicated that they cannot consider joining the games for fear of the ban.  Adams Decl. ¶ 35; Hawke Decl. ¶ 39. This includes Olympic swimmers and others who had expressed great interest in competing as *non-enhanced athletes*.  Adams Decl. ¶ 35.  The following screenshots provide a couple illustrative examples of such communications received by Enhanced.

*Athlete 1:*

*Athlete 2:*




Many others expressed the same fear about the risks of participating in the Enhanced Games following Defendants' conduct:

- A swimming Olympian planned to "do both" (the Olympic Games and the Enhanced Games) but changed their plans after the By-Law was announced: "I'll talk to anyone,

but can not join as long as FINA has banned both". Hawke Decl. ¶ 39 & Ex. E, B. Hawke Text Messages with Athlete 1.[2]

- An Olympic medalist expressed that there is an "extremely low likelihood" of joining the Enhanced Games due to "leaning towards pushing for (the) 2028 (Olympic Games)," something they would not be eligible for based on World Aquatics' recent bylaw. Hawke Decl. ¶ 39 & Ex. G, B. Hawke WhatsApp Messages with Athlete 3.

- An athlete who competed in three Olympics emphasized a strong desire to potentially compete at the Enhanced Games with the only concern they had being the recent bylaw from World Aquatics: "What's the deal with WA [World Aquatics] tho? (...) I compete at [E]nhanced and I'm [f*****]. Hawke Decl. ¶ 39 & Ex. I, B. Hawke WhatsApp Messages with Athlete 5.

Many others who previously had expressed interest have ceased communication with Enhanced altogether. Adams Decl. ¶ 35; Hawke Decl. ¶ 45. Coaches, trainers, and timekeepers, who previously expressed interest and/or were involved in Enhanced events have also withdrawn from the Enhanced Games and/or cut all public ties with Enhanced, as Defendants clearly intended. Adams Decl. ¶ 35; Hawke Decl. ¶ 42. For example:

- A retired collegiate swimmer and distinguished professional swimming coach expressed strong support for Enhanced but felt unable to offer support publicly. Specifically, he stated the following: "I really hope you and Enhanced succeed. I just can't do it publicly (...) I've got to protect what I've built. Wish USA Swimming and World Aquatics weren't so protective over their monopoly". Hawke Decl. ¶ 42 & Ex. J, B. Hawke Text Messages with Coach 1.

- Two official timekeepers and current members of USA Swimming, whom Enhanced contacted after By-law 10 was issued, stated they "decline to engage in any conversations and/or statements made related to our thoughts and opinions at this time. This is only to protect our current USA-S membership standing." Adams Decl. ¶ 35 & Ex. B, June 17th, 2025 Email to R. Adams.

- A former champion swimmer who supported Enhanced and its work communicated following the boycott said that even he could "never support [Enhanced] publicly." Hawke Decl. ¶ 44;

- A professional training and coaching company severed all commercial ties with head swimming coach Brett Hawke following the boycott announcement. Hawke Decl. ¶ 43 & Ex. K, B. Hawke Text Messages with Training Company; and some members

---

[2] Plaintiff has anonymized the identities of the individuals in order to protect them from retaliation by Defendants for their statements and prior support of Enhanced.

of the aquatics community went so far as to remove "likes" of Coach Hawke's social media posts out of fear of punishment from World Aquatics. Hawke Decl. ¶ 45.

The harm to Enhanced from Defendants' boycott is not limited to aquatics athletes and support personnel. Before the By-Law, Enhanced received expressions of interest from dozens of elite athletes across track and field, swimming, and weightlifting. Adams Decl. ¶ 34. Now, however, multiple Olympic hopeful weightlifters have expressed concerned they will face similar repercussions from their national federations or IOC-affiliated organizations for affiliating with Enhanced. Adams Decl. ¶ 35; Rojas Decl. ¶¶ 12-13. Similarly, agents for top track & field athletes who would like to compete in the Enhanced Games have advised that they cannot commit their clients while the World Aquatics ban remains in place because its track & field counterpart (World Athletics) might follow suit. *Id.* In fact, the President of the International Weightlifting Federation recently publicly stated that, in referring expressly to Enhanced, "we are revising our anti-doping rules to specifically address these kinds of cases."[3] The boycott has even had ripple effects among *scientists* who fear being banned by the various arms of the International Olympic Committee and their members. Turner Decl. ¶ 31. Most recently, three suppliers of weightlifting equipment advised Enhanced that they could no longer supply equipment for the May 2026 Games because they were instructed by IWF that they could not do so. Rojas Decl. ¶¶ 16-17.

Defendants' actions have also generated extremely negative media attention that has damaged Enhanced's reputation, goodwill and prospective business relationships. Rosner Decl. ¶ 90; Adams Decl. ¶ 39; D'Souza Decl. ¶¶ 55, 63-65. Defendants' calls for athletes and non-athletes alike to shun and condemn Enhanced and any individual participating in or supporting

---

[3] Kieren O'Connor, *IWF President talks Enhanced Games and Olympic future,* INSIDER SPORT July 28, 2025 (available at https://insidersport.com/2025/07/28/iwf-president-enhanced-games-olympic/).

the games together with a call for the *prosecution* of athletes and for Enhanced to be *shut down*– has further tainted, and will continue to taint, Enhanced's business relationships and ability to raise capital, and damages the company's good will and reputation.  Rosner Decl. ¶¶ 84, 90-94; Adams Decl. 35-40; D'Souza Decl. ¶¶ 58-65; Hawke Decl. ¶ 38-46.

The 2026 Games' competitive and commercial appeal depends on recruiting current world-class athletes, both enhanced and non-enhanced, to showcase a direct competition between and among the two groups.  Rosner Decl. ¶ 80; Adams Decl. ¶ 25.  Without the participation of current elite athletes – particularly those who are still in the prime of their career and not using performance-enhancing substances – Enhanced risks being perceived as a novelty event rather than a credible, world-class competition.  Rosner Decl. ¶¶ 83-85.  The participation of current, top athletes, both enhanced and non-enhanced, is essential to the success of the Games.  *Id.*; D'Souza Decl. ¶ 28; Adams Decl. ¶¶ 25, 27; Hawke Decl. ¶ 36.

Moreover, so long as Enhanced lives under the dark cloud of the boycott:

- It continues to be stalled in building the goodwill on which its success depends, and instead, continues to suffer the effects of the threats and negative publicity that Defendants have generated.  Rosner Decl. ¶ 90; D'Souza Decl. ¶¶ 63-65.  This harm will include harm to its ability to generate fan and media interest in the May 2026 Games, lost revenue, and a substantial restraint on its ability to grow and succeed in the marketplace.  Rosner Decl. ¶¶ 78-106; D'Souza Decl. ¶ 58-65; Adams Decl. ¶¶ 36-42;

- It risks being unable to make the significant deposits needed to construct the facilities for those games, including construction of the pool, the surface for the track & field, and others.  Many non-refundable deposits are upcoming in the next couple of weeks,

and Enhanced risks losing its place in line to have that work completed in time. Adams Decl. ¶¶ 29-33;

- Its ability to line up broadcast rights, corporate sponsorships, and other agreements on which the financial success of the games depends is damaged.  Adams Decl. ¶ 39; and

- Because the boycott, if allowed to remain in place, will substantially reduce the value of the company in the minds of investors, its ability to raise the additional capital it needs to fund the Games and continue operating is threatened, and the capital it will be able to raise will be more expensive.  Rosner Decl. ¶ 68; D'Souza Decl. ¶¶ 60-62.

Absent relief from the Court, Defendants' boycott threatens both the success of the planned May 2026 Games and the longer-term viability of the entire enterprise.  Rosner Decl. ¶ 14; D'Souza Decl. ¶¶ 51, 63, 65.  As explained by Professor Rosner, prior to the adoption of By-Law 10, Enhanced had all the necessary characteristics to be positioned for success as an emerging sports property.  Rosner Decl. ¶¶ 40-75.  But the headwinds created by the boycott irreparably harm Enhanced's goodwill, financial prospects, and strength as a potential competitor, threatening its ability to gain a foothold in the relevant markets and to survive financially.  Rosner Decl. ¶¶ 77-94; D'Souza Decl. ¶¶ 50-65.

In sum, the boycott has substantially impaired Enhanced's ability to host successful Games next year, to continue to build goodwill, to establish itself as a significant competitor to World Aquatics, and to create a new paradigm for sports by advancing sports science and medicine.  Absent relief from the Court, that harm will be irreparable.

# ARGUMENT

## I. THE COURT SHOULD EXPEDITIOUSLY ISSUE A PRELIMINARY INJUNCTION TO PRESERVE THE STATUS QUO

Section 16 of the Clayton Act entitles a party to obtain injunctive relief "'against threatened loss or damage by a violation of the antitrust laws.'" *California v. Am. Stores Co.*, 495 U.S. 271, 282 (1990) (quoting 15 U.S.C. § 26). To obtain injunctive relief under Section 16, that injury must be "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat,* 429 U.S. 477, 489 (1977). By foreclosing Enhanced from recruiting the swimmers and other personnel it needs for the May 2026 Games, Defendants' boycott of Enhanced clearly gives rise to antitrust injury. *See* discussion at Section III(D) below.

Separately, a party is entitled to a preliminary injunction under FRCP 65 by showing "'(1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a [TRO or] preliminary injunction is in the public interest.'" *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018); *Oneida Nation of New York v. Cuomo*, 645 F.3d 154, 164 (2d Cir. 2011). As demonstrated below, Enhanced easily satisfies each of these elements.

### A. Enhanced Will Suffer Irreparable Harm If Defendants Are Not Expeditiously Enjoined

Irreparable harm is any injury that is "actual and imminent and that cannot be remedied by an award of monetary damages." *Forest City Daly Hous., Inc. v. Town of N. Hempstead*, 175 F.3d 144, 153 (2d Cir. 1999) (citation omitted). The evidence demonstrates that Defendants' conduct has inflicted injury that the courts recognize as irreparable.

### 1. Defendants' Boycott Threatens Enhanced's Viability

When the alleged financial injury is so great as to threaten the viability of a business, such harm may be considered irreparable. *See Tom Doherty Assocs., Inc. v. Saban Ent., Inc*., 60 F.3d 27, 37-38 (2d Cir. 1995) (irreparable harm exists "where a party is threatened with the loss of a business"); *Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co.,* 749 F.2d 124, 125-27 (2d Cir. 1984); *John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc*., 588 F.2d 24, 28-29 (2d Cir. 1978) (same). As demonstrated in the accompanying declarations, Defendants' boycott and other conduct pose such a threat. Rosner Decl. ¶¶ 14, 85; D'Souza Decl. ¶¶ 60-65. Successfully establishing a new sports league or property raises significant risks of failure. Rosner Decl. ¶ 40. Yet, prior to the boycott, Enhanced was well positioned for success. *Id.* Defendants' bringing the full might of their power to bear in attempting to kill Enhanced inevitably raises a real risk that they will succeed – just as World Aquatics similarly succeeded in killing ISL when it attempted to enter the markets and compete against World Aquatics.

### 2. Defendants' Boycott Causes Substantial Harm to Enhanced's Good Will and Reputation

As World Aquatics promised: athletes and others who in any way support Enhanced will have "no place in aquatics."[4] The By-Law had the predictable and intended result of severely limiting the number of eligible athletes willing to participate in the 2026 Games, particularly those who are still active or wish to compete in World Aquatics-sanctioned events in the future. *See* Adams Decl. ¶¶ 35-37; Hawke Decl. ¶ 46. Enhanced must recruit these athletes, and others, to hold a successful event in Las Vegas next May. Rosner Decl. ¶¶ 78-81; Adams Decl. ¶¶ 27, 35-37. Beyond the 2026 Games, Enhanced needs access to these athletes to establish a

---

[4] https://www.worldaquatics.com/news/4277567/world-aquatics-bureau-bylaw-protect-sport-from-enablers-of-doped-sport

meaningful foothold in the market; to continue to obtain funding; and for it to be positioned to grow into a meaningful competitor to World Aquatics and other established sports bodies. Rosner Decl. ¶ 85; D'Souza Decl. ¶¶ 51, 60-63.  Accordingly, the clock is ticking on Enhanced's ability to recruit enough elite athletes and others it needs for the May 2026 Games to continue with planning, building out the facility, fundraising and building good will.  Rosner Decl. ¶¶ 95-106; D'Souza Decl. ¶¶ 31-37; Adams Decl. ¶¶ 26-33.

The damage to Enhanced's goodwill and reputation with athletes, fans, potential viewers, and others resulting from the boycott and related public attacks on its business and integrity constitutes irreparable injury.  *Regeneron Pharm., Inc. v. United States HHS*, 510 F. Supp. 3d 29, 39-40 (S.D.N.Y. 2020) ("loss of reputation, good will, and business opportunities" constitute irreparable harm) (citation omitted); *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc*., 323 F. Supp. 2d 525, 532 (S.D.N.Y. 2004) (same); *John E. Andrus Mem'l, Inc. v. Daines*, 600 F. Supp. 2d 563, 571-72 (S.D.N.Y. 2009) (same).

Such harm is demonstrated where, as here, a defendant cuts off the supply of an input needed by the plaintiff to provide customers what they want, particularly where that input is "unique" and cannot be obtained elsewhere.  Indeed, the Second Circuit has held that under such circumstances, the defendant's conduct "inevitably creates irreparable damage to the good will of the [plaintiff]."  *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 908 (2d Cir. 1990) (finding irreparable harm where Reuters threatened to cut off UPI's access to its photos leading to lost customers).

Following its decision in *Reuters,* the Second Circuit established the following "governing principle" in returning to this point: "Where the availability of a product is essential to the life of the business or increases business of the plaintiff beyond sales of that product…the

damages caused by loss of the product will be far more difficult to quantify than where sales of one of many products is the sole loss. In such cases, injunctive relief is appropriate." *Tom Doherty Assocs. v. Saban Entm't, Inc.* 60 F.3rd 27, 38 (2nd Circ. 1995). This standard is satisfied, the court held, where a plaintiff makes a "clear showing that a product that a plaintiff has not yet marketed is a truly unique opportunity for a company." *Id.*. Thus, anticipated, prospective harm can constitute harm that is irreparable; and "even a speculative loss may cause immediate irreparable harm to [a plaintiff's] good will." *Reuters,* 903 F.2d at 908.

Here, Defendants' conspiracy has undisputably blocked Enhanced's access to non-enhanced swimmers, enhanced swimmers who wish to preserve their option of returning to World Aquatics' competitions, athletes from other sports, coaches, and support personnel. Each of these groups is a necessary "input" without whom Enhanced cannot host its Games next year, let alone possibly match the success Enhanced would otherwise enjoy. Rosner Decl. ¶¶ 78-85; D'Souza Decl. ¶¶ 53-54. Its ability to showcase enhanced swimmers competing against non-enhanced swimmers, and to feature top athletes across its events unconstrained by the impact of the boycott, clearly constitutes a "truly unique opportunity" for Enhanced. As in *Tom Doherty Assocs.*, elite swimmers "are a unique product with an established exceptional appeal" both in the swimming community and the public at large, and there are no "reasonably substitutable" alternatives. 60 F.3d at 38. Likewise, the limited pool of coaches and support personnel with the requisite experience to support this caliber of event have no reasonable substitutes. The expected harm to its goodwill resulting from Enhanced's inability to hold Games with those athletes (and other personnel) and the competitive disadvantage therefrom constitutes irreparable harm.

### B. Enhanced is Likely to Succeed on the Merits of Its Claims

The Second Circuit has adopted a flexible standard regarding the "likelihood of success" requirement, allowing a party seeking injunctive relief to show either a likelihood of success on

the merits or "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *See Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (citation omitted). To establish a likelihood of success on the merits, a plaintiff "need not show that success is an absolute certainly. [It] need only make a showing that the probability of his prevailing is better than fifty percent." *See Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 510 (S.D.N.Y. 2017) (citation omitted). Enhanced easily satisfies this element of the test for injunctive relief.

1.     **The Adoption and Enforcement of By-Law 10 Is An Illegal Boycott in Violation of Sherman Act Section 1**

Section 1 of the Sherman Act proscribes agreements between or among two or more persons that unreasonably restrain trade. 15 U.S.C. § 1; *United States v. Apple, Inc.*, 791 F.3d 290, 313-14 (2d Cir. 2015). A violation of Section 1 is established by showing (i) "concerted action" (ii) by "separate economic actors pursuing separate economic interests" (iii) that "unreasonably restrains trade." *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 186-87, 195 (2010).

A conspiracy under Section 1 does not require a formal agreement or explicit contract. Instead, it is sufficient if there is a "unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *American Tobacco Co. v. United States,* 328 U. S. 781, 328 U. S. 810 (1946). Here, Defendants have been transparent about their conspiracy and intent to restrain trade, and the evidence of their illegal agreement is direct and remarkably clear.

a.     **World Aquatics Engaged in Concerted Actions with Separate Economic Actors**

The Supreme Court has held that an association and its members constitute separate economic actors for purposes of Section 1. *Am. Needle*, 560 U.S. at 195. (NFL and its member

teams are separate economic actors for purposes of Section 1); *see also NCAA v. Board of Regents*, 468 U.S. 85, 99 (1984)); *Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55, 71 (2d Cir. 1988). Indeed, in ISL's antitrust case against World Aquatics, the district court held that World Aquatics' member federations are distinct economic entities capable of conspiring among each other and with World Aquatics. *Shields v. Fed'n Internationale de Natation*, 649 F. Supp. 3d 904, 916-17 (N.D. Cal. 2023), *rev'd on other grounds*, *Shields v. World Aquatics*, 2024 U.S. App. LEXIS 23559 (9th Cir. Cal., Sept. 17, 2024).[5]

The ISL district court also found World Aquatics' written rules "constitute concerted action by [World Aquatics] and its member federations." *Shields,* 649 F. Supp. 3d at 918. Notably, World Aquatics' Constitution expressly requires all members to "fully comply" with its By-Laws. Kaplan Decl. ¶ 24 & Ex. AC ("World Aquatics Rules" definition at 7 and Section 7(b)). In practice, World Aquatics members virtually always adopt and follow World Aquatics' rules without deviation. Hawke Decl. ¶¶ 7, 9. Thus, aquatics athletes and others know that member federations will implement By-Law 10 as part of athlete eligibility standards regardless of whether those members formally adopt their own version of By-Law. This is why it has been so effective. Because By-Law 10 is part of World Aquatics' written rules, the concerted action element of a Section 1 claim is easily satisfied.

Finally, World Aquatics members have taken acts in furtherance of the boycott, as amply demonstrated by USA Swimming's public statements and its investigation of Enhanced Coach Brett Hawke into his association with Enhanced. Hawke Dec. ¶¶ 48-51. The alignment between World Aquatics and its federations constitutes concerted action under Section 1, even if By-Law 10 provides federal members with nominal discretion over whether to adopt it. *Laumann v.*

[5] Fed'n Internationale de Natation ("FINA") changed its name to World Aquatics in 2022.
https://www.worldaquatics.com/news/2979029/fina-becomes-world-aquatics-as-new-brand-launched.

*NHL*, 56 F. Supp. 3d 280, 303 (S.D.N.Y. 2014) ("'It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators.'") (citation omitted).

As also demonstrated above, it was essential for WADA to take affirmative steps to join Defendants' conspiracy because it cannot independently ban or otherwise punish athletes that would support Enhanced and, thereby, challenge the existing status quo that props up WADA's broken bureaucracy. Hawke Decl. ¶ 8. In sum, there is ample evidence that both WADA and USA Swimming (as well as the other 210 World Aquatics members) joined the boycott.

Accordingly, Enhanced is likely to succeed in showing that World Aquatics' adoption of By-Law 10, its coordination with WADA, and the participation of member federations constitutes concerted action by separate economic actors under Section 1 of the Sherman Act.

### b. By-Law 10 Constitutes a Naked Conspiracy to Restrain Competition and a *Per Se* Section 1 Violation

An unreasonable restraint is one that injures competition, and courts use a sliding scale to assess whether an injury to competition has occurred. *See N.C. State Bd. of Dental Exam'rs v. FTC*, 717 F.3d 359, 373 (4th Cir. 2013), *aff'd*, 135 S. Ct. 1101 (2015). At one end of the scale are practices considered *per se* illegal. *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 458 (1986). At the other end of the scale, restraints are analyzed under the "rule of reason" which "requires the factfinder to decide whether under all the circumstances of the case the restrictive practice imposes an unreasonable restraint on competition." *Arizona v. Maricopa Cty. Med. Soc'y*, 457 U.S. 332, 343 (1982)). Courts apply a middle ground called "quick-look" analysis "when the great likelihood of anticompetitive effects can easily be ascertained," and "after assessing and rejecting [the] logic of proffered procompetitive justifications." *Cal. Dental Ass'n v. FTC*, 526

U.S. 756, 770–71 (1999). The boycott of Enhanced Games constitutes an unreasonable restraint of trade no matter the lens through which By-Law 10 is scrutinized.

Group boycotts, or concerted refusals to deal, are "joint efforts by a firm or firms to disadvantage competitors by 'either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle.'" *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 294 (1985) (quoting L. Sullivan, Law of Antitrust 292-293 (1977)). Courts have "long held" that "group boycotts are so likely to restrict competition without any offsetting efficiency gains that they should be condemned as *per se* violations of § 1 of the Sherman Act." *Id*. at 290. *Per se* treatment of a boycott is warranted when (1) the defendants possess a "dominant position in the relevant market" (i.e. market power), (2) the conduct "cut off [plaintiff from] access to a supply, facility, or market necessary to enable the boycotted firm to compete," *id.* at 294, and (3) the agreement "impl[ies] anticompetitive animus" as opposed to one that is "justified by plausible arguments that they were intended to enhance overall efficiency and make markets more competitive." *Id.* at 294, 296. Although "a concerted refusal to deal need not necessarily possess all of these traits to merit *per se* treatment," *id.* at 295, each of those elements are easily satisfied here.

First, it cannot be seriously disputed that World Aquatics is a monopolist. *See* Section I(B)(2)(a) below. Second, the boycott has unquestionably cut off Enhanced's access to elite swimmers and other professionals, a supply to which Enhanced must have access to compete against World Aquatics. Adams Decl. ¶¶ 35-38; Hawke Decl. ¶¶ 46-47. Finally, Defendants' putative justifications for the boycott are entirely pretextual, and the By-Law was clearly intended to cripple or eliminate a competitor. Hawke Decl. ¶ 47; Kaplan Decl. ¶ 26.

Notably, with a very similar record before it,[6] the Ninth Circuit held in *International Swimming League* that the evidence warranted a trial on whether World Aquatics and its members engaged in a *per se* violation of Section 1. *Fédération Internationale de Natation*, No. 23-15156 at 2024 U.S. App. LEXIS 23559 at *4 (reversing summary judgment for World Aquatics and denial of class certification motion of athletes' class). The evidence here is of equal or greater weight: Enhanced is likely to succeed in showing that By-Law 10 is a *per se* violation of Section 1.

### c. World Aquatics' Group Boycott Violates Section 1 Under Quick Look or Rule of Reason Analysis

Even if the Court finds that the group boycott is not subject to the *per se* rule, Enhanced is likely to succeed in showing it is illegal under the quick look or rule of reason analyses. To meet its burden under the rule of reason, a plaintiff must demonstrate either that the concerted conduct at issue had (i) an "actual adverse effect on competition as a whole in the relevant market"; or (ii) that the defendant and its co-conspirators had "sufficient market power to cause an adverse effect on competition," "plus some other ground for believing that the challenged behavior could harm competition in the market." *US Airways Inc. v. Sabre Holdings Corp.,* 2017 U.S. Dist. LEXIS 40932, *10 (S.D.N.Y. Mar. 21, 2017), *rev'd on other grounds*, 938 F.3d 43 (2d Cir. 2019).

Those elements are easily satisfied here where the harm to competition from a monopolist is amply demonstrated by the evidence filed herewith. *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents*, 468 U.S. 85, 107 (1984) (reduction of price or output is "not consistent

---

[6] In response to ISL attempting to organize swimming competitions in direct competition with World Aquatics, World Aquatics threatened to sanction any of its member federations who cooperated with ISL and then threatened to ban from its own competitions anyone who swam in a planned ISL event. *Fédération Internationale de Natation*, No. 23-15156 at 2024 U.S. App. LEXIS 23559 at *5-6.

with [the] fundamental goal of antitrust law").  Moreover, as demonstrated above, World

Aquatics can proffer no colorable procompetitive justification that could outweigh the obvious

competitive harm resulting from its conduct.

Since World Aquatics' illegal boycott of Enhanced does not pass muster under the rule of

reason, it likewise fails under the quick look test.  *See Clarett v. NFL*, 306 F. Supp. 2d 379, 408

(S.D.N.Y.), *rev'd on other grounds*, 369 F.3d 124 (2d Cir. 2004) (applying quick-look analysis

to strike down NFL's age-based eligibility restrictions).

### 2. World Aquatics' Section 2 Violations

To establish a Section 2 violation, a plaintiff must show "(1) the possession of monopoly

[or monopsony] power in the relevant market; and (2) the willful acquisition or maintenance of

that power as distinguished from growth or development as a consequence of a superior product,

business acumen, or historic accident. "  *U.S. v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966).

Monopoly power "is the power to control prices or exclude competition."  *U.S. v. E.I. duPont de*

*Nemours & Co.*, 351 U.S. 377, 391 (1956).  A firm that dominates a purchasing market possesses

monopsony power.  *Weyerhaeuser Co. v. Ross–Simmons Hardwood Lumber Co.*, 549 U.S. 312,

320–22 (2007) ("a monopsony is to the buy side of the market what a monopoly is to the sell

side" and "similar legal standards should apply").

### a. World Aquatics Possesses Monopoly and Monopsony Power in the Relevant Markets

In its own words, World Aquatics "is the sole and *exclusive world governing body for all*

*Aquatics*."[7]  Because no other organization controls access to the Olympics and other

international elite aquatics events, there are no substitutes for World Aquatics-sanctioned or

---

[7] *World Aquatics – The Global Home of Aquatic Sports*, https://www.worldaquatics.com/about (emphasis in original).

sponsored events for elite-level swimmers. World Aquatics therefore holds a monopoly in the market for the organization, promotion and hosting of international elite swimming events. And because it is the sole "purchaser" of the services of elite swimmers for international elite swimming events, including the events that constitute the pathway to the Olympics, World Aquatics also holds a monopsony in the relevant labor market.

World Aquatics' monopsony and monopoly power is reflected in the fact that, from regional events to the Olympics, it and its members organize and control every event, access to those events, the rules for those events, and virtually every other aspect of organized, elite aquatics. Hawke Decl. ¶ 9. This power includes the ability to foreclose swimmers from World Aquatics-sanctioned events and, by conditioning Olympic eligibility on compliance with its restrictive By-Laws, World Aquatics can dictate the terms under which athletes contract their services. *Id*. Athletes are thereby economically compelled to forgo opportunities with rivals like Enhanced, even where such alternatives offer greater financial or competitive benefits. Rosner Decl. ¶ 79. This power has been recognized as exclusionary and harmful to competition, output and swimmers. Indeed, the Ninth Circuit recognized that World Aquatics' ban targeting ISL could be found to give rise to such harm: "A rational trier of fact could conclude that [World Aquatics' ban] reduced output in the market for swimming competitions by suppressing the number of competitions in 2018, and that it lowered prices in the market for swimmers' services by reducing the total pool of prize money and appearance fees." *Shields v. World Aquatics*, Nos. 23-15092, 23-15156, 2024 U.S. App. LEXIS 23559, at *6 (9th Cir. Sep. 17, 2024)).

### b. World Aquatics Is Unlawfully Maintaining Its Monopoly and Monopsony by Willfully Excluding Competition

A "monopolist may not, of course, use its market power, whether obtained lawfully or not, to prevent or impede competition in the relevant market." *United States Football League v.*

*National Football League*, 842 F.2d 1335, 1360-61 (2d Cir. 1988).  *See also Lorain Journal Co. v. United States,* 342 U.S. 143 (1951) (newspaper's policy not to accept advertisements from establishments that advertised with new competitor violated Section 2); *Wash. State Bowling Proprietors Ass'n v. Pac. Lanes, Inc.*, 356 F.2d 371, 374-77 (9th Cir. 1966) (affirming antitrust judgment against bowling alley proprietors that blacklisted bowlers who bowled in competitors' establishments); *In re Dental Supplies Antitrust Litig.,* 2016 U.S. Dist. LEXIS 133410 (E.D.N.Y. Sep. 26, 2016) (dominant supplier of artificial teeth violated Section 2 by prohibiting distributors from carrying competing products).

By-Law 10 creates for swimmers "precisely the dilemma the Sherman Act is designed to prevent," wherein "the dominant firm[] force[s] [its] suppliers or customers to choose between assisting the dominant firm[] in injuring [its] competitors or working exclusively with those competitors, knowing that because of the dominant firm['s] market power very few suppliers or customers will be able to rely exclusively on the competitors."  *PLS.com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 836 (9th Cir. 2022).  In fact, without access to swimmers who wish to preserve the opportunity to compete in World Aquatics events, Enhanced is substantially foreclosed from competing in the monopsony market World Aquatics controls, and will be relegated to, at best, serving as a niche, marginalized competitor in the market for elite international swimming competitions.

Adoption of the By-Law to shield World Aquatics' monopoly and monopsony from competition is plainly unlawful.  Indeed, World Aquatics scheme to deprive Enhanced of the swimmers and other professionals it needs to compete is borrowed from the same playbook it used against ISL where, according to the Ninth Circuit, "a rational trier of fact could conclude that [World Aquatics' ban] had no purpose other than to disadvantage [World Aquatics']

competitors," and "cut off ISL's access to top tier professional swimmers, an input necessary for ISL to compete."[8]

Because World Aquatics has maintained its monopsony and monopoly power through unlawful exclusionary conduct, including organizing a group boycott to destroy a rival, Enhanced is likely to succeed on the merits of its Section 2 claims.

### 3. Defendants' Purported Justifications for Their Conduct Are Patently Pretextual and Irrelevant

World Aquatics' effort to disguise its predatory conspiracy as a noble effort to protect the sport fails because the Supreme Court "has regularly refused . . . requests from litigants seeking special dispensation from the Sherman Act on the ground that their restraints of trade serve uniquely important social objectives beyond enhancing competition.... 'The social justifications proffered for respondents' restraint of trade . . . do not make it any less unlawful.'" *NCAA v. Alston*, 594 U.S. 69 at 94-95 (2021) (quoting *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 424 (1990)).

In any event, as demonstrated above, those efforts are plainly pretextual. Defendants' well-publicized failures to put their own house in order and to cover up the resulting scandals wholly undermine their credibility (as even USADA has pointed out). Enhanced, after all, is not the one facing a criminal investigation by DOJ for fraudulently concealing its cover-up of PES use in its games.

The pretextual nature of World Aquatics' justification for the boycott is also demonstrated by the fact that athletes caught doping in their events – even multiple times – almost never receive more than a suspension of a few years by World Aquatics and WADA.

---

[8] *International Swimming League Ltd. v. World Aquatics*, No. 23-1516, D.C. No. 3:18-cv-07394-JSC, 2024 U.S. App. LEXIS 23559 at *4-6 (9th Cir. Sept. 17, 2024).

Kaplan Dec. ¶ 28-29.  Yet, By-Law 10 threatens to ban *for life non-enhanced athletes,* coaches, timekeepers and others just for associating with Enhanced.  Courts routinely reject similarly hypocritical justifications.  *See, e.g.*, *U.S. v. Visa U.S.A., Inc.*, 344 F.3d 229, 243 (2d Cir. 2003) (defendants' purported justification for exclusionary rules was pretextual where they did not enforce such rules overseas); *U.S. v. Dentsply Int'l, Inc.*, 399 F.3d 181, 196–97 (3d Cir. 2005) (conduct inconsistent with purported justifications for exclusionary policies is pretextual).

Finally, By-Law 10's gross overbreadth also belies World Aquatics' true predatory intent.  Just because "*some* restraints are necessary to create or maintain a league sport does not mean *all* aspects of elaborate interleague cooperation are."  *NCAA*, 594 U.S. at 90.  Any purported "procompetitive benefits" of By-Law 10 can be achieved through "substantially less restrictive restraints;" and there can be no doubt that absent anticompetitive rules like By-Law 10, World Aquatics' competitions would still "go on."  *Id.* at 91, 100.  By-Law 10 isn't about protecting sports from doping; it's about protecting World Aquatics from competition.

### 4.  Enhanced Has Suffered Antitrust Injury

Antitrust injury is an element of a rule of reason antitrust claim.  To prove antitrust injury, a plaintiff must satisfy two elements: (1) the injury is of the type the antitrust laws were intended to prevent, and (2) the injury flows from that which makes the defendant's conduct unlawful.  *Brunswick*, 429 U.S. at 489.  That inquiry is simple here, because both the harm to competition and the injuries to Enhanced flow directly from the exclusion of Enhanced from the market.  "When a monopolist's actions are designed to prevent one or more new or potential competitors from gaining a foothold in the market by exclusionary, *i.e.* predatory, conduct, its success in that goal is not only injurious to the potential competitor but also to competition in general."  *LePage's Inc. v. 3M*, 324 F.3d 141, 159 (3d Cir. 2003).  *See also Blue Shield of Virginia v. Mcready,* 457 U.S. 465 (1982) (conspiracy between health plan and psychiatric

society to restrain competition by foreclosing psychologists from obtaining reimbursement gave rise to antitrust injury); *Ross v. Bank of America*, 524 F.3d 217, 224-25 (2d Cir. 2008) (reductions in "consumer choice" are cognizable antitrust injuries).

C.    **The Balance of Hardships Weighs Decidedly in Favor of Enhanced**

As demonstrated above, Defendants' continued enforcement of the boycott would be severely injurious to Enhanced. Defendants, on the other hand, can proffer no evidence of genuine (or even theoretical) harm that would occur if ordered to end their illegal scheme. Clearly, any relationship between the Enhanced Games and World Aquatics' purported aim of protecting its own games and elite aquatics *writ large* is extraordinarily tenuous, at best, and Defendants cannot adequately explain why they cannot sufficiently control the use of PESs in their games through their pre-existing rules and without also deploying a patently illegal boycott of an independent, rival organizer of elite swimming events.[9]

Moreover, Defendants' putative goal of protecting "the credibility of the global aquatics community," is belied by their pattern of shameful management of PES use. Surely Enhanced's total transparency regarding its own PES program, and its administration of PESs to some of its athletes under safe, carefully controlled, medically supervised conditions, will not damage the credibility of Defendants' separate, unaffiliated, and obviously distinct competitions.

In fact, Enhanced Games requires its enhanced athletes to first "retire" from WADA testing and World Aquatics events, and to not return to World Aquatics swimming until they are "in full compliance" with the WADA Code. Adams Decl. ¶ 14. In practice, this is *exactly* how

---

[9] Notably, WADA has taken it upon itself to urge its partners to test athletes participating in the Enhanced Games. *See* WADA May 22, 2025 Press Release, https://www.wada-ama.org/en/news/wada-condemns-enhanced-games-dangerous-and-irresponsible. ("WADA will encourage Anti-Doping Organizations to test involved athletes before, during and after this event, in order to protect the integrity of legitimate sport. WADA will also work closely with its Athlete Council to ensure that athletes are fully informed of the risks.").

Defendants routinely allow athletes to return to sport after testing positive for banned substances. Credibility of sports is harmed by duplicity; not by transparency and the open exploration of new avenues of sports medicine and achievement.

The only material impact of an injunction on Defendants will be to deprive them of the ability to control how *their competitor* manages its events, how some athletes choose to compete and reach their peak potential, how some coaches, doctors and others choose to apply their skills and training to earn a living, and what kind of aquatic competitions the public will be able to enjoy: *rights that they do not have under the antitrust laws*. Under these circumstances, the balance of interests clearly favors Enhanced. *FuboTV Inc. v. Walt Disney Co.*, 745 F. Supp. 3d 109 (S.D.N.Y. 2024) (balance of equities favors plaintiff where it would face imminent subscriber loss, likely followed by bankruptcy, delisting, and the collapse of its business while defendant would suffer only suffer a mere delay in the launch of their joint venture); *Willis v. Herriott*, 550 F. Supp. 3d 68 (S.D.N.Y. 2021) (balance of equities favors the plaintiff where injunction would not cause great hardship for the defendant but plaintiff faces the prospect of losing business to a major competitor).

### D. The Public Interest Favors Immediate Injunctive Relief Against Defendants

Once a plaintiff has shown a likelihood of success on the merits to establish a violation of the Sherman Act, the public interest requirement is necessarily satisfied. Clayton Act Section 16 was enacted "not merely to provide private relief . . . but to serve as well the *high purpose* of enforcing the antitrust laws." *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 130–31 (1969) (emphasis added); *see also trueEX, LLC v. MarkitSERV Ltd.*, 266 F. Supp. 3d 705, 726 (S.D.N.Y. 2017) ("The public has an interest 'in enforcement of the antitrust laws and in the preservation of competition.' Granting a preliminary injunction in this case would serve those interests because it would preserve competition....") (quoting *Columbia Pictures*, 507 F.

Supp. 3d 705); *United States v. Columbia Pictures Indus., Inc.,* 507 F. Supp. 412, 434 (S.D.N.Y. 1980*)* ("Any doubt concerning the necessity of the safeguarding of the public interest should be resolved by the granting of a preliminary injunction.").  Moreover, actions by a monopolist to foreclose competition are contrary to the public's interest.  *Eastman Kodak Vo. v. Image Technical Services, Inc.,* 504 U.S. 451 (1992) (denial of repair parts to competitor ISO was predatory and violated Section 2); *Aspen Highland Skiing Corp. v. Aspen Skiing Corp.,* 472 U.S. 585 (1985) (denial of access to ski slopes by competitors' customers violated Section 2).

Furthermore, the athletes (enhanced and non-enhanced), coaches, physicians, physiotherapists, and others victimized by Defendants' boycott of Enhanced are also relevant to the public interest.  No athlete should have to forego their Olympic dreams in order to choose to earn a living wage (and possibly much more) or pursue their peak performance goals by participating in the Enhanced Games.

Finally, issuance of the injunction will preserve for the public the potential benefits that Enhanced expects will flow from its research and work with others in the scientific and medical communities, all of which will hopefully advance enhancements in innovation and medical research.

Under these circumstances, the public interest weighs heavily in favor of Plaintiff.

## II.    NO BOND IS NECESSARY UNDER RULE 65

Rule 65 of the Federal Rules of Civil Procedure requires an applicant for a temporary restraining order or preliminary injunction to give "security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  FRCP 65.  However, "Rule 65(c) gives the district court wide discretion to set the amount of a bond, and even to dispense with the bond requirement 'where there has been no proof of likelihood of harm.'"  *Doctor's Assocs. v. Distajo*, 107 F.3d 126, 136 (2d Cir.

1997) (*quoting Doctor's Assocs. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996)). As the violations here are blatant and egregious, and there is no likelihood of harm to Defendants should the Court enjoin them from enforcing their illegal boycott, the Court should not require Enhanced to post a security bond.

## CONCLUSION

For the foregoing reasons, Enhanced respectfully requests that its Motion be granted in its entirety, and a preliminary injunction be entered to prohibit World Aquatics and USA Swimming from enforcing the By-Law pending adjudication of the merits of this action, along with such other and further relief as the Court deems just, fair and equitable.

Dated: New York, New York
      September 2, 2025

**REED SMITH LLP**

*Edw. 1 B. Schwartz*
_____
Edward B. Schwartz, Esq.
1301 K Street, N.W.
Suite 1000, East Tower
Washington, DC 20005-3317
Tel. +1 (202) 414-9200
Fax: +1 (202) 414-9299
eschwartz@reedsmith.com

Ian Turetsky, Esq.
Pamela Schoenberg, Esq.
599 Lexington Ave., 22nd Floor
New York, NY 10022
Tel. +1 (212) 521-5400
Fax: +1 (212) 521-5450
ituretsky@reedsmith.com
pschoenberg@reedsmith.com

Christopher R. Brennan, Esq.
(pro hac vice forthcoming)
Nicole Kaplan, Esq.
(admitted pro hac vice)
225 Fifth Avenue
Pittsburgh, PA, 15222
Tel. +1 (412) 288-3131

Fax: +1 (412) 288-3063
cbrennan@reedsmith.com
nkaplan@reedsmith.com

*Attorneys for Plaintiff Enhanced US LLC*

## WORD COUNT CERTIFICATION

Pursuant to S.D.N.Y. Local Rule 7.1(c) and the Court's Order, dated August 29, 2025 [Dkt. # 15], I hereby certify that the foregoing Memorandum of Law was prepared on a computer using Microsoft Word. The total number of words in the foregoing Memorandum of Law, inclusive of point headings and exclusive of the caption, title, table of contents, table of authorities, signature block, and certificate of compliance, is 10,604 words.

Dated: New York, New York
      September 2, 2025

By: _/s/ Edward B. Schwartz_