UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
ENHANCED US LLC,                                        :
                                                        :
                          Plaintiff,                    :
                                                        :
                                                        :        25-CV-7096 (JMF)
                -v-                                      :
                                                        :        OPINION AND ORDER
WORLD AQUATICS, et al.,                                 :
                                                        :
                          Defendants.                   :
                                                        :
------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      Plaintiff Enhanced US LLC ("Enhanced") seeks, in its own words, to "disrupt the

athletics industry" by hosting and promoting competition between "'non-enhanced' athletes,"

meaning athletes who do not take performance enhancing substances ("PESs") that are

prohibited in most elite international athletic competitions, and "'enhanced' athletes," who

choose to use PESs.  ECF No. 1 ("Compl."), ¶ 9.  Its efforts at disruption have, to put it mildly,

not been well received in the established world of international athletics competition.  Most

relevant for purposes of this case, in response to Enhanced's efforts, World Aquatics (the

principal international governing body for aquatic sports formerly known as Fédération

Internationale de Natation), promulgated a By-Law — By-Law 10 — that renders any person

who supports, endorses, or otherwise participates in sporting events that embrace certain

"scientific enhancements" ineligible to participate in World Aquatics events or competitions in

any capacity.  *See* ECF No. 1-1, Ex. A ("By-Law 10").

      In this lawsuit, Enhanced challenges By-Law 10 and other purported efforts to prevent it

from disrupting the athletics industry.  Specifically, Enhanced sues World Aquatics; USA

Swimming, Inc. ("USA Swimming"), the principal governing body for aquatics competitions in

the United States and a member of World Aquatics; and the World Anti-Doping Agency ("WADA"), a body that promulgates rules and policies regarding doping that are intended to apply across all sports at all levels of competition around the world. Enhanced brings claims for violations of American antitrust law — namely, Sections One and Two of the Sherman Act — and tortious interference with prospective business relations. Now pending are (1) Enhanced's motion, pursuant to Rule 65 of the Federal Rules of Civil Procedure, to enjoin Defendants from enforcing By-Law 10 and otherwise making threats against people who associate with Enhanced, *see* ECF No. 16; *see also* ECF No. 17 ("Pl.'s Mem.") at 1; (2) Defendant WADA's motion, pursuant to Rule 12(b)(2), to dismiss for lack of personal jurisdiction, *see* ECF No. 55; *see also* ECF No. 56 ("WADA Mem.") at 1; and (3) Defendants' motion, pursuant to Rule 12(b)(6), to dismiss for failure to state a claim, *see* ECF No. 58; *see also* ECF No. 59 ("Defs.' Mem.") at 1-2. For the reasons that follow, the Court concludes that it may exercise personal jurisdiction over WADA but that Enhanced's claims fall short as a matter of law, principally because By-Law 10, on its face, does not bind USA Swimming or any other entity. Accordingly, WADA's motion to dismiss for lack of personal jurisdiction is DENIED, and Defendants' motion to dismiss for failure to state a claim is GRANTED (albeit with leave to amend). Enhanced's motion for a preliminary injunction is therefore DENIED as moot.

## BACKGROUND

Unless otherwise noted, the following facts are taken from the Complaint and assumed to be true for purposes of these motions. *See, e.g.*, *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009).

The three Defendants in this case play important, longstanding roles in the world of aquatic sports. World Aquatics (formerly known as the Fédération Internationale de Natation) is

a non-governmental nonprofit organization headquartered in Switzerland that governs all aquatic sports, including swimming, diving, and water polo. Compl. ¶¶ 38-39. It holds itself out as "the sole and exclusive world governing body for all aquatics." *Id.* ¶ 3. That governance takes several forms. First, the International Olympics Committee recognizes World Aquatics as the exclusive International Sports Federation for aquatics events, which means that World Aquatics sets the rules governing swimmers' eligibility for the Olympics. *Id.* ¶ 40. Second, World Aquatics itself hosts several elite international swimming competitions, including the World Aquatics Swimming Championships, the World Aquatics World Cup, and the World Aquatics World Championships. *Id.* ¶ 167. Third, World Aquatics recognizes 209 National Member Federations ("NMFs"), which act as national governing bodies for aquatic sports, host competitions of their own, and play an important role in selecting athletes for international competitions, including the Olympics. *Id.* ¶¶ 43, 48-49. Finally, World Aquatics promulgates rules that govern athletes' physical and medical requirements, including a set of Doping Control Rules that define what qualifies as "doping," sets testing and investigation procedures, and lays out the penalties and sanctions athletes may incur for doping violations. *Id.* ¶¶ 88, 91, 97.

USA Swimming is the World Aquatics-recognized NMF for the United States. *Id.* ¶ 47. It has responsibility for the conduct and administration of amateur swimming in the United States and selects which American swimmers will compete in the Olympics and other international competitions. *Id.* ¶¶ 48-49. USA Swimming has adopted and enforces an "independent set of rules" for its member athletes, but it recognizes World Aquatics's exclusive authority to govern international aquatics and is forbidden by World Aquatics from promulgating rules that conflict with World Aquatics's own rules. *Id.* ¶¶ 92-93.

WADA is a private, nonprofit foundation headquartered in Canada that develops

international rules and policies regarding doping, known as the World Anti-Doping Code, that are intended to apply across all sports at all levels of competition. *Id.* ¶¶ 51, 95. Formal adoption and enforcement of the World Anti-Doping Code, however, is delegated to individual sports federations. Indeed, WADA itself has no enforcement mechanism and cannot take any action against individual athletes. *Id.* ¶ 96. World Aquatics has opted to adopt WADA's rules, and its Doping Control Rules mirror WADA's World Anti-Doping Code. *Id.* ¶¶ 91, 95.

Enhanced "seeks to disrupt," *id.* ¶ 9, the ecosystem of international swimming that Defendants inhabit — which, it says, is "held captive by a small number of notoriously corrupt . . . organizations . . . who for decades have faced virtually no competition." *Id.* ¶ 70. It plans to offer competitions and programs in swimming and other sports that are open to athletes who take performance-enhancing substances that are prohibited by World Aquatics, USA Swimming, and WADA's World Anti-Doping Code. *Id.* ¶ 32. It refers to these athletes as "enhanced." *E.g.*, *id.* ¶ 9. Backed by private investors, it plans to handsomely compensate swimmers who participate, offering $500,000 prize purses for each swimming event and bonuses of up to $1 million for swimmers who break world records. *Id.* ¶ 85. Enhanced's events are also open to "non-enhanced" swimmers (*i.e.*, those who follow World Aquatics's Doping Control Rules). *Id.* ¶ 9. Indeed, competition between enhanced and non-enhanced athletes is "a critical element" of Enhanced's events and "is intended and expected to generate substantial media and fan interest." *Id.* ¶ 76. Defendants, who pride themselves on their adherence to "clean sport," *id.* ¶ 100, have vigorously criticized Enhanced. For example, World Aquatics's Chief Executive Brent Nowicki described Enhanced as "a farce" and a "joke" and stated that those who "partake in [Enhanced's] activity . . . shouldn't be involved in any sport ever again." *Id.* ¶ 134.

On May 21, 2025, Enhanced publicly announced a plan to hold the inaugural Enhanced

4

Games in Las Vegas in May 2026, *id.* ¶ 113, including events in swimming, track, and weightlifting. *Id.* ¶ 74. The response from Defendants was swift. The next day, WADA issued a public statement condemning the Enhanced Games "as a dangerous and irresponsible concept," and invited its "clean sport partners . . . to join us in condemning this event." *Id.* ¶ 114. WADA President Witold Bańka told reporters that WADA "will urge the U.S. authorities to find legal ways to block" the Enhanced Games and that Enhanced "must be stopped." *Id.* ¶ 140. One day later, USA Swimming issued its own statement to American athletes, coaches, and support staff "express[ing] its serious concerns regarding the Enhanced Games." *Id.* ¶ 119 (cleaned up). It warned those considering participation in the Enhanced Games "in any capacity, whether as a coach, athlete, official, or other support personnel," to "carefully consider the serious impact an anti-doping violation . . . could have on your livelihood, future career, and reputation within the sport and the Olympic Movement." *Id.* ¶ 120. And on May 27, 2025, USA Swimming initiated an investigation into Enhanced's Head Swim Coach, Brett Hawke, for potential rule violations due to his affiliation with the Enhanced Games. *Id.* ¶ 123.

More significant for present purposes, on June 3, 2025, World Aquatics promulgated a new rule — By-Law 10 — that targets competitions like the Enhanced Games. By-Law 10 renders "Relevant Person[s]" ineligible (1) to "participate (in any capacity) in a World Aquatics event or competition"; (2) "to be employed or engaged by World Aquatics"; (3) "to be elected or appointed to any World Aquatics committee or other body"; and (4) "to participate in any other activity organized by World Aquatics." By-Law 10 § 10.4.[1] It defines a "Relevant Person" as

---

[1]    In ruling on Defendants' motion to dismiss, the Court may consider the text of By-Law 10 because "the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991)); *see* Fed. R. Civ. P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes.").

anyone who:

(1) "actively supported or endorsed";

(2) "participated (in any capacity) in"; or

(3) "supported (e.g., as a coach, trainer, manager, training partner, doctor or physiotherapist) any other person in their preparation for and/or participation in"

"a sporting event or competition that embraces scientific enhancements that include the use of Prohibited Substances" as defined by the Doping Control Rules. *Id.* In other words, any person who endorses or otherwise affiliates with the Enhanced Games in any way is prohibited from participating in any World Aquatics event or competition in any capacity. World Aquatics has the sole right to "decide on the application of this By-Law in each particular case." *Id.* § 10.5. By-Law 10 expressly reserves to NMFs the choice "to apply a similar policy for national competitions and events under their jurisdiction." *Id.* § 10.6. Shortly after World Aquatics promulgation of By-Law 10, WADA issued a public statement praising it and warning "athletes and support personnel . . . that if they were to take part in events which actively promote doping," such as the Enhanced Games, "they would risk committing anti-doping rule violations under the [World Anti-Doping Code]." Compl. ¶¶ 137, 139.

Enhanced alleges that By-Law 10 has harmed its ability to recruit personnel, especially the non-enhanced swimmers, that are necessary for its inaugural Games. According to Enhanced, "numerous elite swimmers with whom Enhanced had been in discussions to sign on to the Enhanced Games have now refused to participate, expressly citing World Aquatics' By-law . . . and their concerns about the impact on their future Olympic and championship aspirations due to Defendants' threats of ineligibility." *Id.* ¶ 144. Similarly, "[s]everal coaches and trainers . . . declined to participate in the Games," citing By-Law 10 as a reason for their refusal. *Id.* ¶ 147. And "timekeepers, consultants and operational staff," whose roles are critical

to putting on swimming events, have also "declined to participate out of fear that it would harm their standing and ability to work with World Aquatics and USA Swimming in the future." *Id.* ¶ 148. As a result, Enhanced is unable to meet its goals of recruiting between "20-30 elite swimmers," *id.* ¶ 75, for the Enhanced Games, putting in doubt the viability of the enterprise. *See id.* ¶ 164.

On August 27, 2025, Enhanced filed this action against Defendants and, as noted, now moves for preliminary injunctive relief. Specifically, it seeks an injunction prohibiting Defendants from "enforcing World Aquatics By-Law 10" and "making threats of penalties, retaliatory action and/or deeming ineligible" anyone based on their association with Enhanced. ECF No. 16, at 1-2. It also seeks to prevent Defendants from "making any false, misleading, or unsubstantiated claims about Enhanced" and the athletes or other personnel who participate in its competitions. *Id.* at 2. Defendants oppose Enhanced's motion and, as noted, cross-move for dismissal for failure to state a claim and (with respect to WADA) lack of personal jurisdiction. *See* ECF Nos. 55, 58. Enhanced served WADA with requests for limited jurisdictional discovery but, after WADA objected to several of the requests, the Court substantially denied Enhanced's motion to compel responses. *See* ECF No. 52.

## DISCUSSION

The Court will begin with Defendants' motions to dismiss because, absent a viable claim, Enhanced's motion for preliminary injunction would be moot. As noted, WADA moves, pursuant to Rule 12(b)(2), to dismiss for lack of personal jurisdiction, *see* ECF No. 55, and all three Defendants move, pursuant to Rule 12(b)(6), to dismiss for failure to state a claim, *see* ECF No. 58. The Court will address the motions in that order. *See, e.g.*, *Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 11 (2025) ("We have long held that a court must have power over the parties

before it (personal jurisdiction) before it can resolve a case." (cleaned up)); *Dfinity Found. v. N. Y. Times Co.*, 702 F. Supp. 3d 167, 177 n.54 (S.D.N.Y. 2023) ("As a general matter, personal jurisdiction is 'a threshold question to be addressed prior to consideration of the merits of a claim.'" (quoting *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 498 n.6 (2d Cir. 2013)), *aff'd*, No. 23-7838-CV, 2024 WL 3565762 (2d Cir. July 29, 2024).

## A. Personal Jurisdiction

When responding to a Rule 12(b)(2) motion, a "plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) (per curiam) (internal quotation marks omitted). Where, as here, there has been no discovery, a plaintiff need only make a *prima facie* showing that personal jurisdiction exists. *See, e.g.*, *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84-85 (2d Cir. 2013) (per curiam). Such a showing "entails making legally sufficient allegations, including an averment of facts that, if credited, would suffice" to establish that jurisdiction exists. *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 35 (2d Cir. 2010) (cleaned up). In evaluating personal jurisdiction, a court must construe "all allegations . . . in the light most favorable to the plaintiff." *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001).

To make a *prima facie* showing of personal jurisdiction, a plaintiff must demonstrate: (1) procedurally proper service of process, (2) "a statutory basis for personal jurisdiction that renders such service of process effective" and (3) that "the exercise of personal jurisdiction . . . comport[s] with constitutional due process principles." *In Re LIBOR-Based Fin. Instruments Antitrust Litig.*, 22 F.4th 103, 121 (2d Cir. 2021) (internal quotation marks omitted). Here, WADA does not dispute that service upon it was proper. Instead, it argues there is no statutory basis for personal jurisdiction and that, even if there were, the exercise of personal jurisdiction

does not comport with due process. *See* ECF No. 81 ("WADA Reply"), at 1. In response, Enhanced proffers several alternative bases for personal jurisdiction over WADA, including Rule 4(k) of the Federal Rules of Civil Procedure. *See* ECF No. 73 ("Pl.'s 12(b)(2) Mem."), at 1-2. In the alternative, Enhanced renews its request for jurisdictional discovery. *See id.* at 2-3.

It is a close call, but the Court concludes that personal jurisdiction over WADA is proper under Rule 4(k)(2) and, thus, does not reach Enhanced's other arguments. Rule 4(k)(2) "which is commonly known as the federal long-arm statute, permits federal courts to exercise personal jurisdiction over a defendant that lacks contacts with any single state if the complaint alleges federal claims and the defendant maintains sufficient contacts with the United States as a whole." *Havlish v. Royal Dutch Shell PLC*, No. 13-CV-7074 (GBD), 2014 WL 4828654, at *4 (S.D.N.Y. Sept. 24, 2014) (quoting *Getz v. Boeing Co.*, 654 F.3d 852, 858 (9th Cir. 2011)). Rule 4(k)(2) establishes personal jurisdiction "where (1) the claim arises under federal law, (2) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction, and (3) exercising jurisdiction is consistent with the United States Constitution and laws." *Id.* (internal quotation marks and footnote omitted).

Here, the first two prongs of Rule 4(k)(2) are plainly satisfied. First, this case is brought under the Sherman Act and, thus, "'arises under federal law' for the purposes of Rule 4(k)(2)." *Porina v. Marward Shipping Co. Ltd.*, 521 F.3d 122, 127 (2d Cir. 2008).[2] Second, "[b]y arguing that it has no presence in the United States and did not engage in transactions in New York sufficiently related to the instant dispute to constitute 'transacting business' jurisdiction,"

---

[2]    The fact that Enhanced brings one claim under state law does not affect the analysis. If the Court may exercise personal jurisdiction over WADA with respect to Enhanced's claims under federal law, it may exercise jurisdiction over it as to the state-law claim too because that claim and the federal claims "derive from a common nucleus of operative fact." *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1056 (2d Cir. 1993).

WADA "has in fact established the [second] necessary predicate for personal jurisdiction pursuant to Fed. R. Civ. P. 4(k)(2)." *Peterson v. Islamic Republic of Iran*, No. 10-CV-4518 (KBF), 2013 WL 1155576, at *17 (S.D.N.Y. Mar. 13, 2013); *see also* WADA Reply at 7-10. The dispositive question, then, is whether the exercise of personal jurisdiction over WADA under Rule 4(k)(2) is consistent with the due process requirements of the Constitution.

In evaluating whether the exercise of jurisdiction under Rule 4(k)(2) is consistent with due process, courts have traditionally applied nearly the same test as they do when personal jurisdiction is based on state long-arm statutes. Specifically, to determine whether "[d]ue process permits a court to exercise personal jurisdiction over a non-resident," a court must "ask whether the defendant has sufficient minimum contacts with the forum to justify the court's exercise of personal jurisdiction . . . and consider whether the assertion of personal jurisdiction is reasonable under the circumstances of the particular case." *Porina*, 521 F.3d at 127 (internal quotation marks omitted). That calls for an inquiry into "the quality and nature of the defendant's contacts with the forum . . . under a totality of the circumstances test," and into whether "the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013). Notably, however, the operative question for purposes of Rule 4(k)(2) is whether the defendant "has sufficient affiliating contacts with the United States in general, rather than with New York in particular." *Porina*, 521 F.3d at 127.[3]

---

[3]    Although neither party addresses the issue, some courts have questioned whether this analytical framework survives the Supreme Court's recent decision in *Fuld*, which held that minimum contacts analysis does not apply to the "subset of federal cases . . . in which personal jurisdiction is 'authorized by a federal statute,'" 606 U.S. at 11 (quoting Fed. R. Civ. P. 4(k)(1)(C)), and suggested that a more "flexible jurisdictional inquiry" may be warranted when, as here, a federal court is asked to exercise personal jurisdiction over a foreign defendant. 606 U.S. at 16; *compare, e.g.*, *Finan v. Lafarge S.A.*, No. 22-CV-7831 (NGG), 2025 WL 2504317, at *16-17 (E.D.N.Y. Aug. 29, 2025) (concluding that, after *Fuld*, Rule 4(k)(2) provides a proper

For a defendant's contacts with the United States to support personal jurisdiction, they "must be the defendant's own choice and not 'random, isolated, or fortuitous.'" *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984)). In other words, they "must show that the defendant deliberately reached out beyond its home." *Id.* (cleaned up). And because due process requires an affiliation between the forum and underlying controversy, the plaintiff's claims "must arise out of or relate to the defendant's contacts with the forum." *Id.* (cleaned up). Here, Enhanced alleges that exercising personal jurisdiction over WADA satisfies the test for at least four reasons: (1) because WADA issues rules and regulations that govern U.S. athletes, Pl.'s 12(b)(2) Mem. 5; (2) because WADA receives funding from the U.S. government and is the subject of U.S. government investigations, *id.* at 16; (3) because WADA made public statements denouncing the Enhanced Games and threatening its potential supporters, with the knowledge that Enhanced is based in the United States and plans to host its event here, *id.* at 15; and (4) because WADA asked U.S. authorities to shut down the Enhanced Games, *id.*

The Court need not dwell long on the first and second reasons because they are irrelevant to the jurisdictional analysis. As to the first, it is well settled that the "unilateral activity of another party or third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum . . . to justify an assertion of jurisdiction."

---

basis for personal jurisdiction in cases concerning "important foreign policy and national security concerns."), *with Cent. Am. Bank for Econ. Integration v. Mossi*, No. 24-CV-2544 (CRC), 2025 WL 2732731, at *8 (D.D.C. Sept. 25, 2025) (noting that, "even though *Fuld* did not squarely involve an application of [Rule 4(k)(2)]," it "theoretically unsettles the D.C. Circuit's minimum contacts-based [Rule 4(k)(2)] standard"). Happily, the Court need not chart the precise boundaries of what a more "flexible jurisdictional inquiry" entails here because any defendant possessing "sufficient minimum contacts with the forum would also satisfy the . . . standards set forth in *Fuld*." *In re Fairfield Sentry Ltd.*, 671 B.R. 404, 418 (Bankr. S.D.N.Y. 2025). Thus, if WADA satisfies the more stringent nationwide contacts test, it necessarily satisfies any more "flexible" inquiry.

*Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984); *see also Walden v. Fiore*, 571 U.S 277, 291 (2014). That principle is fatal to counting WADA's regulatory efforts as minimum contacts because WADA's World Anti-Doping Code does not apply directly to U.S. athletes; instead, it applies only because of the independent decision of USA Swimming to adopt it. *See* Compl. ¶ 96 ("WADA itself has no enforcement mechanism and cannot take any action against individual athletes."). And as to the second, Enhanced's antitrust claims do not "arise out of or relate to" the funding of WADA by the U.S. government or any investigations by the government into WADA's enforcement of its anti-doping rules. *Ford*, 592 U.S. at 359. "The phrase 'relate to' incorporates real limits," *id.* at 362, and Enhanced makes no attempt to draw any connection, causal or otherwise, between the government funding and investigations it alleges and its own claims. *See* Pl.'s 12(b)(2) Mem. 16.

That leaves Enhanced's allegations regarding WADA's public statements and its stated intent to ask U.S. authorities to shut down the Enhanced Games. These allegations are relevant to the jurisdictional analysis because Enhanced claims that those same denunciations and threats are evidence of WADA's participation in a conspiracy to violate U.S. antitrust laws and exclude Enhanced from competition. Accordingly, Enhanced's antitrust claims clearly "arise out of or relate to" these allegations. *Ford,* 592 U.S. at 359. The more difficult question is whether they constitute sufficient affiliating contacts with the United States such that it can be said that WADA "purposefully availed itself of the privilege of doing business in the [United States] and could foresee being haled into court there." *Licci*, 732 F.3d at 170. That is especially so here because none of the alleged statements were made inside the United States.

In cases when "the conduct that forms the basis for the controversy occurs entirely out-of-forum," personal jurisdiction may still be proper over a foreign defendant under the "effects

test" — because the "in-forum effects" of such conduct are harmful to the plaintiff and the defendant "expressly aimed its conduct at the forum." *Id.* at 173. The Supreme Court has held that, when applying the effects test, "the proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Walden*, 571 U.S. at 290. That is because "the plaintiff cannot be the only link between the defendant and the forum." *Id.* at 285. Put differently, it is not enough for personal jurisdiction that a defendant knows a plaintiff has connections to a forum and foresees that the plaintiff will suffer harm there. *See id.* at 289. The defendant must engage in conduct that shows it intended to avail themselves of the benefits of the forum.

Whether WADA's alleged contacts with the United States satisfy that test is a close call, but the Court concludes that they do. Without more, WADA's statements condemning the Enhanced Games and threatening those who choose to affiliate with it would likely be insufficient to justify the exercise of personal jurisdiction. That is because the only connection between those statements and the United States is that the plaintiff — Enhanced — experiences injury from them in the United States because it is headquartered here and plans to host its games here. But the Court must look at "the quality and nature of the defendant's contacts with the forum state under a totality of the circumstances test," *Licci*, 732 F.3d at 170, and the statement of WADA President Bańka to the effect that WADA intended to "urge the U.S. authorities to find legal ways to block" the Enhanced Games based on its view that the Games "must be stopped" is sufficient to justify the exercise of personal jurisdiction over WADA. Compl. ¶ 140. Construing "all allegations . . . in the light most favorable to the plaintiff," it is reasonable to infer from President Bańka's statement that WADA did, in fact, urge U.S. authorities to shut down the Enhanced Games. *See, e.g.*, *Whitaker*, 261 F.3d at 208. In doing so, WADA

"deliberately reached out beyond its home" and purposefully attempted to avail itself of the law enforcement capacity of the United States to achieve its aims. *Ford*, 592 U.S. at 359. And having taken those steps, WADA could reasonably expect to be haled into the courts of the United States to account for that activity. Accordingly, Enhanced alleges sufficient minimum contacts with the United States to justify the exercise of personal jurisdiction over WADA.

WADA's counterarguments fall short. It argues that, as a matter of law, extraterritorial statements cannot justify a court's exercise of personal jurisdiction "if the defendant does nothing in connection with the tort in that jurisdiction." WADA Mem. 3. In support of that proposition, it cites two cases — *Waldman v. Palestine Liberation Organization*, 835 F.3d 317 (2d Cir. 2016), and *Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122 (S.D.N.Y. 2018) — in which a court held that the exercise of personal jurisdiction was improper because the plaintiffs had failed to allege that the defendants' conduct was "expressly aimed at the United States." 835 F.3d at 337; *see also* 343 F. Supp. 3d at 207 ("There are no allegations that the Foreign Defendants expressly aimed their conduct at the forum."). But those cases are distinguishable because, as discussed above, the key allegation Enhanced makes is that WADA explicitly expressed its intent to reach out to U.S. law enforcement to have Enhanced's inaugural games shut down. That conduct was "expressly aimed" at the United States and is connected to Enhanced's claim that WADA is part of a conspiracy to exclude Enhanced from competition.

WADA attempts to minimize the import of that alleged communication with two additional arguments: (1) that Enhanced fails to "establish that its claims arise from" WADA's communications to law enforcement; and (2) that statements directed towards the U.S. government are immunized from antitrust scrutiny under the *Noerr-Pennington* doctrine and

therefore cannot count towards jurisdictional analysis. *See* WADA Mem. 4.[4]  Neither argument

is convincing.  As to the first, WADA misstates the relevant legal standard.  To support personal

jurisdiction, a plaintiff need not articulate "a strict causal relationship" between its claims and the

defendant's forum contacts.  *Ford*, 592 U.S. at 362.  It is enough that the contacts "relate to" the

plaintiff's claims, and a defendant's alleged efforts to enlist U.S. law enforcement in shutting

down a competitor plainly "relate to" a claim that the defendant is seeking to exclude that same

competitor from competition in violation of the antitrust laws.  *Id.*  As to the second argument,

WADA cites no authority for the proposition that activities purportedly immunized from the

antitrust laws cannot count for jurisdictional analysis.[5]  Nor could it because "in determining

jurisdiction a court assumes the validity of plaintiff's merits claims."  *Coleman v. Miller*, 307

U.S. 433, 446 (1939); *see also Aamer v. Obama*, 742 F.3d 1023 (D.C. Cir. 2014).

Given that WADA's contacts with the United States are sufficient to justify the exercise

of personal jurisdiction under Rule 4(k)(2), the only remaining question is "whether the assertion

of personal jurisdiction is reasonable under the circumstances of this case."  *Porina*, 521 F.3d at

127.  In assessing the reasonableness of a court's exercise of specific jurisdiction, courts consider

"(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of

the forum state in adjudicating the case; and (3) the plaintiff's interest in obtaining convenient

and effective relief."  *BMW of N. Am. LLC v. M/V Courage*, 254 F. Supp. 3d 591, 600 (S.D.N.Y.

---

[4]    The *Noerr-Pennington* doctrine derives its name from two antitrust decisions, *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), and *United Mine Workers of America v. Pennington*, 381 U.S. 657 (1965), but has evolved to stand for the more general proposition that "lobbying alone cannot form the basis of liability," *Hamilton v. Accu-tek*, 935 F. Supp. 1307, 1321 (E.D.N.Y. 1996).

[5]    WADA characterizes *Waldman* as standing for this proposition, *see* WADA Mem. 4, but there, the Second Circuit rejected minimum contacts based on the defendants' "lobbying activities" because they were "not connected to the wrongs for which the plaintiffs" in that case sought redress — not because they were somehow immunized by statute.  835 F.3d at 342.

2017) (cleaned up).  Notably, a defendant must present "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id.* (internal quotation marks omitted).  Here, each factor weighs in favor of exercising personal jurisdiction over WADA.  First, although WADA is a foreign entity, the "mere fact that a defendant is foreign and would have to travel to [the United States] is insufficient to defeat a finding of reasonableness," *id.*, especially where, as here, the defendant has previously litigated in American courts, *see, e.g.*, *Baranov v. World-Wide Anti-Doping Agency*, No. 155881/2017, 2018 WL 5043893 (N.Y. Sup. Ct. Oct. 16, 2018).  Second, the United States plainly has an interest in adjudicating alleged violations of its antitrust laws that affect U.S. entities such as Enhanced.  And finally, "bringing [WADA] before this court will enable efficient resolution of [Enhanced's] claims in a single proceeding."  *BMW*, 254 F. Supp. at 600.  Thus, the Court finds that the exercise of personal jurisdiction is reasonable and comports with the requirements of due process.

The only countervailing consideration WADA proffers is that subjecting it to the jurisdiction of the federal courts for statements it made outside the United States "cannot be reconciled with . . . the First Amendment" and would subject it to "jurisdiction anywhere in the world where a party promotes doping."  WADA Mem. 6.  But the Supreme Court has expressly rejected "the suggestion that First Amendment concerns enter into the jurisdictional analysis" in the context of a libel action because those concerns are addressed in "the substantive law governing such suits" and considering them at this stage "would needlessly complicate an already imprecise inquiry."  *Calder v. Jones*, 465 U.S. 783, 790 (1984).  WADA provides no reason to think a different rule applies to antitrust cases.  And exercising jurisdiction over an entity based on its statements and actions in enlisting U.S. law enforcement does not risk opening the floodgates to jurisdiction "anywhere in the world."  WADA Mem. 6.  In short,

16

WADA fails to present a compelling case that the exercise of jurisdiction against it is unreasonable.

In sum, although the question is close, the Court concludes that it may exercise personal jurisdiction over WADA pursuant to Rule 4(k)(2).  Accordingly, WADA's motion to dismiss pursuant to Rule 12(b)(2) must be and is DENIED.

## B.  Failure to State a Claim

The Court turns, then, to Defendants' motion to dismiss for failure to state a claim. Enhanced brings three sets of claims: (1) claims under Section One of the Sherman Act; (2) claims under Section Two of the Sherman Act; and (3) a claim, under state law, for tortious interference with prospective business relations.  The Court will address each set in turn.[6]

### 1.  Section One Claims (Counts One and Two)

Section One of the Sherman Act declares illegal "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce."  15 U.S.C. § 1.  Section One prohibits only restraints of trade "effected by a contract, combination, or conspiracy," so a plaintiff must allege that the defendants entered into an agreement or conspiracy — be it "tacit or express"— to state a claim.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 553 (2007).  At the pleading stage, a plaintiff need only allege "enough factual matter (taken as true) to suggest that an agreement was made."  *Id.* at 556.  In other words, a plaintiff must allege facts that "reasonably tend[] to prove that the defendant and others had a conscious commitment to a common scheme designed to

---

[6]    In a footnote, Defendants suggest that Enhanced lacks antitrust standing because it "has failed to plead and cannot prove antitrust injury."  Defs.' Mem. 9 n.3.  The Court will not address an argument raised only in passing in a footnote.  *See, e.g.*, *Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 43 n.2 (S.D.N.Y. 2018) (stating that an argument "relegated" to a footnote "does not suffice to raise [an] issue" and citing cases).  Accordingly, and because antitrust standing, "[d]espite its name, . . . is not jurisdictional in nature," *Bilinski v. Keith Haring Found., Inc.*, 96 F. Supp. 3d 35, 43 n.7 (S.D.N.Y. 2015) (internal quotation marks omitted), the Court assumes without deciding that Enhanced has antitrust standing.

achieve an unlawful objective." *United States v. Apple, Inc.*, 791 F.3d 290, 315 (2d Cir. 2015) (cleaned up). Those facts can constitute either "direct evidence that the defendants entered into an agreement" or indirect evidence in the form of "circumstantial facts supporting the inference that a conspiracy existed." *Id.* (internal quotation marks and emphasis omitted).

More specifically, a horizontal agreement or conspiracy, the sort of pact alleged here, "may be inferred on the basis of conscious parallelism when such interdependent conduct is accompanied by circumstantial evidence and plus factors." *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001). Such "plus factors may include: a common motive to conspire, evidence that shows the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." *Mayor & City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) (cleaned up). That list, however, is "neither exhaustive nor exclusive, but rather illustrative of the type of circumstances which, when combined with parallel behavior, might permit a jury to infer the existence of an agreement." *Id.* at 136 n.6. The ultimate question is whether allegations of parallel conduct are "placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557.

Enhanced brings two counts alleging violations of Section One. Count One alleges that all three Defendants entered a conspiracy, primarily centered around World Aquatics's promulgation of By-Law 10, to exclude Enhanced from competition in the markets for elite international swimming competitions and the services of elite international swimmers by depriving it of access to athletes and other professionals. *See* Compl. ¶¶ 194-209. Count Two alleges that World Aquatics and USA Swimming entered into an agreement to that same end via By-Law 10. *Id.* ¶¶ 210-29. Because a plaintiff "must separately identify how each particular

defendant contributed to the alleged conspiracy," *City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381, 407 n.12 (2d Cir. 2024), the Court will consider separately Enhanced's allegations against WADA and USA Swimming.[7]

### a. WADA

The Court need not dwell long on Enhanced's allegations with respect to WADA. Enhanced does not argue that there is direct evidence of WADA's participation in a conspiracy. Instead, it relies entirely on a host of public statements by WADA condemning the Enhanced Games and encouraging national sports federations, governments, and national anti-doping organizations to work together to reject the Games. *See* ECF No. 74 ("Pl.'s Opp'n"), at 10-11; *see also* Compl. ¶ 114 (quoting WADA stating that it "invites all our clean sports partners, including athletes, to join us in condemning [Enhanced Games].").  With respect to By-Law 10 specifically, the Complaint notes only that WADA issued a public statement praising World Aquatics for promulgating it and warning athletes and support personnel that they might risk committing anti-doping rule violations if they participate in the Enhanced Games. *See* Compl. ¶¶ 137, 139-40.  Because Enhanced acknowledges that WADA "cannot independently ban or otherwise punish athletes that would support Enhanced," Pl.'s Mem. 25, it is doubtful that these statements alone even constitute the kind of "parallel conduct" that could support an inference of conspiracy to boycott Enhanced. *See, e.g.*, *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 453 (9th Cir. 2021) (noting that "[c]ollective action in support of an individual boycott is not the same as a group boycott").  But even they did, Enhanced still fails to state a claim for the more fundamental reason that WADA's statements (both those made before and after the promulgation

---

[7]    The Court need not and does not separately address World Aquatics because, absent a plausible allegation that World Aquatics conspired with one of the other Defendants, Enhanced's conspiracy claims obviously fail as a matter of law.

of By-Law 10) are entirely consistent with its own "independent action." *Twombly*, 550 U.S. at 557. Indeed, Enhanced does not attempt to explain how WADA's statements would be contrary to its "economic self-interest" in perpetuating clean sport and alleges no facts indicating *any* degree of communications between WADA, World Aquatics, or USA Swimming. *Mayor of Baltimore*, 709 F.3d at 136. The public calls by WADA to other organizations to "come together" to condemn Enhanced are far more plausibly explained by WADA's relative powerlessness and inability to take concrete action against athletes than evidence of its entry into a conspiracy with either or both of World Aquatics and USA Swimming. Thus, Count One against WADA must be and is DISMISSED for failure to state a claim.

> **b. USA Swimming**

With respect to USA Swimming, by contrast, Enhanced puts all of its eggs in the direct-evidence basket — despite the fact that Defendants argued in their motion to dismiss that Enhanced fails to plausibly allege either direct *or* circumstantial evidence of USA Swimming's participation in a conspiracy. *Compare* Defs.' Mem. 11-18, *with* Pl.'s Opp'n 5-9. Enhanced is therefore deemed to have abandoned any indirect-evidence theory of conspiracy. *See, e.g.*, *Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, No. 08-CV-442 (TPG) (FM), 2014 WL 4723299, at *7 (S.D.N.Y. Sept. 23, 2014) ("At the motion to dismiss stage . . . , a plaintiff abandons a claim by failing to address the defendant's arguments in support of dismissing that claim."). But in any event, such a theory would fail for much the same reason it failed as to WADA. Enhanced alleges that USA Swimming, like WADA, issued public statements prior to the promulgation of By-Law 10 expressing concerns regarding the Enhanced Games and warning those considering participation in the Enhanced Games to consider the risks to their reputations from doing so. *See* Compl. ¶¶ 119-20. The Complaint also points to USA

Swimming's alleged investigation of Enhanced's Head Swim Coach Brett Hawke as further evidence of a conspiracy. *See id.* ¶ 123. But these allegations, even taken together, suffer from the same defect as those made against WADA — they are entirely consistent with USA Swimming's own "independent action" and motives to ensure "clean sport" in swimming as part of its responsibilities as an NMF. *Twombly*, 550 U.S. at 557. They therefore do not make it plausible that USA Swimming entered into a conspiracy or agreement with World Aquatics to exclude Enhanced.

On the direct-evidence front, Enhanced argues that By-Law 10 is, by itself, evidence of an agreement (*i.e.*, "concerted action") between World Aquatics and NMFs like USA Swimming because "World Aquatics's Constitution expressly requires all members" — including USA Swimming — "to fully comply with its By-Laws." Pl.'s Mem. 24.[8]   In support, Enhanced relies heavily on *Relevent Sports, LLC v. U.S. Soccer Fed'n, Inc.*, 61 F.4th 299 (2d Cir. 2023), and *Shields v. Fédération Internationale de Natation*, 649 F. Supp. 3d 904, 914, 918 (N.D. Cal. 2023), *rev'd on other grounds*, *Shields v. World Aquatics*, No. 23-15092, 2024 WL 4211477 (9th Cir. Sept. 17, 2024). *See* Pl.'s Opp'n 7-9. *Relevent* involved an antitrust challenge to a policy adopted by FIFA that prohibited national soccer leagues from playing games outside their home territory. On appeal, the Second Circuit held that the plaintiff had plausibly alleged the existence of an agreement between FIFA and its U.S. member federation because "the adoption of a binding association rule designed to prevent competition is *direct evidence* of concerted action"

---

[8]    Enhanced also suggests in passing that the approval of By-Law 10 by the World Aquatics Bureau (the primary governing body of World Aquatics) constitutes concerted action with NMFs because some of the people who sit on the Bureau also hold positions within NMFs. *See* Pl.'s Opp'n 9. But the Court may not consider these allegations because they too appear nowhere in the Complaint. *See Munck v. Simons Found.*, No. 23-CV-9188, 2024 WL 4307776, at *5 (S.D.N.Y. Sept. 26, 2024). And, in any event, they would not suffice because the mere overlap of personnel does not plausibly suggest a conspiracy and because Enhance fails to allege that any dual-hatted members of the Bureau voted in favor of By-Law 10.

and that "no further proof [was] necessary." 61 F.4th at 307 (emphasis in original). Applying similar logic, the *Shields* court held that a World Aquatics rule "prohibit[ing] member federations from affiliating with organizations not sanctioned by" World Aquatics constituted concerted action for purposes of the Sherman Act when it was used to exclude the International Swimming League ("ISL"), another nascent competitor to World Aquatics. *See* 649 F. Supp. 3d at 914, 918.

But Enhanced's own allegations and the language of By-Law 10 are fatal to this theory. As Enhanced concedes, *World Aquatics* — not USA Swimming (let alone WADA) — "promulgated" By-Law 10, *see, e.g.*, Compl. ¶ 126), and the By-Law applies, by its terms, *only* to a "*World Aquatics* event or competition," *see* By-Law 10 § 10.4(a) (emphasis added); *see also* Compl. ¶ 14. What's more, the By-Law explicitly states the Member Federations, such as USA Swimming, are *not* mandated to apply the policy embodied therein; instead, "Member Federations *may choose* to apply a similar policy for national competitions and events under their jurisdiction." By-Law 10 § 10.6 (emphasis added); *see also* Compl. ¶ 216 (acknowledging this feature of By-Law 10). And as Enhanced concedes, USA Swimming has chosen *not* to apply By-Law 10 or a similar policy to its own events. *See* Compl. ¶ 119; *see also* Pl.'s Opp'n 5.

These features of By-Law 10 distinguish this case from *Relevent* and *Shields*, in both of which the policies at issue were, by their terms, binding on members. *See Relevent*, 61 F.4th at 307, 310; *Shields*, 649 F. Supp. 3d at 913-14. Indeed, the Second Circuit explicitly distinguished the binding nature of the policy there from "non-binding" policies. *See* 61 F.4th at 310. Perhaps recognizing this problem, Enhanced points instead to other provisions of World Aquatics's Constitution that require NMFs such as USA Swimming to "fully comply at all times" with its By-Laws and condition approval of competitions within their jurisdiction on such compliance.

*Id.* at 5-6.  But By-Law 10 expressly cedes to USA Swimming the choice of whether to apply a similar policy to events "under [its] jurisdiction," so its decision not to do so means it is still in compliance with World Aquatics's By-Laws.  By-Law 10 § 10.6.  In its brief, Enhanced also points to the minutes of a June 18, 2025 meeting of USA Swimming's Rules Committee, which purportedly reflect that, after discussing the Enhanced Games and whether World Aquatics had issued any declarations or rules that USA Swimming needed to consider, the Committee concluded that further action was unnecessary because Article 303.1 of USA Swimming's own Rulebook required compliance with the rules and decisions of World Aquatics.  *See* Pl.'s Opp'n 6-7 (citing ECF No. 79-5, Ex. AM, at 3; ECF No. 79-6, Ex. AN, at 9).  But the Court may not consider these factual allegations because they appear nowhere in the Complaint.  *See Munck v. Simons Found.*, No. 23-CV-9188, 2024 WL 4307776, at *5 (S.D.N.Y. Sept. 26, 2024).  And in any event, they provide no evidence of an agreement to boycott Enhanced given that By-Law 10, even if "binding," explicitly grants to USA Swimming the choice of whether to apply a similar policy to events and competitions in its own jurisdiction.[9]

In sum, Enhanced asks the Court to accept its allegation that USA Swimming is automatically bound by By-Law 10 despite the plain text of the By-Law stating precisely the opposite and Enhanced's own acknowledgment that USA Swimming *has not* adopted such a policy.  But the Court cannot make that inference when Enhanced has not pleaded any factual

---

[9]    For these same reasons, Enhanced's unpleaded allegation that the NMFs of Ireland, Canada, and France have publicly confirmed their intent to apply the substantive portions of By-Law 10 to events and competitions in their jurisdictions, *see* Pl.'s Opp'n 7, does not get Enhanced over the plausibility threshold.  The Court may not consider those materials and even if it could, they do not support Enhanced's claims because they merely evidence those NMFs' choices to consider or promulgate their own rules, as they are permitted to do under By-Law 10.  *See, e.g.*, ECF No. 79-7, Ex. AO, at 2 ("Swim Ireland fully support[s] World Aquatics's . . . new By-Law" and "will now set to review our own rules and regulations.").

basis to make that claim facially plausible. Accordingly, the Court concludes that Enhanced fails

to plead the prerequisite existence of a "conspiracy or agreement" between World Aquatics and

USA Swimming for a Section One Sherman Act claim. Counts One and Two therefore must be

and are DISMISSED against all parties for failure to state a claim.[10]

## 2. Section Two Claims

Section Two of the Sherman Act prohibits "monopolizing], or attempt[ing] to

monopolize . . . any part of the trade or commerce among the several States." 15 U.S.C. § 2. A

claim of monopolization "requires, in addition to the possession of monopoly power in the

relevant market, the willful acquisition or maintenance of that power as distinguished from

growth or development as a consequence of a superior product, business acumen, or historic

accident." *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 133 (2d Cir. 2014) (internal

quotation marks omitted) (quoting *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko,*

*LLP*, 540 U.S. 398, 407 (2004)). "To state an attempted monopolization claim, a plaintiff must

establish '(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a

specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.'"

*PepsiCo., Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam) (quoting

*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)). The two kinds of claims "are

substantially identical, with the exception that attempted monopolization requires a showing of

specific intent to monopolize." *New York v. Actavis, PLC*, No. 14-CV-7473 (RWS), 2014 WL

7015198, at *35 (S.D.N.Y. Dec. 11, 2014), *aff'd sub nom. New York ex rel. Schneiderman v.*

---

[10]    The Court therefore need not address Defendants' argument that USA Swimming is
immunized from the antitrust laws by virtue of the Ted Stevens Olympic and Amateur Sports
Act ("ASA"), 36 U.S.C. §§ 220501 *et seq.*, *see* Defs.' Mem. 18-19, or the parties' back and forth
about whether Enhanced's allegations should be analyzed under the *per se* framework or the rule
of reason framework, *compare* Defs.' Mem. 20-24, *with* Pl.'s Opp'n 13-15.

*Actavis PLC*, 787 F.3d 638 (2d Cir. 2015).

Counts Three through Six of the Complaint allege violations of Section Two. Count Three alleges that all three Defendants entered into a conspiracy to monopolize the markets for elite international swimming competitions and the services of elite international swimmers in those competitions. Compl. ¶¶ 230-40; *see id.* ¶¶ 242-43 (defining the relevant market as the "organization, promotion, and hosting of international elite swimming events," namely those that "feature international competition among elite swimmers, such as international championship meets, Olympic qualifying events, and other competitions that attract the participation of elite swimmers"). Count Four alleges that World Aquatics, through By-Law 10, has monopolized the "product" market for the organization, promotion, and hosting of international elite swimming events. *See id.* ¶¶ 241-52. Count Five alleges that World Aquatics, though By-Law 10, has monopsonized the "labor" market for the services of elite swimmers for international elite swimming events. *Id.* ¶¶ 253-65; *see Weyerhaeuser Co. v. RossSimmons Hardwood Lumber Co.*, 549 U.S. 312, 320-22 (2007) (observing that "a monopsony is to the buy side of the market what a monopoly is to the sell side" and "similar legal standards should apply"). Count Six charges World Aquatics with attempted monopolization and monopsonization of those markets.

Count Three requires little discussion. A plaintiff alleging conspiracy to monopolize must plead "(1) concerted action, (2) overt acts in furtherance of the conspiracy, and (3) specific intent to monopolize." *Volvo N. Am. Corp. v. Men's Int'l Pro. Tennis Council*, 857 F.2d 55, 74 (2d Cir. 1988). As discussed above, Enhanced fails to plausibly allege the existence of "concerted action" between and among Defendants. It follows that Count Three fails at the first step, and it must be and is DISMISSED. *See, e.g., NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 139-40 (1998) (holding that the plaintiff "could [not] succeed on [its Section 2 conspiracy to

monopolize claim] without prevailing on its § 1 claim").  Counts Four through Six, which are aimed solely at World Aquatics, present closer questions.  Defendants argue that the claims fail because Enhanced fails to identify relevant, well-defined markets, Defs.' Mem. 25-29; because Enhanced fails to plead that World Aquatics has monopoly power in the markets it does identify, *id.* at 29-31; and finally, because World Aquatics had legitimate, procompetitive purposes for promulgating By-Law 10, which defeat any antitrust violation, *id.* at 31-33.[11]  The Court need not and does not address the first and third arguments because it agrees with the second — namely, Enhanced fails to plausibly allege that World Aquatics enjoys monopoly (or monopsony) power, a failure that is fatal to all of its Section Two claims.  The Court will address each Count in turn.

### a.  Monopolization (Count Four)

Monopoly power "is the power to control prices or exclude competition."  *U.S. v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 391 (1956).  Like market power, "it may be proven directly by evidence of the control of prices or the exclusion of competition, or it may be inferred from one firm's large percentage share of the relevant market."  *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 98 (2d Cir. 1998); *see also Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 227 (2d Cir. 2006).  It is common for plaintiffs pleading monopolization claims to "rely on indirect proof," such as market share, to prove monopoly power "because direct

---

[11]    The parties appear to disagree over a threshold question — whether a plaintiff must plead a market at all to state a monopolization claim.  *Compare* Pl.'s Opp'n 25, *with* ECF No. 82 ("Defs.' Reply Mem."), at 16.  At least one Second Circuit case suggests "that there is authority to support [the] claim that a relevant market definition is not a necessary component of a monopolization claim."  *PepsiCo, Inc.*, 315 F.3d at 107.  But more recent precedent seems to suggest otherwise.  *See, e.g., Concord Assocs., L.P. V. Enter. Props. Trust*, 817 F.3d 46, 53 (2d Cir. 2016) (noting that "market analysis . . . is essential for assessing the potential harm to competition" for "claims made under Section Two of the Sherman Act because without a definition of that market there is no way to measure the defendant's ability to lessen or destroy competition." (cleaned up)).  The Court need not and does not answer the question.

measures are often difficult or impossible to prove." *Heerwagen*, 435 F.3d at 227.

Here, Enhanced disclaims the need to provide indirect proof of World Aquatics's monopoly power (*e.g.*, through market share estimates). Instead, it relies solely on direct evidence that World Aquatics has excluded competition by "dictating the terms under which" elite, international swimming competitions "are conducted." Pl.'s Opp'n 24 (quoting Compl. ¶ 244). It has done so, Enhanced alleges, through the use of "its rules, sanctioning power, coercive authority, and disciplinary mechanisms," *id.* at 24 (quoting Compl. ¶ 247), to "foreclose Enhanced from recruiting any non-enhanced athletes and support staff." *Id.* at 26. As evidence of that exclusion, Enhanced points to both World Aquatics's current campaign against Enhanced itself and World Aquatics's earlier attempt to prevent NMFs from working with the ISL, which were the subject of the litigation in *Shields*. Enhanced alleges that these campaigns, by their very nature, "reduce[] output of elite international swimming competitions." *Id.* at 26.

That theory is insufficient to support an inference of monopoly power in the relevant market for the same reason that Enhanced's Section One claims failed: It rests on the same false premise that "By-Law 10 must apply to every elite, international swimming competition, including competitions hosted by [NMFs] and 'independent' entities." *Id.* at 25. As discussed above, Enhanced fails to allege that By-Law 10, contrary to its plain language, automatically applies to every elite, international swimming competition. Instead, the only events By-Law 10 conditions access to are those elite, international swimming competitions hosted by World Aquatics, which Enhanced itself concedes do not constitute the entirety of the market. *See id.* at 24 ("Enhanced never alleged that World Aquatics has monopoly power because it 'hosts' a dominant share of elite, international swimming competitions."). For similar reasons, World Aquatics's purported exclusion of the ISL does not help Enhanced's case. As discussed above,

unlike By-Law 10, the purportedly exclusionary rule there did not grant NMFs the discretion to

adopt similar rules and thus expressly applied to *all* elite, international swimming competitions,

not just those hosted by World Aquatics itself.  *See Shields*, 649 F. Supp. 3d at 914, 918.

Accordingly, Count Four must be and is DISMISSED for failure to state a claim.[12]

### b.  Monopsonization (Count Five)

As noted, Count Five alleges that, through By-Law 10, World Aquatics has a monopsony

in the labor "market for the services of elite swimmers for international elite swimming events,"

Compl. ¶ 254, with "elite swimmers" defined as "world-class, top-tier swimmers who have

achieved international recognition in the sport of swimming . . . and whose specialized skills,

training and accomplishments distinguish them from non-elite . . . swimmers . . . and make them

a critical draw for competitive swimming events, sponsors, and fans," *id.* ¶ 183.  Enhanced

alleges that World Aquatics has monopsony power because it "holds a 100[%] share of the labor

---

[12]     That is not to say that there is *no* theory of monopolization that could apply to this case.  The Second Circuit has expressly held open the possibility that a plaintiff may allege monopoly power through direct evidence of a monopolist excluding competition.  *See, e.g.*, *Tops Markets*, 142 F.3d at 98.  At the same time, Plaintiff does not cite, and the Court has not found, a single Second Circuit case in which such direct evidence sufficed to demonstrate monopoly power, *see, e.g.*, *id.* (rejecting proffered direct evidence as "too speculative"); *PepsiCo. Inc.*, 315 F.3d at 108 (noting that the plaintiff had "failed to adduce direct evidence that [defendant] . . . can control prices or exclude competition."), perhaps because, as one antitrust scholar has noted, the criterion "that market power can be proven directly by the exclusion of competition . . . contravenes a line of case holding that exclusionary conduct that does not distort the overall competitiveness of the market is not actionable under the antitrust laws," Daniel A. Crane, *Market Power Without Market Definition*, 90 Notre Dame L. Rev. 31, 64-65 (2014).  Be that as it may, it is possible that, in the context of By-Law 10, World Aquatics's monopoly power stems from the relative importance of the subset of elite, international swimming competitions World Aquatics hosts to athletes and other professionals.  In other words, if World Aquatics's events (and those events alone) are "practically indispensable" to those athletes and professionals, such that By-Law 10 "force[s]" them "to refrain" from working with Enhanced for fear of exclusion from World Aquatics events, that could be strong direct evidence that World Aquatics is able to exclude competition through By-Law 10 even though By-Law 10 does not automatically apply to every elite, international swimming competition.  *Lorain Journal Co. v. United States*, 342 U.S. 143, 149-50 (1951).  But the Court declines to address the merits of a theory that Enhanced itself has declined to advance.

market," *id.* ¶ 191, as "the sole 'purchaser' of the services of elite swimmers for international elite swimming events," Pl.'s Mem. 29. And it alleges that that power is "demonstrated by the conduct of World Aquatics, which has been able to impose sub-competitive compensation for international, elite swimming competitions without losing a meaningful number of elite swimmers to another type of sport or event." Compl. ¶ 186. In other words, Enhanced proffers both indirect and direct evidence of World Aquatics's monopsony power.

Neither suffices. As to the indirect evidence, Enhanced's assertion that World Aquatics is the "sole purchaser" of the services of elite swimmers and holds a "100% share" of that market is fatally undermined by its concession that World Aquatics does not host 100% of the competitions within the relevant market. *See* Pl.'s Opp'n 24-25. That is, it follows that there are other purchasers, like NMFs and independent organizers, of the services of elite swimmers within the relevant market. Nor does Enhanced allege any facts that could support an inference that World Aquatics somehow dictates the compensation paid to elite swimmers in the elite international swimming competitions it does not hold. There is therefore insufficient indirect evidence to make it plausible that World Aquatics has monopsony power in the market.

Turning to the direct evidence, Enhanced does not allege sufficient facts to make it plausible that World Aquatics has been able to impose sub-competitive compensation. "When an antitrust plaintiff advances an antitrust claim based on direct evidence in the form of increased prices, the question is whether it can show an actual anticompetitive change in prices after the restraint was implemented." *1-800 Contacts, Inc. v. Fed. Trade Comm'n*, 1 F.4th 102, 118 (2d Cir. 2021). The same logic applies when a plaintiff advances claims based on direct evidence in the form of decreased wages in a monopsony claim. *See Weyerhaeuser Co.*, 549 U.S. at 320-22. Enhanced's allegations here, however, are impermissibly conclusory. The Complaint

characterizes World Aquatics's compensation for elite swimmers as "sub-competitive," Compl.
¶ 186, and "bare minimum," *id.* ¶ 192, but it fails to allege facts that support those conclusions or
establish an appropriate baseline against which to measure swimmer compensation.  Indeed, the
sole fact in the Complaint that could support its conclusory assertions is that "the 2026 Enhanced
Games will have a potential prize purse of $7.5 million for just a single day of competition,"
whereas World Aquatics events provide "$7.1 million in prize money . . . for an entire year of
competitions." *Id.* ¶ 23.  But it is not clear from the Complaint whether the $7.5 million prize
purse is reserved for swimmers or if it is for all athletes competing in the Enhanced Games.
Moreover, and in any event, the mere fact that Enhanced plans to pay more than World Aquatics
does not necessarily lead to an inference that World Aquatics has, by itself, been able to hold
down compensation for elite swimmers. [13]  That is especially so when there are no facts alleged
about the prize pools of comparable international swimming contests *not* hosted by World
Aquatics or compensation trends over time.

      In short, Enhanced fails to plausibly allege that World Aquatics has monopsony power in
the alleged market.  Count Five is therefore DISMISSED for failure to state a claim.

### c.  Attempted Monopolization/Monopsonization (Count Six)

      Enhanced's final federal claim is Count Six, which alleges attempted
monopoly/monopsony.  As stated above, "[t]o state an attempted monopolization claim, a
plaintiff must establish (1) that the defendant has engaged in predatory or anticompetitive

---

[13]      The reply declaration of Enhanced's economic expert offered in support of its motion for
a preliminary injunction provides facts that could conceivably support this inference — for
example, that the Enhanced Games provides significantly higher prize money per swimming
event ($500,000 versus $65,000) than the World Aquatic Championships organized by World
Aquatics.  *See* ECF No. 76 ("Kahwaty Decl."), ¶ 36.  But the Court may not consider these facts
in connection with Defendants' motion to dismiss because they appear nowhere in the
Complaint.  *See Munck*, 2024 WL 4307776, at *5.

conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving

monopoly power." *PepsiCo., Inc.*, 315 F.3d at 105 (cleaned up).  Attempted monopolization and

monopolization claims "are substantially identical, with the exception that attempted

monopolization requires a showing of specific intent to monopolize."  *Actavis*, 2014 WL

7015198, at *35.  And to show that a defendant has a "dangerous probability of achieving

monopoly power," the plaintiff must show that the defendant has "some degree of market

power," albeit a "lesser degree . . . than necessary to establish a completed monopolization

claim."  *Tops Markets*, 142 F.3d at 100.  Applying these standards, the Court concludes that the

claim fails because, as discussed above, Enhanced fails to sufficiently plead any degree of

monopoly or monopsony power.  Thus, as a matter of law, Enhanced cannot show that World

Aquatics has a dangerous probability of achieving such power.  *See, e.g.*, *Apotex Corp. v.

Hospira Healthcare India Private Ltd.*, No. 18-CV-4903 (JMF), 2020 WL 58247, at *7

(S.D.N.Y. Jan. 6, 2020) (dismissing an attempted monopolization claim because the plaintiff

failed to allege market power).  Count Six is therefore DISMISSED for failure to state a claim.

### 3.  Tortious Interference with Prospective Business Relations (Count Seven)

That leaves only Enhanced's state-law claim for tortious interference with a prospective

business relationship.  To the extent that Enhanced invokes only the Court's federal question

jurisdiction, *see* Compl. ¶ 56, the Court declines to exercise supplemental jurisdiction over that

claim.  Pursuant to 28 U.S.C. § 1367, a district court has discretion over whether to exercise

jurisdiction over state-law claims "that are so related to claims in the action within such original

jurisdiction that they form part of the same case or controversy under Article III of the United

States Constitution."  28 U.S.C. § 1367(a).  The Supreme Court and the Second Circuit have

made clear, however, that, as a general rule, "when the federal claims are dismissed the 'state

31

claims should be dismissed as well.'" *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)).  Here, there is no basis to depart from that general rule.  Given the relatively early state of the case, the traditional "values of judicial economy, convenience, fairness, and comity" that the Court must consider do not counsel in favor of exercising jurisdiction.  *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).  Accordingly, Enhanced's tortious interference claim is DISMISSED as well.  *See* 28 U.S.C. § 1367(c)(3); *see also, e.g.*, *Purgess v. Sharrock*, 33 F.3d 134, 138 (2d Cir. 1994).

That said, to the extent that Enhanced could independently invoke the Court's diversity jurisdiction, *see* Compl. ¶¶ 26, 38, 46, 51 (alleging complete diversity); *id.* Prayer for Relief (seeking "no less than $200,000,000" in damages), the tortious interference claim, as alleged, fails as a matter of law.  To state a claim for tortious interference with prospective business relations under New York law, a plaintiff must plausibly allege "(1) a business relationship between the plaintiff and a third party; (2) the defendant, knowing of that relationship, intentionally interferes with it; (3) the defendant acts with the sole purpose of harming the plaintiff, or, failing that level of malice, uses dishonest, unfair, or improper means; and (4) the relationship is injured." *Goldhirsh Grp. v. Alpert*, 107 F.3d 105, 108-09 (2d Cir. 1997).  To satisfy the first element, it is not enough to conclusorily allege interference with unspecified business relationships; instead, "the weight of authority . . . requires a plaintiff to identify the potential customers at issue." *Lesesne v. Brimecome*, 918 F. Supp. 2d 221, 227 (S.D.N.Y. 2013) (Nathan, J.) (citing cases).  Enhanced fails to do so, referring to the third parties at issue generically as "elite swimmers," Compl. ¶ 144, "coaches and trainers," *id.* ¶ 147, and "other support personnel," *id.* ¶ 148.  That is not enough.  *See Lesesne*, 918 F. Supp. 2d at 227-28

(dismissing claims that referred only to "patients" and other "unspecified third parties").[14]

## CONCLUSION

For the reasons stated above, WADA's motion to dismiss for lack of personal jurisdiction is DENIED, and Defendants' motion to dismiss the Complaint for failure to state a claim is GRANTED.  Enhanced's motion for a preliminary injunction is thus DENIED as moot.

The only remaining question is whether Enhanced should be granted leave to amend its Complaint.  Because leave to amend a complaint should be freely given "when justice so requires," Fed. R. Civ. P. 15(a)(2), and because Enhanced purports to be in possession of facts that could cure at least some of the defects discussed above, *see* Pl.'s Opp'n 28 n.38 (stating a willingness to amend the tortious interference claim to identify the third parties at issue), the Court grants Enhanced leave to file an amended complaint to address the defects in its claims discussed above.  Enhanced shall file any amended complaint within **thirty days of the date of this Opinion and Order**.  If Enhanced fails to file an amended complaint by that deadline, the Court will enter judgment in Defendants' favor consistent with this Opinion and Order.  In light of the foregoing, the initial pretrial conference scheduled for November 25, 2025, is ADJOURNED *sine die*, as is the parties' deadline to file their preconference materials.

The Clerk of Court is directed to terminate ECF Nos. 16, 55, and 58.

SO ORDERED.

Dated: November 17, 2025
      New York, New York

_____
JESSE M. FURMAN
United States District Judge

---

[14]     Enhanced represents that it "did not specifically name" the third parties "out of concern" that "those aligned with Defendants" would take "retaliatory actions."  Pl.'s Opp'n 28 n.38.  But the "proper solution" for such a concern is to seek leave to file the Complaint in redacted form. *Taft v. Agric. Bank of China Ltd.*, 156 F. Supp. 3d 407, 421 n.16 (S.D.N.Y. 2016).